**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| JOHN NORTHRUP, Individually and on behalf of a Class of Similarly Situated Individuals | § § § | |
| Plaintiff, | § § | Civil Action No. 8:17-cv-01890-CEH-JSS |
| v. | § § | DISPOSITIVE MOTION |
| Innovative Health Insurance Partners, LLC, CyberX Group, LLC, David E. Lindsey; and Independent Truckers Group, Inc.; | § § § § | |
| Defendants. | § § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW BASED ON THE**
**ABSENCE OF AN AUTOMATIC TELEPHONE DIALING SYSTEM**

Pursuant to M.D. Fla. Local Rule 3.01, Federal Rule of Civil Procedure 56(c) and other applicable authority, Defendants move for summary judgment and respectfully show as follows:

## I.
## SUMMARY

The text messages at issue in this case were sent via a system that required substantial human intervention, thereby falling outside the definition of an automatic telephone dialing system ("ATDS") and invalidating any liability under the TCPA. The Court denied Defendants' prior motion to allow for Plaintiff to conduct discovery, which has been done. The deposition testimony shows that under, whether the Court chooses Plaintiff or Defendants' post-*ACA* definition of an ATDS, Defendants prevail: (1) nine separate human actions were required to send the texts; (2) no predictive dialer or functions were used; and (3) the systems at issue do not have the present capacity to generate random or sequential numbers and dial them.

## II.
## STATEMENT OF MATERIAL UNDISPUTED FACTS

1.      Plaintiff's claims are wholly based on text messages sent by Defendant CyberX Group, LLC ("CyberX") on June 30, 2017 described by paragraphs 32-33 of the Second Amended Complaint [Dkt. 38].

2.      Christopher Pearson is a co-founder of CyberX and was the President and only employee of CyberX on June 30, 2017.  (Ex. A, ¶ 1.)

3.      On June 30, 2017, Pearson manually uploaded a list of customer lead data contained in an Excel spreadsheet to 212CRM. (*Id.* at ¶ 3.)

4.      The spreadsheet had been bought from FleetSeek and obtained via download from FleetSeek's servers. (*Id.* at ¶ 3.) A true and correct copy of a portion of the spreadsheet is attached hereto as **Exhibit A-1**.

5.      Upon uploading the spreadsheet, Pearson manually reviewed the lead data for errors.

6.      Pearson then "mapped" the columns of lead data to the 212CRM system, specifically including connecting 212CRM to the telephone number fields in the spreadsheet and enabling him to choose the order in which the numbers appeared, which would then be the order in which the numbers were dialed for the text messages. (Ex. A, ¶ 4.)

7.      After mapping the lead data to 212CRM, Pearson then navigated to the SMS Broadcast Manager page of 212CRM, where Pearson manually entered in: (1) the lead data to be used to send a text message campaign; (2) the order in which the text messages should be sent to each number in the lead data; and (3) the content of each text message. (*Id.* at ¶ 5.) A true and correct copy of a screenshot of the 212CRM SMS Broadcaster is attached hereto as **Exhibit A-2 (**CyberX Depo Ex. 7).

8.     Pearson then chose to set the system to start sending the text messages immediately (as opposed to a scheduled start time in the future) at an interval of one message per minute, an interval Pearson had manually set in the 212CRM. (Ex. A, ¶ 6.) *See also* Ex. A-2 (212CRM screenshot).

9.     Pearson then initiated or "dialed" the lead data numbers by pointing and clicking on the "SEND" button in 212CRM. (Ex. A, ¶ 6.) *See also* Ex. A-2 (212CRM screenshot).

10.    The 212CRM system then communicated the dialing/delivery instructions to Twilio, whereupon over the next few hours Twilio delivered the messages to the appropriate phone carriers exactly as instructed by Pearson's commands in 212CRM. Twilio sent only the requested message content, to the requested recipient numbers, in the requested order, at the requested time, and at the requested interval. (Ex. A, ¶ 7.)

11.    This is clearly summed up in Pearson's deposition testimony as the corporate representative for CyberX: "**Q. In this case, did CyberX navigate to a website, log into the CRM platform, determine the content of the text messages at issue, type the content of the message into the platform, determine whether to send the messages immediately or at a different time and then click 'send' to initiate the campaign? A. Yes.**" **Exhibit A-3**, CyberX Depo. Trans., 96:15-21.

12.    Each and every text message sent by the Twilio requires a separate instruction from 212CRM comprising (1) the Twilio number from which the message should originate; (2) the body of the message; (3) the telephone number to which the user wants that text message sent; (4) when the text message should be sent. (Ex. A, ¶ 7.)  The text messages were sent by 212CRM to Twilio with Pearson's instructions to be separated executed, one-by-one. (*Id*. ¶ 8.)

13.     Subsequently, Twilio completed the message delivery and generated a report setting out the messaging data and responses. (*Id*. ¶ 8.) A true and correct copy of a portion of the data report from Twilio is attached hereto as **Exhibit A-4** (CyberX Depo. Ex. 14, CXG000032).

14.     The 212CRM system did not generate the phone numbers for any of the text messages dispatched on June 30, 2017. (Ex. A, ¶ 10.)

15.     Twilio did not generate the phone numbers for any of the text messages dispatched on June 30, 2017. (*Id*. ¶ 10.)

16.     The numbers to which the messages were sent by CyberX on June 30, 2017 were solely from the FleetSeek list, as arranged and reviewed by Pearson. (*Id*. ¶ 10.)

17.     The 212CRM system cannot generate telephone numbers, nor could its users modify it to generate telephone numbers. (*Id*. ¶ 10.)

18.     Twilio cannot generate telephone numbers, nor could its users modify the Twilio to generate telephone numbers. (*Id*. ¶ 10.)

19.     CyberX agreed to the Twilio's Terms of Service as a condition of using the Twilio Platform. (*Id*. ¶ 13.) Twilio's Terms of Service prohibit reverse engineering of the Twilio Platform. (Ex. B, Lin Decl., Ex. 1 § 6(e).)

## III.
## LEGAL STANDARD

A summary judgment motion is intended "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Federal Rule of Civil Procedure 56(a) provides that a court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, not every factual dispute defeats summary judgment; the requirement is that "there be no genuine issue of *material fact*."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A "material" fact is one that "might affect the outcome of the suit under the governing law." *Id*. at 248.

## IV.
## ARGUMENTS AND AUTHORITIES

Plaintiff's TCPA causes of action require showing that the alleged texts were sent using an ATDS. Because the texts were not sent using an ATDS as that term is defined since *ACA*, Plaintiff's claims fail as a matter of law.

**A.      *ACA* controls the definition of ATDS.**

That *ACA* controls the definition of ATDS is a well-settled question by federal courts in Florida and around the count. Simply put: *ACA* is a D.C. Circuit decision on consolidated challenges from multiple circuits, which makes it binding on all circuits. *See, e.g.*, *Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F.Supp.3d 1262, 1270-72 (S.D. Fla. 2018) (holding "the *ACA* decision is binding on this Court"); *Reyes v. BCA Fin. Servs.*, 312 F. Supp. 3d 1308, 1314 (S.D. Fla. 2018) ("To be sure, the Court does not challenge the notion that *ACA International* is binding authority[….]").

*ACA* "set aside the Commission's explanation of which devices qualify as an ATDS" as arbitrary and capricious. *ACA*, 885 F.3d at 695. An action for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*., ("TCPA") require that the defendant have sent a text message using an "automatic telephone dialing system" or "ATDS." An ATDS is defined as "equipment which has the capacity— (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). As explained in *ACA*: "That definition naturally raises two questions: (i) when does a device have the 'capacity' to perform the two enumerated functions [in § 227(a)(1)(A) and (B)]; and (ii) what precisely are those functions?" *Id.*

For the first question, *ACA* instructs that a device has the "capacity" to do something only if it has the present ability without additional effort (beyond, e.g., flipping a switch), and that the Commission's broader definition was "utterly unreasonable." *Id*. at 699. The question of present capacity turns on "considerations such as how much is required to enable the device to function as an autodialer: does it require the simple flipping of a switch, or does it require essentially a top-to-bottom reconstruction of the equipment?" *Id*. at 696. *ACA* rejected the Commission's "expansive interpretation of capacity" because that would have "the apparent effect of embracing any and all smartphones." *Id*. at 696. "Since *ACA*, the courts have interpreted the statutory definition of an autodialer in accordance with the FCC's prior rules, that is, that a system is an autodialer if it has the present capacity to function as such." *Ramos*, 334 F. Supp.3d at 1272 ("Latent or potential capacity to function as an autodialer does not satisfy the statute.").[1]

For the second question, a device must both generate random or sequential numbers and dial them, which excludes dialing from a pre-existing list. As *ACA* explains, "[a]nytime phone numbers are dialed from a set list, the database of numbers must be called in some order—either in a random or some other sequence." *ACA*, 885 F.3d at 702. Consequently, "'dialing random or sequential numbers' *cannot simply mean dialing from a set list of numbers* in random or other sequential order: if that were so, there would be no difference between 'dialing random or sequential numbers' and 'dialing a set list of numbers.'" *Id*. (emphasis added). This interpretation is reinforced by *ACA*'s reasoning that "[t]he TCPA cannot reasonably be read to render every smartphone an ATDS subject to the Act's restrictions." *ACA*, 885 F.3d at 697. *ACA* even cites this exact hypothetical of sending group messages as one of the "anomalous outcomes … bottomed in an unreasonable, and impermissible, interpretation" of the TCPA:

---

[1] *See also Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018) (holding that plaintiff must provide evidence "to show that the Email SMS Service had the present capacity to function as an autodialer.").

> Imagine, for instance, that a person wishes to send an invitation for a social gathering to a person she recently met for the first time… *And if she sends a group message inviting ten people to the gathering*, again without securing prior express consent from any of the recipients, she not only would have infringed the TCPA ten distinct times but would also face a minimum damages recovery against her of $5,000.

*Id.* (emphasis added). Under the plain meaning of the statutory language and *ACA*'s guidance, a device with the capacity to text a list of numbers does not qualify as an ATDS without generating the numbers randomly or sequentially and also dialing them.

This Court accurately summarized the conflicting interpretations of *ACA*, both in this District as well as throughout the country in its previous Order. [Dkt. 80 at 7-9.] The heart of this issue is whether an "ATDS is a device with the current capacity to generate and call random or sequential numbers" (as Defendants propose) or instead "the key factor in determining whether a device is an ATDS is the amount of human intervention required" (as Plaintiff proposes). [*Id.*]

Defendants respectfully submit that their interpretation is the more well-reasoned one, supported by more courts throughout the country as all three Federal Circuit Courts to consider the issue have found that the "current capacity" question controls. *See, e.g.*, *King v. Time Warner Cable, Inc.*, 894 F.3d 473 (2d Cir. 2018) (concluding that the test is whether a device "current has features that enable it to perform the functions of an autodialer"); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018) (granting summary judgment to defendant where no evidence that the "Email SMS Service had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers"); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1050 (9th Cir. 2018) (holding that after *ACA* "only the statutory definition of ATDS as set forth by Congress in 1991 remains.").

However, as shown below Defendants prevail under either definition.

**B.      The systems used by CyberX are not ATDS as a matter of law under either post-*ACA* definition of ATDS.**

Extensive human intervention by CyberX in sending the text messages makes the systems fall outside the definition of an ATDS under applicable Eleventh Circuit precedent. Additionally, Defendants unquestionably sent the messages to a list that was *not* generated by any software, and the systems used here do not have the capacity to generate random or sequential numbers. As discussed in more detail below, these undisputed record facts establish that Defendants are entitled to judgment as a matter of law.

**1.      The numerous human intervention steps by CyberX are dispositive**

Post-*ACA*, cases in both the Middle and Southern Districts of Florida agree that "the defining characteristic of an ATDS is 'the capacity to dial numbers without human intervention.'" *Ramos*, 334 F.Supp.3d at 1272; *see also Gaza v. Auto Glass America, LLC*, 2018 U.S. Dist. LEXIS 188207 (M.D. Fla. Nov. 2, 2018) ("The essential function of an ATDS is 'the capacity to dial numbers without human intervention.'").

Based on the key analysis of human intervention, four recent text message software cases show why Defendants are entitled to summary judgment: *Gaza*; *Ramos*; *Jenkins*; and *Herrick*. In ***Gaza v. Auto Glass America, LLC***, 2018 U.S. Dist. LEXIS 188207 (M.D. Fla. Nov. 2, 2018), the plaintiff alleged he received text messages from a software texting platform called "Textedly" as utilized by Defendant Auto Glass. This Court held that "[t]he essential function of an ATDS is 'the capacity to dial numbers without human intervention.'" *Id.* at *4.[2] This Court then looked to the following key facts showing human intervention in the use of the systems at issue there:

> One characteristic of an ATDS is that the equipment itself "dial[s] ... numbers at random, in sequential order, or from a database of numbers." 47 U.S.C. § 227(a)(1) (emphasis added). The undisputed record evidence shows that

---

[2] Quoting *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rec. 14014, 14091-93 ¶¶ 131-134 (2003 FCC Ruling)

> Defendant's representative **creates** and **uploads** a list to an online 'platform' from which customer names and phone numbers are **selected**, text messages **drafted**, a date and time of delivery is **selected**, and the 'send' button is **pressed**, all requiring human intervention.

*Id.* at 2018 U.S. Dist. LEXIS 188207 *7-8 (emphasis supplied on the human steps). On those facts, this Court found that no material issues remained on the ATDS question and granted summary judgment for defendant.

This Court's prior MSJ order also cited another text message ATDS case in which summary judgment was granted to the defendant. In ***Ramos v. Hopele of Fort Lauderdale, LLC***, 334 F.Supp.3d 1262, 1267 (S.D. Fla. 2018), jewelry store Hopele collected customer numbers and stored them in their sale system, which then used a web-based software platform called "EZ-Texting" to deliver the text messages to the numbers. Hopele's managing member "designed and implemented Hopele's text marketing campaigns." *Id.* The software used could not send a text without a person physically **inputting** numbers, **drafting** a message, **selecting** recipients, **choosing** a date and time to send the message, and **manually** hitting a 'send' button." *Id.* at 1275 (emphasis supplied on the human steps).[3] On those facts, the court granted summary judgment because "the EZ-Texting system could not send the text messages at issue without a significant amount of human involvement." *Id.* at 1276.

*Ramos* relied on the analysis of two other software texting cases in reaching its conclusion: *Jenkins* and *Herrick*. In ***Jenkins v. mGage, LLC***, 2016 U.S. Dist. LEXIS 106769, at *2-5 (N.D. Ga. Aug. 12, 2016), a night club (Opera) utilized the software platform of a marketing company (mGage) to send text messages to customers. *Jenkins*' facts are nearly identical to that of *Ramos* (as well as the present matter) as to multiple human intervention steps justifying summary judgment—an employee had to:

---

[3] *Ramos* specifically rejected any requirement that human intervention must occur "at the exact moment that a text is sent," instead taking a wholistic view of the entire process of creating and sending the message. *See id.* at 1273-75.

(i) **navigate** to a website; (ii) **log** into the Platform; (iii) **determine** the content of the text message; (iv) **type** the content of the text message into the Platform; (v) **determine** whether to send the text message immediately or to schedule a later date to send the message; (v) either **click** 'send' to send the message immediately, or take an action to select a later date and time to send the message by using a drop-down calendar function. Opera also determine the telephone numbers to which text messages were sent by an employee **choosing** a particular list of numbers and **uploading** the list to mGage's Platform as a CSV file.

*Id.* at *5-6 (emphasis on separate human steps added). The *Jenkins* court agreed this was sufficient direct human intervention to place the software system outside the definition of an ATDS, and it granted summary judgment for Defendant. Id. at *19-20.

In **Herrick v. GoDaddy.com LLC**, 312 F.Supp.3d 792, 793-94 (D. Ariz. 2018), GoDaddy utilized 3Seventy's software platform to store numbers and send text messages to GoDaddy's customers. The Court found human intervention was involved in sending the texts:

First, an employee of GoDaddy provided 3Seventy with a list of customer phone numbers via its FTP site, which 3Seventy then **uploaded** to the Platform. The employee then **navigated** to the website, **logged** onto 3Seventy's Platform, and **selected** the customer numbers it wished to send the text message. The employee then **drafted** the message and **selected** a time and date to send the message. Finally, the employee **entered** a "captcha" - a device designed to ensure that a human, not a robot, was authorizing the desired message. Only after the employee entered the captcha was the 3Seventy Platform able to send the message.

*Id.* at 802 (record citations omitted; emphasis on separate human steps added). Based on those seven human acts, the *GoDaddy* court granted summary judgment to Defendant based on the finding that the "level of human agency involved in transmitting the text amounts to essential human intervention that precludes defining the 3Seventy Platform as an ATDS." *Id.* at 803 (quotations omitted).

In this case, *Gaza*, *Ramos*, *Jenkins* and *Herrick* all support the grant of summary judgment for Defendants in this case. The extensive human intervention is undisputed, particularly after the deposition of CyberX's President, Christopher Pearson, who actually sent the messages at issue and testified based on his personal use of 212CRM and Twilio:

| CyberX's Human Steps in Sending the Text Messages at Issue | Supporting Evidence in the Record | Authority Confirming Steps Excludes CyberX's Systems From ATDS Definition |
|---|---|---|
| **(1)** Pearson navigated to the CyberX 212CRM website and logged in; | Ex. A, ¶ 3<br>Ex. A-3, 96:4-21 | *Jenkins*<br>*Herrick* |
| **(2)** Pearson uploaded the raw data of customer leads from the FleetSeek spreadsheet; | Ex. A, ¶ 3<br>Ex. A-3: 22:2-15, 23:1-10, 96:4-21 | *Gaza*<br>*Ramos*<br>*Jenkins*<br>*Herrick* |
| **(3)** Pearson manually curated the numbers on the original list in 212CRM by aligning the data categories, checking for errors, and sorting them, thereby selecting the order for texting; | Ex. A, ¶ 4<br>Ex. A-3: 22:2-15, 24:18-25:22, 97:23-98:6 | *Gaza*<br>*Jenkins* |
| **(4)** Pearson navigated to the SMS Broadcast Manager page in 212CRM; | Ex. A, ¶ 5<br>Ex. A-2 (screenshot)<br>Ex. A-3: 31:20-33:8, 43:10-21, 96:4-21 | *Herrick* |
| **(5)** On the SMS Broadcast Manager, Pearson selected the set of phone numbers to which the texts would be sent; | Ex. A, ¶ 5<br>Ex. A-2 (screenshot)<br>Ex. A-3: 31:20-33:8, 96:4-21 | *Gaza*<br>*Ramos*<br>*Herrick* |
| **(6)** On the Manager, Pearson determined the content of the text message and typed the content of the text message into 212CRM; | Ex. A, ¶ 5<br>Ex. A-2 (screenshot)<br>Ex. A-3: 26:13-27:9,31:20-33:8, 96:4-21 | *Gaza*<br>*Ramos*<br>*Jenkins*<br>*Herrick* |
| **(7)** On the Manager, Pearson determined whether to send the text message immediately or later; | Ex. A, ¶ 5<br>Ex. A-2 (screenshot)<br>Ex. A-3: 62:4-63:11, 96:4-21 | *Gaza*<br>*Ramos*<br>*Jenkins*<br>*Herrick* |
| **(8)** Pearson determined the interval of sending each text message individually (one minute between each); and | Ex. A, ¶ 6<br>Ex. A-3: 51:1-21 (212CRM sends instructions to Twilio, and Twilio goes through the records one by one to send texts), 96:4-21 | *Gaza*<br>*Ramos*<br>*Jenkins*<br>*Herrick* |
| **(9)** On the Manager, Pearson pointed and clicked on the "Send" button to immediately begin the campaign utilizing the chosen content, recipients, timing, and interval by delivering those instructions to Twilio as the delivery platform.[4] | Ex. A, ¶¶ 6-7<br>Ex. A-2 (screenshot)<br>Ex. A-3, 94:15-19 (clicking send = dialing)<br>Ex. A-3, 95:6-10 (Twilio followed Pearson's instructions) | *Gaza*<br>*Ramos*<br>*Jenkins*<br>*Herrick* |

---

[4] Pearson went on to testify that, after clicking the "send" button, 212CRM sends the delivery instructions to Twilio, and Twilio individually executes those instructions for each separate recipient, line-by-line, at the instructed one-minute interval (as opposed to in a single, contemporaneous batch). *See, e.g.*, Ex. A-3: 48:17-49:25 (212CRM instructs Twilio on how to send the messages per Pearson's instructions), 50:14-25 (instructions on timing), 51:1-21 (212CRM sends instructions to Twilio, and Twilio goes through the records one by one to send texts), 95:6-10 (Twilio followed Pearson's instructions)

These various steps show more than enough human intervention to satisfy the analysis in *Gaza*, *Ramos*, *Jenkins*, and *Herrick*. And the undisputed record evidence confirms that the text messages could not have been sent without Mr. Pearson's extensive human intervention. Ex. A-3, 97:23-98:2 ("Q. And without uploading the FleetSeek list into the CRM system, and then aligning the columns to map the data to the CRM system, could the text messages at issue have been sent? A. No.").

Unequivocally, the systems used by CyberX are not an ATDS due to the extensive, required human intervention to cause the systems to send the text messages at issue. *Gaza*, *Ramos*, *Jenkins*, and *Herrick* all support a grant of summary judgment in Defendants' favor.[5]

### 2. Defendants did not use a predictive dialer.

The systems used by Defendants to send the texts at issue do not qualify as a predictive dialer, which would otherwise bring the systems under the definition of an ATDS. "[I]n 2003, the FCC issued an order finding, among other things, 'that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress.' *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14,014, 14,093 (2003). The 2003 FCC order defined a predictive dialer as 'an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone

---

[5] ***Glasser v. Hilton Grand Vacations Co.***, 341 F. Supp. 3d 1305 (M.D. Fla. 2018) supports summary judgment despite being a "call dialing" case as opposed to a text message case. In that case, a sales agent used a "business software automation tool" that enabled him to point-and-click to make calls from numbers stored in the tool. The Court granted summary judgment on the basis of no ATDS. First, the Court held that human intervention of dialing by point-and-click is sufficient even without manual dialing of each number because, under *ACA*, "it matters not that the computer actually dial the number forwarded to it by the clicking agent…the focus is on the agent's human intervention in initiating the calling process." *Id.* at 1312 ("since it is undisputed that calls cannot be made unless an agent clicks on the screen and forwards a telephone number to the server to be called, Defendant's 'point-to-click' system does not constitute an autodialer system under the TCPA"). Like in *Glasser*, CyberX did not physically dial each number but rather engaged in the "point-and-click" manual action by Pearson to send the text messages from 212CRM through Twilio's system. And neither 212CRM or Twilio used any predictive algorithm or function in sending the texts—rather, each was sent in the exact order, method, and timing that Pearson manually instructed them to be done.

and a telemarketer will be available to take the call.' *Id.* at 14143 n. 31." *Reyes v. BCA Fin. Servs.*, 312 F. Supp. 3d 1308, 1314 (S.D. Fla. 2018).

The lack of any predictive algorithm or function for predictive dialing supports a finding that an ATDS was not utilized. *See, e.g., Glasser*, 341 F. Supp. 3d at 1331; *Ramos*, 334 F.Supp.3d at 1275 (distinguishing texting software that decides itself when to dial or text, versus one in which the user decides; the latter is not a predictive dialer and not an ATDS). Unlike in *Glassner* and *Ramos*, the court in *Reyes* easily concluded the software used was an ATDS the parties agreed that software was an used was a "Noble predictive dialer" that "automatically dials telephone numbers without human intervention." *Reyes*, 312 F. Supp. 3d at 1320.

In this case, Plaintiff's pleadings admit that Defendants texted a set list of numbers from a spreadsheet of lead data, not numbers produced by a random or sequential number generator.[6] *See also* Ex. A-3, 46:7-47:15 (Pearson testimony that the numbers texted came from the FleetSeek list). Furthermore, the undisputed testimony of CyberX is that Pearson decided all aspects of the message campaign—including what to send, when to send it, intervals for sending, and to whom it would be sent—while none of the decisions were made by 212CRM or Twilio. Ex. A-3, 97:7-22.[7] Given the utter lack of any facts to support predictive software or features, this Court should find that the systems used were not an ATDS predictive dialer.

### 3. The systems do not have the present capacity to generate and text random or sequential numbers.

---

[6] Plaintiff's TCPA claim is premised on the allegation that "Defendants were able to effectively send thousands of text messages simultaneously to **lists** of thousands of wireless phone numbers of consumers without human intervention." (Dkt. 38, 2d Am. Compl. ¶ 73 (emphasis supplied).) Likewise, Plaintiff's motion for class certification alleged that "Defendants obtained a **database** of truck drivers' mobile phone numbers and engaged in a text message advertising campaign trying to sell their services to the truck drivers in the database." (Dkt. 54 at 1 (emphasis supplied).)

[7] "Q. Does the software itself make a determination, as opposed to the human user, as to what to send, when to send it, to whom it would be sent, or how to send a text message? A. No. Q. Did you yourself decide what message to send in these campaigns? A. The message was provided to me, and I entered it, yes. Q. Did the machine decide what message to send? A. No. Q. Did you or the machine decide when the messages should be sent? A. I did."

Under the *Marks/Dominguez/King* definition of ATDS espoused by Defendants, Defendants are entitled to summary judgment because the systems used by CyberX did not have the present capacity to do so and both substantive practical and legal barriers exist the systems having that capacity.As opposed to some hypothetical ability to act as an ATDS, *ACA* holds that a system has the "capacity" to generate and dial random or sequential numbers only if it can do so with only trivial actions ("touching a button" or "flipping of a switch") and excludes actions such as adding software or modifying code. *See ACA*, 885 F.3d at 898.

In *Herrick*, the court held that the texting software was not an ATDS because it had two barriers to generating and dialing random or sequential numbers: (1) lack of present capacity without substantial modification; and (2) legal bar. *Herrick*, 2018 U.S. Dist. LEXIS 83744, at *20. **First**, the court noted that the "[n]umbers that were called could only be inputted into the 3Seventy Platform by a preprogrammed file or list provided by the user; the Platform could not randomly or sequentially generate these numbers by itself." *Id.* **Second**, the software agreement required third party permission to modify it to be engage in the prohibited acts. *Id.* ("As such, a user of the 3Seventy Platform, even if armed with the programming knowledge necessary to enable it to generate numbers randomly or sequentially, would not be able to do so without the permission of 3Seventy's CEO.")

In this case, CyberX's systems had the same two barriers to being an ATDS as the software in *Herrick*. Both 212CRM and Twilio did not have the present capacity to generating random or sequential numbers and dial them. Twilio imposes an absolute requirement that each text message requires a separate instruction comprising (1) the Twilio number from which the message should originate; (2) the body of the message; and (3) the telephone number to which the user wants that text message sent, rendering it impossible for any user to modify it to

generate phone numbers. The facts here are undisputed and essentially identical to the ones in *Herrick*, which found that the "[n]umbers that were called could only be inputted into the 3Seventy Platform by a preprogrammed file or list provided by the user; the Platform could not randomly or sequentially generate these numbers by itself." *Herrick*, 2018 U.S. Dist. LEXIS 83744, at *20. Any change, even if hypothetically possible, would require additional programming of new functionalities to both systems, thus falling outside the "present capacity" requirement from *ACA*.

Additionally, even if it was theoretically possible to modify Twilio and 212CRM, Twilio's terms of service, which all users including CyberX agree to, prohibit modification and reverse engineering of the Twilio software. (Ex. B, Lin Decl., Ex. 1 § 6(e).) Thus, like in *Herrick*, Defendants' legal barrier to modifying the software to have ATDS functionality supports that the systems are not an ATDS.

The undisputed existence of these two barriers proves as a matter of law that Defendants' texting systems do not qualify as an ATDS. Accordingly, Defendants are entitled to summary judgment.

**WHEREFORE,** Defendants respectfully request entry of an Order granting summary judgment in their favor because the undisputed record evidence confirms that no automated telephone dialing system was used with regard to the complained of text, as well as an award of all other relief at law and equity to which they are entitled.

Date: March 22, 2019

Respectfully Submitted,

*s/ Bill S. Richmond*
WILLIAM S. RICHMOND, ESQ. (Trial Counsel)
Texas Bar No. 24066800 (Admitted *Pro Hac Vice*)
**PLATT CHEEMA RICHMOND PLLC**
1201 N. Riverfront Blvd., Suite 150
Dallas, Texas 75207
Telephone: 214.559.2700
Facsimile: 214.559.4390
brichmond@pcrfirm.com

-and-

*/s/ David J. DePiano*
DAVID J. DePIANO, ESQ.
Florida Bar No. 0055699
**SHAPIRO BLASI WASSERMAN & HERMANN, P.A.**
7777 Glades Road, Suite 400
Boca Raton, FL 33434
Telephone: 561.477.7800
Facsimile: 561.477.7722
ddepiano@sbwh.law

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE AND SERVICE LIST**

The undersigned counsel for Defendants hereby certifies that on June 25, 2018, that the foregoing document is being sent via Electronic Mail to Plaintiff's counsel Cory S. Fein (cory@coryfeinlaw.com) and Seth Lehrman (seth@epllc.com) via CM/ECF.

*s/ Bill S. Richmond*
WILLIAM S. RICHMOND, ESQ. (Trial Counsel)
Texas Bar No. 24066800 (Admitted *Pro Hac Vice*)
**PLATT CHEEMA RICHMOND PLLC**
1201 N. Riverfront Blvd., Suite 150
Dallas, Texas 75207
Telephone: 214.559.2700
Facsimile: 214.559.4390
brichmond@pcrfirm.com

**COUNSEL FOR DEFENDANTS**

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| JOHN NORTHRUP, Individually and on behalf of a Class of Similarly Situated Individuals | § § § | |
|     Plaintiff, | § § | |
| v. | § § § | Civil Action No. 8:17-cv-01890-CEH-JSS |
| Innovative Health Insurance Partners, LLC, CyberX Group, LLC, David E. Lindsey; and Independent Truckers Group, Inc.; | § § § § | |
|     Defendants. | § § | |

---

**DECLARATION OF CHRISTOPHER PEARSON IN SUPPORT**
**OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE ATDS**

---

I, Christopher Pearson, declare:

1.      I am over twenty-one years of age and fully competent to make this declaration. I have personal knowledge of all the facts stated herein. I co-founded and am President of Defendant CyberX Group LLC ("CyberX"). I have held this position since December 2016.

2.      CyberX caused the text message described by paragraphs 32-33 of the Second Amended Complaint (Dkt. 38) to be sent. I personally handled all aspects of the below actions related to those text messages.

3.      On June 30, 2017, I manually uploaded a list of customer lead data contained in an Microsoft Excel spreadsheet to 212CRM. 212 CRM is online, proprietary software of

DEFAPPX0002

CyberX used for marketing and customer data that requires a user to navigate to the site and log in. The spreadsheet had been bought from FleetSeek and obtained via download from FleetSeek's servers. A true and correct copy of a portion of the spreadsheet is attached hereto as **Exhibit A-1**.

4. Upon uploading the spreadsheet to 212CRM, I manually reviewed the lead data for errors. I then "mapped" the columns of lead data to the 212CRM system, specifically including connecting 212CRM to the telephone number fields in the spreadsheet and checking for errors, enabling me to choose the order in which the numbers appeared, which would then be the order in which the numbers were dialed for the text messages.

5. After mapping the lead data to 212CRM, I then navigated to the SMS Broadcast Manager page of 212CRM, where I manually entered in: (1) the lead data to be used to send a text message campaign; (2) the order in which the text messages should be sent to each number in the lead data; and (3) the content of each text message. A true and correct copy of a screenshot of the 212CRM SMS Broadcast Manager is attached hereto as **Exhibit A-2**. A true and correct copy of excerpts of the deposition of CyberX Group, LLC, for which I was the corporate representative, is attached hereto as **Exhibit A-3**.

6. I then chose to set the system to start sending the text messages immediately (as opposed to a scheduled start time in the future) at an interval of one message per minute, an interval I had manually set in 212CRM, once I pushed the "SEND" button. I then initiated or "dialed" the lead data numbers by pointing and clicking on the "SEND" button in 212CRM.

7. Upon hitting the "SEND" button in 212CRM, 212CRM then communicated the dialing/delivery instructions to Twilio, whereupon over the next few hours Twilio

DEFAPPX0003

delivered the messages to the appropriate phone carriers exactly as instructed by my commands in 212CRM. Twilio sent only the requested message content; to the requested recipient numbers; in the requested order; at the requested time; in the requested interval. Each and every text message sent by the Twilio Platform requires a separate instruction comprising (1) the Twilio number from which the message should originate; (2) the body of the text message; (3) and the telephone number to which the user want that text message sent. The text messages were sent by 212CRM to Twilio with my instructions to be separated executed, one-by-one.

8.     Subsequently, Twilio completed the message delivery and generated a report setting out the messaging data and responses. A true and correct copy of a portion of the data report from Twilio is attached hereto as **Exhibit A-4**.

9.     The Twilio Platform is a web-based software platform that allows a user to direct the Twilio Platform to send text messages to specific phone numbers provided by the user. *See* https://www.twilio.com/.

10.     I am intimately familiar with the capabilities and functions of 212CRM and Twilio based on my years of experience with both platforms. The 212CRM system cannot generate telephone numbers randomly or sequentially. The 212CRM system cannot be easily modified by its users to generate telephone numbers. The Twilio Platform cannot generate telephone numbers randomly or sequentially. The Twilio Platform cannot be easily modified by its users to generate telephone numbers. The numbers to which the messages were sent by CyberX on June 30, 2017 were solely from the FleetSeek list, as manually arranged and reviewed by me. The Twilio Platform did not

DEFAPPX0004

generate the phone numbers for any of the text messages dispatched on June 30, 2017. The 212CRM system did not generate the phone numbers for any of the text messages dispatched on June 30, 2017.

11.    CyberX agreed to Twilio's Terms of Service as a condition of using the Twilio Platform.

**PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.**

**EXECUTED ON:** March 22, 2019

Christopher Pearson

# EXHIBIT A-1

| FLEET NAME | SALUTATION | FIRST NAME | MIDDLE NAME | LAST NAME | JOB TITLE | CONTACT PHONE | CONTACT EMAIL | CONTACT FAX | WEBSITE | CONTACT PHYSICAL ADDRESS | CONTACT PHYSICAL CITY | CONTACT PHYSICAL STATE CODE | CONTACT PHYSICAL ZIP CODE | TOTAL NUMBER OF DRIVERS | TOTAL VEHICLES | TOTAL TRACTORS | TOTAL TRAILERS | TOTAL TRAILERS OWNED | COMMODITIES | SIC CODE | SIC CLASSIFICATION | YEAR EST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Blue Atlantic Transport, LLC | | Esteban | E | Cacerez | Owner Operator | 2012046164 | | | | 15 Victory Pl | South Amboy | NJ | 08879-1139 | 1 | 1 | 1 | 1 | | Motor Vehicles | 4218 | Owner-operator, individual | |
| Mesa Transport, Inc. | Mr. | Luis | | Mesa | Principal | 2012061476 | mesatruck@gmail.com | 2018830241 | | 174 Holt St | Hackensack | NJ | 07601-5244 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | 2007 |
| Randy Trucking LLC | Mr. | Edel | | Marante | Owner Operator | 2012061563 | | 9086874426 | | 209 49th St | Union City | NJ | 07087-6407 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Caraballo Trucking LLC | Ms. | Sandra | | Caraballo | Owner Operator | 2012062574 | | 3526860188 | | 3115 Montague Ave | Spring Hill | FL | 34608-4265 | 1 | 1 | | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| Premier Cargo Transport LLC | Mr. | Julio | | Cabrera | Owner Operator | 2012067075 | | | | 96 Linwood Plz | | | 07024-3701 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Net Transport, Inc. | Mr. | Abdullah | | Yasar | Owner Operator | 2012068310 | nisettransport@gmail.com | | | 31 Maple Ln | Mount Arlington | NJ | 07856-1380 | 2 | 1 | | 1 | 1 | Motor Vehicles | 4218 | Owner-operator, individual | |
| Flaka Trucking Inc. | | Nathalie | A | Ramirez | Owner Operator | 2012073319 | | | | 49 Church St | Lodi | NJ | 07644-2420 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| 4 Kings Express | Mr. | Gary | | Toussaint | Owner Operator | 2012088053 | | 5706299043 | | 46 Deerfield Way | Scotrun | PA | 18355-9637 | 1 | 1 | 1 | 1 | 1 | Fresh Produce,General Freight,Meat | 4218 | Owner-operator, individual | 2003 |
| Super Trio, LLC | Mr. | Agustin | | Ortiz | Owner Operator | 2012088793 | tinoortiz1@hotmail.com | 9734910052 | | 2720 Linden St | Bethlehem | PA | 18017-3957 | 1 | 1 | 1 | 1 | 1 | General Freight,Refrigerated Food | 4218 | Owner-operator, individual | |
| Air Ocean Logistics | Mr. | Henry | O | Hernandez | Owner Operator | 2012091200 | victoria@verizon.net | 2013091200 | | 418 Duncan Ave | Jersey City | NJ | 07306-6724 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Mxa Enterprises Corp. | Ms. | Fatima | R | Arias | Owner Operator | 2012091200 | | | | 418 Duncan Ave | Jersey City | NJ | 07306-6724 | 2 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| JOA Express, Inc. | Ms. | April | | Uy | Owner Operator | 2012101801 | | | | 183 Olive St | Piscataway | NJ | 08854-1938 | 6 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Destiny 2 Express, LLC | | Oliver | B | Uy | Owner Operator | 2012101801 | | | | 352 W Side Ave | Jersey City | NJ | 07305-1135 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Magnum Express LLC | Mr. | Magno | A | Arana | Owner Operator | 2012121852 | | | | 624 Jackson Ave | Elizabeth | NJ | 07201-1617 | 2 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Marbrand Transport LLC | | Yoandry | | Venereo | Owner Operator | 2012122229 | nxcuban1982@gmail.com | | | 63 John St | Little Ferry | NJ | 07643-1816 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Good Guys Transport, LLC | | 2 | Rance | Corrales | Owner Operator | 2012122800 | goodguystransport@gmail.com | | | 409 79th St | North Bergen | NJ | 07047-5525 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| D & V Transportation, LLC | | Domingo | | Valdez | Owner Operator | 2012123640 | | | | 314 Randolph Ave | Jersey City | NJ | 07304-2828 | 1 | 1 | | | | General Freight Building | 4218 | Owner-operator, individual | |
| Nicky Express LLC | | Luis | N | Santisteban | Owner Operator | 2012144179 | | | | | | | | 1 | 1 | 1 | 1 | 1 | Materials,Construction,General Freight,Logs, Poles, Beams, Lumber | 4218 | Owner-operator, individual | |
| Buchephalus Mk, Inc. | | Vladimir | | Arsovski | Owner Operator | 2012144794 | | | | 274 Harrison Ave | Lodi | NJ | 07644-1014 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| Rio & Ji, LLC | Mr. | Luciano | | Martino | Owner Operator | 2012146483 | | | | 543 Westview Ave | Ridgefield | NJ | 07657-2816 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| Armando Escalante-Velasqu | | Armando | | Escalante-velasqu | Owner Operator | 2012183235 | | | | 44 Cypress Dr | Colonia | NJ | 07067-1505 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Devcon International LLC | | Irfan | | Yaksi | Owner Operator | 2012183624 | | 8623377472 | | 283 1st Ave W | Newark | NJ | 07107-1889 | 1 | 1 | | | | General Freight,Refrigerated Food | 4218 | Owner-operator, individual | |
| Champion Car Carriers, Inc. | Mr. | Yoan | | Mederos | Owner Operator | 2012183753 | | | | 5600 Collins Ave | Miami Beach | FL | 33140-2455 | 1 | 1 | 1 | 1 | 1 | Motor Vehicles | 4218 | Owner-operator, individual | |
| RSP Trucking | Mr. | Paul | | Treer | Owner Operator | 2012185788 | | | | 11331 Red Finch Ln | Charlotte | NC | 28214-7146 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| K & J Logistics, LLC | | Washington | | Paucar | Owner Operator | 2012188982 | lifeisgood0927@yahoo.com | | | 107 Trumbull St | Elizabeth | NJ | 07206-2165 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Mauricio Cruz | Mr. | Mauricio | | Cruz | Owner Operator | 2012201860 | | | | 200 Division St | Cliffside Park | NJ | 07010-2327 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Sweet Rose Logistics LLC | Ms. | Maria | C | Gonzalez | Owner Operator | 2012202939 | | | | 435 79th St | North Bergen | NJ | 07047-7504 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| Machin Trucking, LLC | | Marcelo | | Machin | Owner Operator | 2012204871 | | | | 7302 Tonnelle Ave | North Bergen | NJ | 07047-4515 | 2 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| F Delarosa Trucking | Mr. | Pablo | D | Rosa | Owner Operator | 2012229561 | | | | 85 Haque St | Jersey City | NJ | 07307-3103 | 1 | 1 | 1 | | | Refrigerated Food | 4218 | Owner-operator, individual | 2006 |
| E-Z Cargo, Inc. | Mr. | Oybek | | Saidkhanov | Owner Operator | 2012232600 | info@e-zcargo.com | 2012232611 | | 501 New Country Rd | Secaucus | NJ | 07094-1648 | 1 | 1 | 1 | | | Intermodal Containers | 4218 | Owner-operator, individual | |
| Oscar Serrano | | Oscar | | Serrano | Owner Operator | 2012248134 | racsose@verizon.net | 2012240285 | | 214 Warren Ave | Fort Lee | NJ | 07024-4109 | 1 | 1 | 1 | | | General Freight,Intermodal Containers | 4218 | Owner-operator, individual | |
| Adapium Inc. | | Alla | | Nadein | Owner Operator | 2012270654 | adapium@earthlink.net | 2012270654 | | 1A Dorchester Rd | Englewood Cliffs | NJ | 07632-1931 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | 2006 |
| SRS Trucking LLC | Mr. | Sahil | | Sachdeva | Owner Operator | 2012320740 | | | | 3 Bryant Ave | Jersey City | NJ | 07306-6503 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Nieves Transport, Inc. | Mr. | Jerill | | Nieves | Owner Operator | 2012320749 | nievestransport@aol.com | 7324284558 | | 703 Harrison St | Rahway | NJ | 07065-3511 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| WS Trans, LLC | | Walter | | Stubblefield | Owner Operator | 2012324919 | brad@bluerdigemllc.com | | | 1888 Bridle Rd | Lawrenceville | GA | 30043-2886 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| A Cordero Trucking | Mr. | Anibal | | Cordero | Owner Operator | 2012325229 | acordero411@aol.com | | | 4600 Kennedy Blvd | Union City | NJ | 07087-2713 | 1 | 1 | | | | General Freight,Household Goods,Refrigerated Food | 4218 | Owner-operator, individual | |
| Sto Transportation LLC | Ms. | Shannon | | Tisdale | Owner Operator | 2012328385 | | | | 57 Sunset Ter | Irvington | NJ | 07111-1729 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| PGA Transport Corp. | | Luis | | Marinos | Owner Operator | 2012332735 | rwescorp@yahoo.com | | | 5837 Cove Landing Rd | Byrdie | VA | 22015-4710 | 1 | 1 | 1 | 1 | 1 | | 4218 | Owner-operator, individual | |
| Mendieta & Sons Enterprise, Inc. | Mr. | Edgun | R | Andrade | Owner Operator | 2012334752 | mendietaandson@yahoo.com | | | 88 W 47th St | Bayonne | NJ | 07002-3202 | 1 | 1 | 1 | 1 | 1 | Garbage, Refuse, Trash | 4218 | Owner-operator, individual | |
| Integritas Logistics, Inc. | | Oxana | | Rodriguez | Owner Operator | 2012336555 | rodriguez.oxy@gmail.com | | | 436 Rutherford Ave | Lyndhurst | NJ | 07071-1109 | 1 | 1 | 1 | | | Commodities Dry Bulk,Fresh Produce,General Freight,Meat | 4218 | Owner-operator, individual | |
| Havana Dc Corp. | Mr. | Jorge | | Garcia | Owner Operator | 2012341501 | havanadccorp@yahoo.com | 9086621318 | | 830 Westfield Ave | Elizabeth | NJ | 07208-1270 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| Mrp Trucking, Inc. | | Gerges | A | Shakhoul | Owner Operator | 2012342222 | | | | 156 W 3rd St | Bayonne | NJ | 07002-5232 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Mikfran Logistics, LLC | | Michael | J | Aviles | Owner Operator | 2012380186 | | | | 662 Fairview Ave | Fairview | NJ | 07022-1809 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Oneway Transport Inc. | | J | | Singh | Owner Operator | 2012380398 | | | | 105 W Arthur Pl | Iselin | NJ | 08830-1112 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| AA and H Trucking Inc. | | Hugo | A | Gil-Rosado | Owner Operator | 2012383488 | | | | 110 Jabez St | Newark | NJ | 07105-3105 | 1 | 1 | 1 | | | Garbage, Refuse, Trash | 4218 | Owner-operator, individual | |
| PGR Transportation LLC | Mr. | Manohar | L | Aheer | Owner Operator | 2012385640 | manoharaheer@yahoo.com | | | 32 Crocus St | Woodbridge | NJ | 07095-1904 | 1 | 1 | | | | General Freight,Motor Vehicles | 4218 | Owner-operator, individual | |
| Serie 29 Transport, Inc. | | Jesus | M | Amparo | Owner Operator | 2012386054 | djtall08@hotmail.com | | | 72 W 56th St | Bayonne | NJ | 07002-3316 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| STB Transportation, LLC | Mr. | Esteban | R. | Rodriguez | Owner Operator | 2012386139 | | | | 573 Central Ave | Jersey City | NJ | 07307-2583 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| JDD Rockaway LLC | Mr. | Jan | | Devecka | Owner Operator | 2012388688 | jandevecka@yahoo.com | | | 15 Argyle Pl | North Arlington | NJ | 07031-6445 | 1 | 1 | 1 | | | Commodities Dry Bulk,Construction,Food Products,General Freight | 4218 | Owner-operator, individual | |
| Eighteen Wheel Transport Corp. | Mr. | Dagoberto | R | Mendez | Owner Operator | 2012389409 | | | | 300 Duncan Ave | Jersey City | NJ | 07306-7039 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| P B S Carriers Corp. | Mr. | Bakhshish | | Singh | Owner Operator | 2012391371 | | 2019185425 | | 185 Tonnele Ave | Jersey City | NJ | 07306-5132 | 1 | 1 | 1 | 1 | 1 | Fresh Produce | 4218 | Owner-operator, individual | |
| E & E Moreno Transport, Inc. | Mr. | Josvani | | Moredo | Owner Operator | 2012401646 | | 8135142806 | | 4111 Hudson Way | Carrollwood | FL | 33618-5362 | 10 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| S&A Trucking, LLC | | Heman | | Garcia | Owner Operator | 2012403095 | | | | 95 3rd St | Newark | NJ | 07107-3108 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| M&C Transportation | Mr. | Paul | | Corrao | Owner Operator | 2012405973 | | 6072674748 | | 2 Walnut St | Oneonta | NY | 13820-1824 | 1 | 1 | 1 | 1 | 1 | Commodities Dry Bulk,General Freight | 4218 | Owner-operator, individual | 2007 |
| Santiago Orellana | Mr. | Santiago | | Orellana | Owner Operator | 2012406099 | orelltruckg@yahoo.com | | | 130 3rd St | Passaic | NJ | 07055-7617 | 1 | 1 | | | | Construction | 4218 | Owner-operator, individual | |
| MLA Transport, Inc. | Mr. | Lori | A | Clifford | Owner Operator | 2012406438 | | | | 188 Jefferson St | Newark | NJ | 07105-1622 | 4 | 1 | 1 | 1 | 1 | General Freight,Intermodal Containers | 4218 | Owner-operator, individual | |
| Edgecliff LLC | Ms. | Tonya | | Shenkin | Owner Operator | 2012408038 | redski@msn.com | 2014084440 | | 725 River Rd | Edgewater | NJ | 07020-1171 | 2 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| Collar Services, Inc. | Mr. | John | | Gosper | Owner Operator | 2012408546 | | | | 254 40th Ter | Cape Coral | FL | 33914-6186 | 1 | 1 | 1 | 1 | 1 | General Freight | 4218 | Owner-operator, individual | |
| E G M Trucking Inc. | Mr. | Sergio | | Garrido | Owner Operator | 2012419264 | | | | 40 Jones St | Jersey City | NJ | 07306-5152 | 1 | 1 | | | | Garbage, Refuse, Trash | 4218 | Owner-operator, individual | |
| Thais Transport Corp. | Mr. | Thais | V | Vargas | Owner Operator | 2012450100 | thaisv05@gmail.com | 8622387094 | | 44 S Main St | Lodi | NJ | 07644-2220 | 1 | 1 | 1 | | | Aggregate | 4218 | Owner-operator, individual | |
| Ilhan Demir | | Ilhan | | Demir | Owner Operator | 2012455234 | | | | 254 Union Ave | Clifton | NJ | 07011-3216 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Cesar A Coronado | Mr. | Cesar | A | Coronado | Owner Operator | 2012456031 | | | | 60 Clarke Ave | Jersey City | NJ | 07304-1011 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| E & B Leasing | | John | | Hippler | Owner Operator | 2012461306 | hippler5501@aol.com | | | 22 Bergen Ave | Haskell | NJ | 07420-1002 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Joaquim Matias | Ms. | Joaquim | | Matias | Owner Operator | 2012461621 | larimaria@yahoo.com | | | 146 Tappan St | Kearny | NJ | 07032-3317 | 2 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| B Tushe Express LLC | Mr. | Banush | | Tushe | Owner Operator | 2012502185 | banusht@yahoo.com | | | 406 Semel Ave | Garfield | NJ | 07026-2143 | 1 | 1 | 1 | 1 | 1 | General Freight,Refrigerated Food | 4218 | Owner-operator, individual | |
| All Direct Logistics, Inc. | Ms. | Antoinett | | Gonzalez | Owner Operator | 2012539928 | | | | 542 W Side Ave | Jersey City | NJ | 07304-1518 | 1 | 1 | 1 | | | General Freight,Intermodal Containers | 4218 | Owner-operator, individual | |
| Suramp Trucking Corp. | Mr. | Miguel | F | Aguilar | Owner Operator | 2012563437 | | | | 376 Duncan Ave | Jersey City | NJ | 07306-6724 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| BG Prenku, LLC | | Genc | | Prenku | Owner Operator | 2012567701 | genc169@gmail.com | | | 41 Dulles Dr | Dumont | NJ | 07628-1605 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Bilvoro Autos & Transport Services LLC | Ms. | Yvonne | | Lamptey | Owner Operator | 2012578347 | | | | 92 Railroad Ave | Hasbrouck Heights | NJ | 07604-2887 | 1 | 1 | 1 | 1 | 1 | General Freight,Motor Vehicles | 4218 | Owner-operator, individual | |
| Woodstone Trucking Limited Liability Co. | Mr. | Robert | | Mohr | Owner Operator | 2012613488 | | | | 39 Century Rd | Paramus | NJ | 07652 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| KM2 Specialized Transport, Inc. | Ms. | Karen | I | Mattes | Owner Operator | 2012614464 | km2spectransinc@gmail.com | | | 33A 7th Ave | Westwood | NJ | 07675-2034 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Juarez Enterprises LLC | Mr. | Victor | | Juarez | Owner Operator | 2012707476 | | 2012549270 | | 49 Grove St | Elmwood Park | NJ | 07407-2104 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | 2010 |
| Straight Shot Transportation LLC | Mr. | Sami | | Mustafa | Owner Operator | 2012733378 | | | | 16A1 NW 12th Ave | Fort Lauderdale | FL | 33311-3654 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Victor Linton Trucking | Mr. | Victor | | Linton | Owner Operator | 2012744919 | | | | 291 Union St | Jersey City | NJ | 07304-1513 | 1 | 1 | 1 | | | Intermodal Containers | 4218 | Owner-operator, individual | |
| S Malatesta & Sons | Mr. | Paul | | Malatesta | President | 2012791500 | malasco@yahoo.com | 2012791500 | | 61 65 Illinois Ave | Paterson | NJ | 7503 | 2 | 1 | 1 | 1 | 1 | Household Goods | 4218 | Owner-operator, individual | 1957 |
| Safe Freight Express LLC | Mr. | Daniel | | Diaz-Varona | Owner Operator | 2012793255 | | | | 231 Ridge Pl | Elizabeth | NJ | 07204-1919 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| GEL Xpress LLC | Mr. | Gezuelni | | Esquilin | Owner Operator | 2012798651 | | | | 48 Grove Ave | Kearny | NJ | 07032-1118 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Soprano Trucking, LLC | | Luigi | | Caccioppoli | Owner Operator | 2012810807 | | | | 153 Wilson St | Rutherford | NJ | 07070-2715 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| Hazel Transportation, Inc. | Mr. | Celal | | Koseler | Owner Operator | 2012816412 | | | | 2500 Rachel Ter | Pine Brook | NJ | 07058-9369 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Skyhigh Cargo LLC | | Randy | | | Owner Operator | 2012818327 | | 8882488796 | | 85 Morse St | Newark | NJ | 07114-1117 | 1 | 1 | 1 | 1 | 1 | Motor Vehicles | 4218 | Owner-operator, individual | |
| Ramon Orellana-Maldonado | | Ramon | | Orellana-Maldonado | Owner Operator | 2012827689 | | | | 556 56th St | West New York | NJ | 07093-1335 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Pichy Transport LLC | Ms. | Aisocha | | Pichardo | Owner Operator | 2012827791 | aisocha@truck.com | | | 6009 Hudson Ave | West New York | NJ | 07093-5853 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |
| JDM Trucking Corp. | Mr. | Joerel | | Dela Cruz | Owner Operator | 2012834553 | | | | 621 Summit Ave | Jersey City | NJ | 07307-3422 | 1 | 1 | | | | General Freight | 4218 | Owner-operator, individual | |
| Maneli Trucking LLC | Mr. | Tatjana | | Bogdanovski | Owner Operator | 2012831456 | | | | 256 Oak wood Dr | Paramus | NJ | 07652-3315 | 1 | 1 | 1 | | | General Freight | 4218 | Owner-operator, individual | |

DEFAPPX0007

# EXHIBIT A-2



cyberxgroup.com

**212°** ADMIN

Welcome, Elissa Still ▾

Search... 🔍

🔔 3  ⚙  💬

- 🧭 Dashboard
- 👥 User Groups >
- 💬 Global Communications >
- 🛒 Orders >
- 🗂 Products >
- 📢 Marketing System >
- 🎧 Interaction Management >
- 💲 Manage Commissions >
- 📊 Reporting >
- 📄 Eligibility Files >
- ✴ Fulfillment >
- 🛡 Learning Module >
- 🔓 Log out

🏠 SMS Home   🎤 Broadcaster

## SMS Broadcaster

**Recipients**

All Members (10609)

**Status**

4 of 4 selected

Would You Like to Send the SMS broadcast now or set it for a future time?
- ◉ Compose SMS and Send Immediately
- ○ Compose SMS and Send at a Future Time

**Content**

Characters Remaining : 160

Available tags: [[fname]], [[lname]], [[email]], [[webalias]]

[ Send ]  [ Test ]   **Cancel**



EXHIBIT
3/11
7
DEFAPPX0009
tabbies

# EXHIBIT A-3

DEFAPPX0010

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF FLORIDA

 3                      TAMPA DIVISION

 4                        --o0o--

 5

 6   John Northrup, Individually and  )
     on behalf of a Class of Similarly)
 7   Situated Individuals,            )
                                      )
 8                 Plaintiff,         )
                                      )
 9           vs.                      ) No. 8:17-cv-01890-CEH
                                      )
10   Innovative Health Insurance      )
     Partners, LLC, CyberX Group, LLC,)
11   David E. Lindsey; and Independent)
     Truckers Group, Inc.,            )
12                                     )
                   Defendants.        )
13   _____)

14

15

16

17                    DEPOSITION OF

18                    CHRIS PEARSON

19   _____
                    March 11, 2019
20

21

22

23

24   REPORTED BY BRANDON D. COMBS

25   RPR, TEXAS CSR 10927, CALIFORNIA CSR 12978
```

**Page 2**

```
1                    INDEX
2                                        Page
3  Examination by MR. LEHRMAN              7
4  Examination by MR. RICHMOND            90
5  Further Examination by MR. LEHRMAN     98
6  Further Examination by MR. RICHMOND   102
7
8            --o0o--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                  EXHIBITS
2
3  Number          Description          Page
4
5  Exhibit 1   Notice of Deposition       7
6
7  Exhibit 2   Leads Details              9
8
9  Exhibit 3   Auto Dialer, Contact Name: 12
10             John Northrup
11
12 Exhibit 4   Welcome, MyHealthPass ADMIN 13
13
14 Exhibit 5   Twilio Acceptable Use Policy 17
15
16 Exhibit 6   Cyberxgroup.com, AWIS Admin, 40
17             Welcome, Elissa Still
18
19 Exhibit 7   SMS Broadcaster            40
20
21 Exhibit 8   Declaration of Christopher Pearson 43
22
23 Exhibit 9   Programmable SMS Logs      52
24
25 Exhibit 10  Programmable SMS Logs      52
```

**Page 4**

```
1  Exhibit 11  Programmable SMS Logs      55
2
3  Exhibit 12  Programmable SMS Logs      55
4
5  Exhibit 13  Spreadsheet                65
6
7  Exhibit 14  Spreadsheet                69
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF FLORIDA
3                 TAMPA DIVISION
4                   --o0o--
5
6  JOHN NORTHRUP, Individually and   )
   on behalf of a Class of Similarly)
7  Situated Individuals,            )
                                    )
8            Plaintiff,             )
                                    )
9        vs.                        ) No. 8:17-cv-01890-CEH
                                    )
10 Innovative Health Insurance      )
   Partners, LLC, CyberX Group, LLC,)
11 David E. Lindsey; and Independent)
   Truckers Group, Inc.,            )
12                                  )
            Defendants.             )
13 _____)
14
15              --o0o--
16      BE IT REMEMBERED THAT on Monday, March 11,
17 2019, commencing at 1:04 P.M. thereof, at
18 1201 North Riverfront Boulevard, Suite 150, Dallas,
19 Texas, before me, BRANDON D. COMBS, a Certified
20 Shorthand Reporter, personally appeared
21            CHRIS PEARSON,
22 called as a witness by the Plaintiff, being first duly
23 sworn, testified as follows:
24             --o0o--
25
```

**Page 6**

1          EDWARDS POTTINGER, LLC, 425 North Andrews
2    Avenue, Suite 2, Fort Lauderdale, FL 33301, represented
3    by SETH M. LEHRMAN, Attorney at Law, appeared as counsel
4    on behalf of the Plaintiff.
5          Phone:  954-524-2820
              Email: seth@epllc.com
6
7
8          PLATT CHEEMA RICHMOND, PLLLC,
9    1201 North Riverfront Boulevard, Suite 150, Dallas,
10   TX 75207, represented by WILLIAM S. RICHMOND, Attorney
11   at Law, appeared as counsel on behalf of the Defendants.
12         Phone:  214-559-2700
              Email: brichmond@pcrfirm.com
13
14
15         ALSO PRESENT:  Elissa Still
16
17              --o0o--
18
19
20
21
22
23
24
25

**Page 7**

1
2                  EXAMINATION
3
4    BY MR. LEHRMAN:
5        Q.   Good afternoon, sir.  My name is Seth
6    Lehrman.  I'm an attorney, along with Cory Fein, who
7    you heard briefly say hello.  We're here to take a
8    deposition today of CyberX Group, LLC.
9             Can you tell us your name, please.
10       A.   Chris Pearson.
11       Q.   And Mr. Pearson, you've been designated by
12   CyberX Group, LLC to testify on its behalf today?
13       A.   Yes.
14            (Whereupon, Exhibit 1 was marked for
15            identification.)
16   BY MR. LEHRMAN:
17       Q.   So, sir, I'm handing you, and a copy to your
18   counsel, what's been marked as Plaintiff Exhibit 1.
19   I'll read in the title, Revised Notice of Deposition of
20   Defendant CyberX Group, LLC under Rule 30(b)(6).
21            Do you see this document?
22       A.   Yes, I do.
23       Q.   Have you seen this document before?
24       A.   Yes, I have.
25       Q.   You've been designated by CyberX Group, LLC

**Page 8**

1    to testify as to the topics in this deposition notice;
2    is that right?
3        A.   That's correct.
4        Q.   And for purposes of today's deposition, if I
5    refer to CyberX Group, LLC as CyberX, will that be
6    clear?
7        A.   It's fine, yes.
8        Q.   And, sir, I see there are topics starting at
9    the bottom of page 1, continuing to towards the bottom
10   of page 2, eight topics.  You've been designated as to
11   all of those topics; correct?
12       A.   Correct.
13       Q.   And Mr. Pearson, can you tell us, what's your
14   position, if any, with CyberX?
15       A.   I am a cofounder of CyberX, and also
16   president as well.
17       Q.   When did you cofound CyberX?
18       A.   I believe it was 2016.
19       Q.   And did CyberX begin operations in 2016?
20       A.   Yes.
21       Q.   And what is CyberX's business?
22       A.   We create custom software solutions.
23       Q.   You've produced, or CyberX has provided us
24   with some screen shots of software that appears to have
25   the CyberX name on that; is that right?

**Page 9**

1        A.   Yes.
2        Q.   Is that one of the software solutions that
3    CyberX has developed?
4        A.   Yes.
5        Q.   And what is that software?
6        A.   That's a CRM, at high level would be a CRM
7    system.
8        Q.   What is the specific CRM system that CyberX
9    developed that's shown or depicted in those screen
10   prints that have been produced in discovery?
11       A.   That particular screen shot shows the
12   tracking and -- of any activity that occurs with any
13   communications that go on from within our system.
14       Q.   When you say our system, I want to identify,
15   what's the title of the software, the name of the CRM
16   that's identified in those screen prints?
17       A.   Do you mind asking that a different way, see
18   what you're looking for.
19       Q.   Sure.  And we'll -- we'll mark --
20            You mind?
21            THE REPORTER:  Go ahead.
22            (Whereupon, Exhibit 2 was marked for
23            identification.)
24   BY MR. LEHRMAN:
25       Q.   I'm handing you what's been marked as

**Page 18**

1           Counsel, I'm sorry, I only have one copy of
2 this.
3           Mr. Pearson, this is the document that says
4 Twilio acceptable use policy; is that right?
5     A.   Yes.
6     Q.   And that's one of the documents you
7 identified earlier as being one that you reviewed in
8 preparing for today's deposition?
9     A.   Yes.
10     Q.   So you've indicated that the CyberX admin
11 portal is used by executives and managers exclusively
12 and not customers; right?
13     A.   Yes.
14     Q.   And that software was the only CyberX
15 software that was used in sending the text messages
16 that are the subject of this lawsuit; right?
17     A.   Yes.
18     Q.   And so was it -- were CyberX executives or
19 managers involved in sending the text messages?
20     A.   Yes.  And if it's okay for me to expand on
21 that.  At the time when this occurred, I was the only
22 one at that point in time, executive in management,
23 handling that.
24     Q.   And that was when?
25     A.   That would have been back in June of --

**Page 19**

1 June 30, 2017.
2     Q.   Mr. Pearson, have you testified before at any
3 type of deposition?
4     A.   No.
5     Q.   Have you ever given testimony in court
6 before?
7     A.   No.
8     Q.   So let me, just to be clear, let me tell you
9 what are kind of, I guess, the ground rules for today's
10 deposition, if that's okay.  All right?
11     A.   Okay.
12     Q.   First off, you understand you've taken an
13 oath to tell the truth; right?
14     A.   Yes.
15     Q.   And I'm here to ask you questions.  There's a
16 court reporter that's taking down everything that's
17 said.  Once I ask the question and finish asking it,
18 I'll ask you to think about it and give us an answer if
19 you've understood the question; all right?
20     A.   Okay.
21     Q.   If you don't understand my question, please
22 let me know, and I'm happy to rephrase it; is that all
23 right?
24     A.   Yes.
25     Q.   If I ask a question and you answer it, then

**Page 20**

1 I'll assume that you've understood my question; is that
2 fair?
3     A.   Yes.
4     Q.   Also, because today's deposition is a
5 Rule 30(b)(6) deposition of CyberX, and you're
6 testifying on behalf of CyberX, I may say during the
7 deposition, I probably will, "you."  And when I say
8 "you" during today's deposition, I mean CyberX.
9           Is that clear?
10     A.   Understood.
11     Q.   Now, at other times I may ask you,
12 Mr. Pearson, what you personally know, or what you
13 personally did.  And if I mean to inquire of you in
14 your individual capacity, then I'll clarify that.
15           Is that clear?
16     A.   Yes.
17     Q.   By the way, the last thing is I'm, I
18 apologize in advance, I'm kind of excitable.  I don't
19 mean to cut you off; certainly Mr. Richmond will not
20 allow me to cut you off.
21           But if you feel that I cut short your
22 opportunity to fully answer a question, please let me
23 know and I'll be happy to let you continue to answer.
24           All right?
25     A.   Understood.

**Page 21**

1     Q.   So the time frame, you indicated, was back in
2 June 30, 2017.  At that time you were the only person
3 at CyberX who had what responsibility that you were
4 just describing?
5     A.   At that time the only -- yeah, I was the only
6 person at that point in time that had responsibility to
7 go in and execute anything that had to do with any
8 marketing materials.
9     Q.   And that would include sending text messages?
10     A.   Yes.
11     Q.   And that included sending the text messages
12 that are the subject of this lawsuit?
13     MR. RICHMOND:  Lacks foundation, objection.
14 Assumes facts not in evidence.
15 BY MR. LEHRMAN:
16     Q.   That's correct?
17     MR. RICHMOND:  You can answer, unless I
18 direct you not to answer.  Let me finish my objection,
19 and then you can answer.
20     THE WITNESS:  Yes.
21 BY MR. LEHRMAN:
22     Q.   And the text messages that were -- are the
23 subject of this lawsuit, were sent on what date?
24     A.   I believe, based on the reporting that's in,
25 I'm looking at Exhibit 4 here, the initial text was

Page 22

1  sent on 6/30/2017.  So June 30.
2      Q.   Can you tell me, how is it that you
3  personally, Mr. Pearson, used the admin portal to send
4  the text messages that are the subject of this lawsuit?
5      A.   So it starts by me first uploading the leads
6  or data into our system.  It's a manual process of
7  uploading the data, and then determining, based on the
8  data columns, the appropriate fields.
9           So, for example, basically I go through and I
10  look at, first name column is first name, phone number
11  is phone number.
12          So once the data is uploaded into the system
13  and aligned, then the content of the message is added.
14  I manually click "send" to send to that list that I had
15  just installed into the system.
16      Q.   After you clicked "send" to send the list
17  that was put into the system, then what?
18      A.   Then the system delivers the communications.
19  We monitor the delivery of them.  You can imagine
20  software sometimes has bugs, so we ensure that they're
21  in fact gone through and sent out.
22      Q.   Let me break that down step by step.
23          The first thing you indicated is that you
24  upload leads or data into the system; right?
25      A.   Yes.

Page 23

1      Q.   So what leads are you referring to?  Those
2  leads I saw reference to, phone numbers that were
3  obtained from FleetSeek, are those the leads you're
4  referring to, or something else?
5      A.   In this case, yes, the FleetSeek leads.
6      Q.   So the text messages that were sent that are
7  the subject of this lawsuit, were those text messages
8  sent, all sent to phone numbers obtained from
9  FleetSeek?
10      A.   Yes.
11      Q.   And can you tell me, what is FleetSeek?
12      A.   I'm not familiar with FleetSeek, other than
13  that they had supplied those leads.  So I believe that
14  they would be a lead vendor of some type, but I do not
15  know.
16      Q.   But CyberX purchased these leads from
17  FleetSeek?
18      A.   No.
19      Q.   How did CyberX acquire these leads?
20      A.   They were provided to me.
21      Q.   When you say provided to you, to you
22  personally or to CyberX or --
23      A.   To CyberX, but I was the recipient of them,
24  yes.
25      Q.   What was the format in which CyberX received

Page 24

1  these leads?  For example, was it a .CSV file, or some
2  other way produced?
3      A.   I don't remember specifically, but most
4  likely it would be a .CSV file, is the common file
5  standard for this.
6      Q.   Is CyberX's admin portal able to import or
7  upload CSV files?
8      A.   Yes.
9      Q.   Is it able to upload other formats of data?
10      A.   I do not believe so.
11      Q.   But in this instance CyberX was able to
12  upload a set of leads that were obtained from
13  FleetSeek; is that right?
14      A.   Correct.
15      Q.   And you indicated earlier that that process
16  is done manually?
17      A.   Yes.
18      Q.   What do you mean by that being a manual
19  process?
20      A.   I physically take the list, upload the list,
21  which allows the system to read the data, and at that
22  point in time I manually have to align the columns, the
23  data columns.
24      Q.   When you say the system, are you referring to
25  CyberX's admin portal or something else?

Page 25

1      A.   Yes, CyberX's admin portal.
2      Q.   And when you refer to aligning the columns,
3  do you mean that you have to map the columns in the
4  FleetSeek data file to the columns that exist in the
5  admin portal?
6      A.   Yes, correct.
7      Q.   Meaning you want to match up the first name
8  in the data file with the first name column in the
9  admin portal and so on?
10      A.   Yes, so our system can identify to know what
11  data is in that particular column.
12      Q.   So that's what's manual in terms of the work
13  that's done of bringing this data into the CyberX admin
14  portal; right?
15      A.   First step.  And then you click to upload the
16  data.  And then the next step is we do a review, or I
17  did a review of the data to determine the number that
18  we had and if it had given any errors.
19      Q.   And CyberX did that, everything you just
20  described, with respect to obtaining these leads from
21  FleetSeek; right?
22      A.   Yes, I did that.
23      Q.   You personally did that on behalf of CyberX?
24      A.   Yes.
25      Q.   And once you did this, this lead data from

www.huseby.com          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

DEFAPPX0015

Page 26

1  FleetSeek was saved in the CyberX admin portal;
2  correct?
3      A.  Yes.
4      Q.  And that data that was saved in the admin
5  portal included telephone numbers for these various
6  leads?
7      A.  Yes.
8      Q.  You identified the next step in the process
9  is adding content of a message; right?
10     A.  Yes.
11     Q.  And when you say message, you're referring to
12 text message or something else?
13     A.  Yes, the actual text content that will go out
14 in the text message itself.
15     Q.  And can you describe how that works, how
16 CyberX goes about adding content for a text message
17 into its admin portal?
18     A.  We have a simple text box and we copy and
19 paste, or type the words in.
20     Q.  Did you personally enter the text for the
21 text message into this text box in the admin portal?
22     A.  Yes, I did.
23     Q.  And do you have to manually enter that text
24 into each one of the records, or is there some other
25 process?

Page 27

1      A.  It's a different process for each one.
2      Q.  What's that process?
3      A.  So those contents that I was talking about,
4  that upload process, we then put a tag, if I refer to
5  Exhibit 3, you can see below there's a tag, which is a
6  unique identifier.
7          That unique identifier, we tag to the actual
8  content so that when we deliver the message, any lead
9  in that particular tag will be sent those contents.
10     Q.  So I'm looking at Exhibit 3, the very bottom
11 of the page where it says Tag 3K -- can't read the
12 rest, 3KITG630?
13     A.  Yes.
14     Q.  That tag identifies a specific text message
15 template; is that fair to say?
16     A.  It identifies the particular list that
17 that -- this, in this case, that lead was in.  Maybe a
18 better way to put it is it groups them together.
19     Q.  You say groups them together, meaning a group
20 of these content records?
21     A.  I'm not sure the best way to handle this.  If
22 you go back to a previous thing that you stated.
23         The list that we talked about uploading, at
24 the time that we upload, I create a name, which is the
25 unique -- the tag or the unique identifier, at that

Page 28

1  time.
2          So once we upload the list, that's also part
3  of that manual process before we save that data.
4  Finalize it, and has to be given a name, which is in
5  this case the tag.
6      Q.  So this tag is a unique identifier for an
7  entire list?
8      A.  Correct.
9      Q.  And in this instance, the tag 3KITG630, was
10 that the tag that identified the list of FleetSeek
11 leads?
12     A.  Yes, and this tag was created by myself.
13     Q.  And when you, on behalf of CyberX, entered
14 the text message into the text box in the admin portal,
15 were you able to apply that text message to the entire
16 group of leads with that same tag?
17     A.  Yes.
18     Q.  In other words, you didn't have to manually
19 type the text message into a text box for each
20 individual record?
21     A.  That is correct.
22     Q.  And now, you indicated the next step in the
23 process is that CyberX clicks "send" to cause all the
24 text messages to be sent to the -- everyone in the
25 list; is that right?

Page 29

1      A.  Correct.
2      Q.  Is there a document that you've identified in
3  terms of the screen shot documents, that shows that
4  send button?
5      A.  Not any of these screen shots, no.
6      Q.  Is that a button that exists in the admin
7  portal or somewhere else?
8      A.  In the admin portal.
9      Q.  Is there a document that you've identified,
10 one of these screen shot documents, that shows us how
11 one would navigate to that part of the admin portal in
12 order to click the send button?
13     A.  Not in these documents, no.
14     Q.  Can you describe, meaning can CyberX describe
15 for us, where in the admin portal one would access this
16 send button?
17     A.  Yes.  We have a feature called global
18 communications.  Under global communications is where
19 this is housed.
20     Q.  So I refer you, bring your attention to
21 Plaintiff Exhibit 4, which is another view of a lead
22 detail page?
23     A.  Yes.
24     Q.  And in the left-hand side of the page, I
25 think you referred to that earlier as something related

Page 30

1   to navigation?
2       A.  Yes.  Call this our left-hand navigation, or
3   left panel navigation is also commonly referred to.
4       Q.  Towards the bottom of the left-hand
5   navigation, there's an option that says global
6   communications?
7       A.  Correct.
8       Q.  Is that the global communications option that
9   you identified earlier?
10      A.  Yes.  And then there's what's called a
11  sublink under that in this particular screen shot
12  that's cut off.  But if it had not been cut off, there
13  is -- below there is where it would read, SMS or
14  text message.
15      Q.  So email is a sublink to global
16  communications?
17      A.  Yes.
18      Q.  And below email is another sublink that's not
19  visible on Exhibit 4, and that refers to SMS or
20  text messages; is that right?
21      A.  Yes.  There may also be a couple of other
22  methods I'm not recalling right now, so I don't know
23  that SMS is the next direct one below there.  But it
24  will be underneath that global communications.
25      Q.  So there may be other sublinks --

Page 31

1       A.  Yes.
2       Q.  -- under global communications, but amongst
3   those is one for SMS or text messages?
4       A.  Correct.
5       Q.  And by the way, one other thing I'll say
6   about ground rules, is that -- because you were
7   "yesing" while I was asking a question, which I
8   understand.
9           But when we get the transcript back, we want
10  to make sure that we both understand what the
11  transcript says.  So what I forgot to tell you earlier
12  is that, please wait for me to complete my question
13  before you give an answer.
14          Likewise, I'll do the same.  I'll wait for
15  your answer to be complete before I ask the next
16  question.  That way we'll have a clear transcript;
17  okay?
18      A.  Understood.
19      Q.  Okay.  Thank you, sir.
20          So if CyberX executive or manager selects the
21  SMS or text message sublink under global
22  communications, then where does that take one within
23  the admin portal?
24      A.  To a new screen.  I should say different
25  screen.  It's a different screen where we have our,

Page 32

1   what we call SMS manager.
2       Q.  And this SMS manager screen, this existed
3   back in June 30, 2017?
4       A.  Yes.
5       Q.  And is that what CyberX used in order to hit
6   "send" and send the text messages that are the subject
7   of this lawsuit?
8       A.  Yes.
9       Q.  And can you describe, then, the operation of
10  the SMS manager screen?
11      A.  Yes.  So that's actually the same screen that
12  contains the button for uploading the leads that we had
13  discussed earlier.
14          So once the leads are there, that's where the
15  text box you select -- so you check off and select to
16  manage that list, which contains the text box for
17  adding the contents for the text communication itself.
18      Q.  So one function that's available in the SMS
19  manager screen is to upload leads through that screen;
20  right?
21      A.  Yes.
22      Q.  Another option is to then manage that list
23  that's been uploaded through that screen; correct?
24      A.  Yes.
25      Q.  Another available function is this is where,

Page 33

1   the SMS manager screen, is where the text box is
2   located to enter the text message or body of the
3   message; right?
4       A.  Correct.
5       Q.  And I think you've indicated the send text
6   message button is also located on this SMS manager
7   screen; right?
8       A.  Yes.
9       Q.  Are there any other functions available on
10  the SMS manager screen other than the ones that you've
11  described?
12      A.  Yes.
13      Q.  Are there any functions that are related to
14  the sending of text messages?
15      A.  Yes.
16      Q.  And what are those?
17      A.  It would be what we call dynamic tags.
18      Q.  Any other functions on the SMS manager screen
19  involved in sending text messages?
20      A.  Not that I recall.
21      Q.  So you just mentioned dynamic tags.  What are
22  dynamic tags?
23      A.  So if I were to put a dynamic tag in there
24  that says first name, it will personalize that when the
25  text is sent.

Page 34

1    Q.   So in other words, it will, that dynamic tag
2   first name, in the example you've given, will cause the
3   admin portal to go grab the first name of a record from
4   the list and insert that first name into the
5   text message; is that right?
6    A.   Correct.
7    Q.   And were dynamic tags used in connection with
8   the text messages that were sent that are the subject
9   of this lawsuit?
10   A.   I don't recall.  In looking at Exhibit 4, in
11  the contents of the message, I do not believe that any
12  dynamic tags would have been used in this message.
13   Q.   And so when you're looking at Exhibit 4, can
14  you direct us to where you're looking for the content
15  of the message?
16   A.   Yeah, I'm looking at this one right here,
17  second from the bottom.  That's the actual message
18  there, that was sent.
19   Q.   The one that starts, hate the price of
20  Obamacare, question mark?
21   A.   Correct.
22   Q.   So, this area of this lead detail page that
23  you are both reading from, there's one, two, three,
24  four records or notes or whatever that are listed
25  there.  What does CyberX refer to this area of the lead

Page 35

1   detail page as?
2    A.   This would be the activity feed.
3    Q.   What kind of activity is displayed in this
4   activity feed?
5    A.   Basically any action that occurs, related to
6   this lead.
7    Q.   And so the activity would feed -- shown in
8   the admin portal, or on the lead detail page of an
9   admin portal, will show outbound text messages sent to
10  that particular lead?
11   A.   Yes.
12   Q.   Will it also reflect inbound text messages
13  received from that same lead?
14   A.   Yes.
15   Q.   What other types of actions related to the
16  leads would be displayed in the activity feed?
17   A.   If there was the initial upload, so when the
18  first upload had occurred, it's stored there, as well
19  as if there's any status change.
20   Q.   Anything else?
21   A.   Not that I can recall right now.
22   Q.   When you say status, what are you referring
23  to?
24   A.   In this example, there was a reply with stop,
25  so they automatically move into our status of do not

Page 36

1   contact.  Does that help clarify?
2    Q.   Yes, sir, thank you.  So looking at this
3   activity feed, the bottom record states, lead imported
4   from admin, the date of June 30, 2017, at 11:20 A.M.
5   EST?
6    A.   Correct.
7    Q.   And below that it notes that you, Chris
8   Pearson, are the -- identified as admin name; right?
9    A.   Yes.
10   Q.   And this is consistent with CyberX's
11  testimony that you were the person who was -- who had
12  imported the FleetSeek leads into the admin portal;
13  right?
14   A.   Yes.
15   Q.   So am I correct in understanding that this
16  record I just read from indicates that CyberX uploaded
17  the FleetSeek leads on June 30, 2017, at approximately
18  11:20 A.M. EST?
19   A.   Yes.
20   Q.   And amongst those leads was the lead for the
21  plaintiff in this case, John Northrup; is that right?
22   A.   Yes.
23   Q.   And then the record above that in the
24  activity feed, also had the same date, June 30, 2017,
25  at 2:36 P.M. EST; right?

Page 37

1    A.   Yes.
2    Q.   That's the record that you identified
3   indicates the text message that was sent specifically
4   to this particular lead; right?
5    A.   Yes.
6    Q.   And this particular lead is John Northrup;
7   right?
8    A.   Yes.
9    Q.   So when we refer to Exhibit 4 as a lead
10  detail page, in this instance Exhibit 4 is a lead
11  detail page for the John Northrup lead?
12   A.   Yes.
13   Q.   And the second record from the bottom in the
14  activity feed is indicating that the text message that
15  CyberX caused to be sent to Mr. Northrup was sent on
16  June 30, 2017 at 2:36 P.M. EST; right?
17   A.   Yes.
18   Q.   Now, before the date it says smartE, if I'm
19  reading that correctly?
20   A.   Yes.
21   Q.   What does that refer to?
22   A.   That's how we refer to our system itself.  So
23  to clarify further, so that was a brand-new piece
24  at that point in time that we were playing with, which
25  would apportion.  That would be our smart system.

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

DEFAPPX0018

Page 38

1     Q.    Does that mean that CyberX was referring to
2  its admin portal as smartE, or something else as
3  smartE?
4     A.    No, something else.
5     Q.    And what is it specifically that CyberX was
6  referring to as smartE?
7     A.    So that's part of our proprietary systems,
8  that we had built, that manages, and after sending the
9  actual text message itself.
10    Q.    Now, CyberX indicated that after it hits the
11 send button in the SMS manager screen, then the system
12 delivers the communications; right?
13    A.    Yes.
14    Q.    I just want to back up for one question.
15    There is a send button in the SMS manager
16 screen; is that right?
17    A.    Yes.
18    Q.    And the purpose of that button, the purpose
19 of that button is that -- in other words, once CyberX
20 executive or manager hits that send button in the SMS
21 manager screen, the purpose of that button is to cause
22 the CRM to send the text messages that have been
23 selected; is that right?
24    A.    Yes.
25    Q.    Now, so far everything that CyberX has

Page 39

1  testified about, from uploading the leads to adding the
2  content for the text messages to clicking "send" from
3  the SMS manager screen, these are all things that take
4  place within the CyberX admin portal; right?
5     A.    Yes.
6     Q.    And CyberX is indicating that once the send
7  button in the SMS manager screen is selected, then the
8  system causes the text messages to be sent.
9     How does the system go about causing those
10 text messages to be sent?
11    A.    So this is where Twilio comes into play.  So
12 our system has what's called an API, between our system
13 and Twilio's.  So our system sends the content and the
14 list of who to send to, to Twilio via this API.  API is
15 a secure way to pass data.
16    Q.    By the way, if you need to take a break, use
17 the restroom, stretch your legs, get some more water,
18 please let me know.  We're happy to accommodate you;
19 okay?
20    A.    Thank you.
21    MR. RICHMOND:  I'm going to make a request in
22 the next 10 minutes we take a bathroom break, not right
23 now.
24    MR. LEHRMAN:  Why don't we do it right now.
25    Okay.  Go off the record, please.

Page 40

1     (Recess taken.)
2  BY MR. LEHRMAN:
3     Q.    Mr. Pearson, handing you what's been marked
4  as Plaintiff Exhibit 6, and hand you what's been marked
5  Plaintiff Exhibit 7.
6     (Whereupon, Exhibits 6 & 7 were marked for
7     identification.)
8  BY MR. LEHRMAN:
9     Q.    Starting with Plaintiff Exhibit 6, do you
10 recognize this?  Can you tell us what it is?
11    A.    Yes.
12    Q.    What is it?
13    A.    This is what we alluded to, referred to
14 before as the SMS manager, where the selection or
15 identification of a list occurs, status and composing
16 of the text message itself.  The available tags below
17 is that dynamic portion I referenced as well.
18    Q.    And there's that send button you had
19 described earlier; right?
20    A.    Yes.
21    Q.    That's also shown on Exhibit 6; right?
22    A.    Yes.
23    Q.    And Plaintiff Exhibit 7, can you tell us what
24 that is?
25    A.    I believe it's the same thing.  The only

Page 41

1  difference is, again, pointing out the communication or
2  the left-hand panel over there is expanded out.
3     So Exhibit 7 is not expanded out under global
4  communications; Exhibit 6 is expanded out.  That's the
5  only difference I see.
6     MR. RICHMOND:  Counsel, the only other
7  difference that was intended here was if you had
8  scrolled all the way down to the bottom.
9     So you can see Exhibit 6 is as far down as you
10 can get on this page.  Whereas, Exhibit 7 shows the two
11 tabs at the top, SMS home, and broadcaster, which is the
12 name of the page that is shown in both 6 and 7.
13    MR. LEHRMAN:  I appreciate that, Counsel, and
14 I appreciate CyberX's testimony in identifying these.
15 And I realize that printing things off of the screen,
16 it's tough to display everything.
17    So I appreciate everyone accommodating me in
18 producing these to us now.  This is helpful.
19 BY MR. LEHRMAN:
20    Q.    Now, there's one feature on both
21 Plaintiff Exhibit 6 and 7, but we could use -- work
22 with Plaintiff Exhibit 6, just to be clear.
23    Kind of midway down the page, this option
24 where it says the scheduling option, is how I would
25 think of it.  It says, would you like to send the SMS

**www.huseby.com**          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

DEFAPPX0019

**Page 42**

1  broadcast now or set it for a future time.
2       Do you see that?
3    A.  Yes.
4    Q.  CyberX is familiar with that function; right?
5    A.  Yes.
6    Q.  And what is that function?
7    A.  Two things for clarification on that.  One is
8  this is a newer feature, and I do not know for certain
9  if this was a feature at the time that the previous
10  ones were sent or not.
11       The purpose of this feature is to set a
12  future date and time for the delivery of the messages.
13    Q.  The text messages that are the subject of
14  this lawsuit, were those ones that were sent
15  immediately, scheduled to be sent at a later time, or
16  some other?
17    A.  I believe I sent them immediately.
18    Q.  In other words, whether or not this feature
19  existed in the admin portal to send text messages at a
20  future time, CyberX's recollection is they sent the
21  text messages that are the subject of this lawsuit,
22  immediately; correct?
23    A.  Yes.
24    Q.  Now, Plaintiff Exhibit 6, under recipients
25  where it says all members, and there's a number in

**Page 43**

1  parentheses, 10,609.
2       You see that?
3    A.  Yes.
4    Q.  Does that number indicate the number of
5  records in the selected -- or number of leads in the
6  selected list, or something else?
7    A.  Yes, the number of selected leads?
8    Q.  Yes, the number of selected leads?
9    A.  Selected leads.
10    Q.  Again, to make sure I'm understanding this
11  correctly, Plaintiff Exhibit 6 -- Plaintiff Exhibit 7,
12  we see this bold title that says SMS Broadcaster;
13  right?
14    A.  Yes.
15    Q.  And then when I look at Plaintiff Exhibit 6
16  in the left-hand navigation, under global
17  communications, one of the suboptions is SMS; right?
18    A.  Yes.
19    Q.  Clicking SMS, does that bring it to the SMS
20  broadcaster window?
21    A.  Yes.
22       (Whereupon, Exhibit 8 was marked for
23       identification.)
24  BY MR. LEHRMAN:
25    Q.  Handing you and counsel what's been marked as

**Page 44**

1  Plaintiff Exhibit 8.  And this is a court filing from
2  this case, Document 63-1.  Title is Declaration of
3  Christopher Pearson in Support of Defendants' Motion
4  for Summary Judgment.
5       Do you see this?
6    A.  Yes.
7    Q.  You recognize this document?
8    A.  Yes.
9    Q.  Second page bears your signature at the
10  bottom; is that right?
11    A.  Yes.
12    Q.  And this is a declaration that you signed in
13  connection with this lawsuit; right?
14    A.  Yes.
15    Q.  "You" meaning, in this instance, you
16  personally, Christopher Pearson; right?
17    A.  Yes.
18    Q.  Now, paragraph 2 of this declaration says,
19  CyberX caused the text message described by
20  paragraphs 32 to 33 of the second amended complaint to
21  be sent through the Twilio platform.
22       You see that?
23    A.  Yes.
24    Q.  And just before we took the last break, I
25  think that's when you were beginning to describe kind

**Page 45**

1  of the interaction or interplay between CyberX's admin
2  portal and Twilio; right?
3    A.  Yes.
4    Q.  And is that what you're referring to
5  generally in paragraph 2 of your declaration?
6    A.  Yes, I believe so.
7    Q.  Now, paragraph 3 of the declaration, in
8  Exhibit 8, says, Twilio platform is a web-based
9  software platform that allows a user to direct the
10  Twilio platform to send text messages to specific phone
11  numbers provided by the user.
12       You see that?
13    A.  Yes.
14    Q.  And in this instance user, when it comes to
15  CyberX's use of Twilio, is CyberX the user you're
16  referring to in paragraph 3 of your declaration in
17  Exhibit 8?
18    A.  Yes.
19    Q.  Paragraph 4 of the declaration states, you,
20  Mr. Pearson, state, the Twilio platform did not
21  generate the phone numbers for any of the text messages
22  dispatched on June 30, 2017.
23       You see that?
24    A.  Yes.
25    Q.  Now, CyberX caused the text message to be

**Page 46**

1  sent to Mr. Northrup on June 30, 2017; right?

2      A.  Yes.

3      Q.  And it caused the text messages to be sent to

4  the other leads on that FleetSeek list, also on

5  June 30, 2017; right?

6      A.  Yes.

7      Q.  And Twilio, if I understand paragraph 4

8  directly -- if I understand paragraph 4 correctly.

9          Is it that what you, Mr. Pearson, were

10  stating is that Twilio did not generate any of those,

11  meaning the FleetSeek numbers, to send the

12  text messages on June 30, 2017?

13      A.  Yes, that's correct.

14      Q.  Now, CyberX has already indicated through its

15  earlier testimony today, that the admin portal

16  generated those phone numbers for the transmission of

17  the June 30, 2017, text messages; isn't that correct?

18      MR. RICHMOND:  Objection.  Calls for

19  speculation and legal opinion.

20          But you can answer.

21      THE WITNESS:  I don't believe that was

22  correct or what was stated.  The numbers were provided

23  to us in the list.  We did not generate any phone

24  numbers.

25

**Page 47**

1  BY MR. LEHRMAN:

2      Q.  Okay.  So the numbers -- I'm referring to the

3  numbers that were -- the FleetSeek numbers that were --

4  that CyberX loaded into its admin portal and assigned

5  the tag 3KITG630.

6          I'm referring to those numbers; okay?

7      A.  Okay.

8      Q.  And CyberX provided those telephone numbers

9  to Twilio; right?

10      A.  Yes.

11      Q.  And just to expand on that, CyberX provided

12  those telephone numbers to Twilio in connection with

13  sending the text messages that are the subject of this

14  lawsuit; right?

15      A.  Yes.

16      Q.  Right before our break you were describing

17  that CyberX uses an API for the purpose of sending the

18  text message content and list of numbers to Twilio; is

19  that right?

20      A.  Yes.

21      Q.  Twilio has what they refer to as an SMS API,

22  or SMS programmatic API?

23      A.  Yes.

24      Q.  Is that the API that CyberX was referring to

25  in its earlier testimony, or was CyberX referring to a

**Page 48**

1  different API?

2      A.  The one it was referring to in the earlier

3  testimony.

4      Q.  And what does API stand for?

5      A.  I don't recall exactly.  I can describe to

6  you what it is, which is an authentic secure process of

7  passing data and commands back and forth between two

8  systems.  The connection of two systems.

9      Q.  So CyberX understands an API to be a means of

10  passing data and commands between two systems; right?

11      A.  Correct.

12      Q.  And when CyberX refers to two systems, does

13  it mean two software systems?

14      A.  Yes.

15      Q.  Two applications?

16      A.  Could mean either in this.

17      Q.  And what specific information did CyberX,

18  through its admin portal, send to Twilio?  What data

19  and commands did the CyberX send to Twilio in

20  connection with sending the text messages that are the

21  subject of this lawsuit?

22      A.  I don't have the exact information off the

23  top of my head.  But what I can tell you, that I know

24  that we have to provide, in order to execute, is the

25  content of the message, the numbers that we're sending

**Page 49**

1  to.  And we completely control when it's sent as well.

2      Q.  And what function, if any, does Twilio

3  perform in connection with sending the text messages

4  that are the subject of this lawsuit?

5      A.  They provide both the API, and the second is

6  the actual delivery to the carrier itself.

7      Q.  So Twilio, providing the API, is providing

8  the means by which CyberX can send data and commands to

9  Twilio; right?

10      A.  Yes.

11      Q.  And the second function that CyberX has

12  identified is that Twilio received the text messages

13  prepared by CyberX and sent those messages to telephone

14  carriers; right?

15      A.  Yes.

16      Q.  Now, when -- and all of these text messages

17  that are the subject of the lawsuit, they were all sent

18  on June 30, 2017; right?

19      A.  I believe so.

20      Q.  And when you say that CyberX controls the

21  timing of when the messages were sent, how does CyberX

22  go about controlling that timing?

23      A.  With the API, we've got commands of telling

24  when to start it, who to send it to, and we have full

25  controls to pause, stop or terminate.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

DEFAPPX0021

Page 50

1   Q.   And do these API commands that CyberX has
2   just identified related to the timing of when
3   text messages are sent, does CyberX use those
4   commands -- did it use those commends to indicate a
5   specific time for sending a text message?
6        Or did it use those commands to indicate the
7   order in which text messages would be sent to the leads
8   on the FleetSeek list?  Or something else?
9   A.   Can you clarify.  I feel like there's a
10  couple questions asked there.  If you could break that
11  down for me.
12  Q.   Sure.  And I appreciate you seeking
13  clarification.
14       Is the -- you indicated that there are API
15  commands that CyberX used to indicate the timing, the
16  specific timing of when Twilio should send the subject
17  text messages to each of the FleetSeek leads; right?
18  A.   Yes.
19  Q.   And what I'm asking now is, are those -- did
20  CyberX use those commands to indicate that a specific
21  lead be sent a text message at a particular time?
22  A.   Yes.  And in this case it would have been
23  using that send immediate function.  So at the time
24  that I clicked "send," it would have immediately began
25  to execute the list.

Page 51

1   Q.   How, specifically, would CyberX, through the
2   API or otherwise, communicate to Twilio to execute the
3   list, as opposed to just executing or sending a single
4   text message?
5   A.   So, trying to think of the best, clear way to
6   explain this.
7        It's sent by individual records.  So if we go
8   back to the list, individual records.  So our software
9   sends to Twilio, send to this number, this message.
10  And then they execute that and we get a confirmation as
11  to whether that was sent or not.
12       And then it just goes through the list,
13  literally one by one by one by one.
14  Q.   And again, when you're saying list, you're
15  referring to the list with the unique tag that you've
16  previous -- that CyberX has previously identified;
17  right?
18  A.   Yes.
19  Q.   Because we're talking about this June 30,
20  2017, set of text transmissions?
21  A.   Yes.
22  Q.   And when you said there's some confirmation
23  that's delivered that the text was sent, does that
24  refer to confirmation that Twilio is communicating back
25  to CyberX, or something else?

Page 52

1   A.   Yes.  So Twilio communicates back to us,
2   giving confirmation that it has been sent, or if there
3   had been a reply.
4        (Whereupon, Exhibits 9 & 10 were marked for
5        identification.)
6   BY MR. LEHRMAN:
7   Q.   All right.  So I'm handing you two exhibits.
8   One is Plaintiff Exhibit 9; one, Plaintiff Exhibit 10.
9        So Plaintiff Exhibit 9 is kind of fuzzy, but
10  you'll see a Bates stamp on the bottom right, CXG1.
11       You see that?
12  A.   Yes.
13  Q.   And I'll represent to you that
14  Plaintiff Exhibit 10 was something that was provided, I
15  guess on Friday, by counsel, and at my request to
16  provide me with something that's a more legible
17  version, say, of Exhibit 9; okay.
18       So if we just go off -- so 9 was produced to
19  us previously as part of CyberX's document production,
20  but I'm asking questions about Exhibit 10 now.
21       Do you know what Exhibit 10 is?
22  A.   Yes.
23  Q.   What is it?
24  A.   This is the inside of the Twilio software and
25  platform that reports and shows the text message that

Page 53

1   was sent as well.
2   Q.   So on the top left corner, this is a screen
3   print; right?
4   A.   Yes.
5   Q.   And this screen print, under -- top left
6   corner where it says Twilio, under there, it says
7   cpearson@cyberx, dot, dot, dot.
8        You see that?
9   A.   Yes.
10  Q.   And is that identifying this screen print as
11  being from an account with, I guess the user name is
12  cpearson and so on?
13  A.   I believe so.
14  Q.   Is this an account that you personally
15  maintained?
16  A.   Yes.
17  Q.   And you maintained this Twilio account for
18  your work with CyberX; is that right?
19  A.   Yes.
20  Q.   And then this screen print from your personal
21  CyberX account says, programmable SMS logs.
22       You see that?
23  A.   Yes.
24  Q.   And these are, under that one record listed
25  there, says, direction, outgoing API; right?

Page 58

1    A.    Correct.

2    Q.    I want to make sure I understand CyberX's
3   testimony about how CyberX used Twilio to send the
4   text messages that are the subject of this lawsuit;
5   okay?

6    A.    Okay.

7    Q.    And when I say the text messages, I'm
8   referring to the text messages sent on June 30, 2017,
9   to these leads that have that unique tag of 3KITG630;
10  okay?

11   A.    Yes.

12   Q.    I'm --

13   A.    I understand.

14   Q.    Great.  Okay.

15        So my -- is it correct to say that CyberX's
16  testimony is that the Twilio API was -- served as a
17  conduit for CyberX to communicate to Twilio all the
18  telephone numbers to which it wanted to send
19  text messages; is that right?

20   A.    Yes.

21   Q.    That the Twilio API was a conduit for CyberX
22  to communicate to Twilio the content of each
23  text message that it wanted Twilio to send on its
24  behalf?

25   A.    Yes.

Page 59

1    Q.    And that Twilio would send the
2   text message -- that Twilio would send the
3   text messages provided by CyberX to the carriers; is
4   that right?

5    A.    Yes.

6    Q.    And Twilio would also provide to CyberX
7   confirmation of delivery status for all of the outgoing
8   text messages?

9    A.    Yes.

10   Q.    Now, CyberX used the term earlier in
11  testimony about -- in describing how it caused
12  text messages to be sent immediately and not on a
13  scheduled basis; right?

14   A.    Yes.

15   Q.    You used the term or phrase, execute the
16  list; you recall that?

17   A.    Yes.

18   Q.    And so I want to get into now, kind of see if
19  we can unpack that and get testimony from CyberX about
20  how CyberX caused Twilio to execute the list, if it
21  did; okay.

22        So it's -- was it the case that CyberX
23  delivered to Twilio through the API the entire list of
24  telephone numbers in one communication?  Or was it that
25  CyberX sent telephone numbers one by one to Twilio, or

Page 60

1   something else?

2    A.    Yes.  It's what we refer to as a cron job or
3   script.  Which starts at the top of the list, and it
4   sends those -- each transaction in a single -- in a
5   single entry.

6    Q.    And, I'm sorry, sir, you say a cron job?

7    A.    Yeah.

8    Q.    Does that mean chronological?

9    A.    No.  It's basically the running -- going back
10  to that word again, the execution of -- we've told the
11  system to start, now that we've manually gone through
12  that list and we've clicked the button to send.

13        Now the system starts going through, sending
14  each one of those items, connecting it up with the
15  content of the message and delivering those.

16   Q.    What specific data in -- what's the specific
17  data in CyberX's admin portal that is identifying the
18  start of the list, or the top of the list, from the
19  middle of the list, from the end of the list?

20   A.    It's -- the order of the list is all based on
21  the order that we received it in.  So we don't change
22  which order in any way, shape, or form.  It's based on
23  how we receive the list.

24   Q.    And CyberX has indicated in its earlier
25  testimony that it believes it likely received a list in

Page 61

1   the form of a CSV file; correct?

2    A.    Correct.

3    Q.    And that's one file that lists however many
4   records; right?

5    A.    Yes.

6    Q.    And those records included a telephone
7   number?

8    A.    Yes.

9    Q.    And so whatever the -- whatever the sequence
10  of records were in that CSV file, that's the same
11  sequence that CyberX instructed Twilio to follow in
12  sending these text messages; is that right?

13   A.    Yes.

14   Q.    So it's not like Twilio was on its own coming
15  up with its own sequence.  Rather, Twilio was following
16  the sequence provided by CyberX?

17   A.    Absolutely.

18   Q.    And just to clarify, what I mean is Twilio
19  was following the sequence provided by CyberX to
20  determine the order in which Twilio sent the
21  text messages provided by CyberX?

22   A.    Correct.

23   Q.    Referring back to Plaintiff Exhibit 6.  This
24  is the SMS manager screen print.  So Exhibit -- again,
25  CyberX has indicated it doesn't recall whether the

Page 62

1  scheduling function existed at the time, back on
2  June 30, 2017; correct?
3       A.    Correct.
4       Q.    But otherwise, other than that scheduling,
5  those few lines of scheduling, where it says, how would
6  you like to send the SMS broadcast, now or send it in
7  for a future time, and the two options below it.
8             Aside from that, Plaintiff Exhibit 6
9  otherwise fairly and accurately depicts what the SMS
10 manager screen appeared, how it appeared back on
11 June 30, 2017?
12      A.    Yes.
13      Q.    Including the inclusion of this send button;
14 correct?
15      A.    Yes.
16      Q.    And back on June 30, 2017, CyberX accessed
17 this particular window; right?
18      A.    Yes.
19      Q.    And hit that send button; right?
20      A.    Yes.
21      Q.    And hitting that send button caused CyberX's
22 admin portal to communicate with Twilio through
23 Twilio's API; right?
24      A.    Yes.
25      Q.    And caused CyberX to send phone numbers, and

Page 63

1  text messages to Twilio on a one-at-a-time; right?
2       A.    Yes.
3       Q.    And the sequence that CyberX followed when it
4  did this, was the same sequence or same order in which
5  the records appeared in the original FleetSeek CSV
6  file; right?
7       A.    Yes.
8       Q.    And Twilio then proceeded to send the
9  text messages in that sequence to the phone numbers
10 provided by CyberX; right?
11      A.    Yes.
12      Q.    And Twilio sent those text messages without
13 any person at CyberX having to manually dial any
14 telephone numbers after hitting the send button; is
15 that right?
16      A.    Can you ask that another way, so I understand
17 better.
18      Q.    Sure.  Now, you personally, were you
19 personally the one who hit the send button on behalf of
20 CyberX back on June 30, 2017?
21      A.    Yes.
22      Q.    After you hit the send button, did you
23 personally dial Mr. Northrup's telephone number in
24 order to send that text message?
25      A.    No.

Page 64

1             MR. RICHMOND:  Assumes facts not in evidence,
2  calls for speculation.
3  BY MR. LEHRMAN:
4       Q.    You understand my question?
5       A.    Yes.
6       Q.    And did you personally dial the number?
7             Same objections.
8             MR. RICHMOND:  Objection.  Vague.
9             Go ahead.
10            THE WITNESS:  No.
11 BY MR. LEHRMAN:
12      Q.    Now I'm asking CyberX.
13            Did anyone at CyberX, after CyberX hit the
14 send button, did anyone at CyberX dial Mr. Northrup's
15 number for the purpose of sending the text message to
16 him on June 30, 2017?
17      A.    No.
18      Q.    Did -- does CyberX know if anyone at Twilio
19 dialed Mr. Northrup's telephone number to send him the
20 June 30, 2017, text message, after CyberX hit the send
21 button?
22      A.    I would not be privy to that information, so
23 I don't know.
24      Q.    CyberX does not know; correct?
25      A.    Correct.

Page 65

1       Q.    Does CyberX have any reason to believe that
2  Twilio dialed Mr. Northrup's telephone number after
3  CyberX hit the send button, for purposes of sending the
4  text message?
5             MR. RICHMOND:  Objection.  Vague.
6             THE WITNESS:  It would be a speculation
7  answer.  I truly don't know.
8  BY MR. LEHRMAN:
9       Q.    What I'm asking is, does CyberX -- does
10 anyone at CyberX have any reason to believe
11 that -- strike that.
12            I'm asking CyberX.  Does CyberX have any
13 reason to believe that someone at Twilio manually
14 dialed Mr. Northrup's telephone number after CyberX hit
15 the send button?
16      A.    No.
17      Q.    Let me go at it a different way.
18            Has anyone at Twilio communicated to CyberX
19 that it manually dialed Mr. Northrup's number after
20 CyberX hit the send button?
21      A.    No, not that I'm aware of, or recall.
22            MR. LEHRMAN:  Off the record for a second.
23            (Discussion off the record.)
24            (Whereupon, Exhibit 13 was marked for
25            identification.)

www.huseby.com          **Huseby, Inc.  Regional Centers**          800-333-2082
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

DEFAPPX0024

Page 82

1    Q.   And secondly, CyberX has no reason to believe
2  that Twilio physically keyed in any of those numbers
3  dialed on June 30, 2017; right?
4    A.   Correct.
5    Q.   Mr. Pearson, I want to talk to you now about
6  how we might go through these call log lists that are
7  CXG28 through CXG33.
8        Not right this second, but the methodology
9  the parties could use to review those call logs to
10  identify the total number of text messages that were
11  sent and delivered.  Okay.
12       So isn't one way of identifying all outgoing
13  messages that were sent and delivered, would be to,
14  because these are CSV files, to identify all messages
15  that have a status of delivered -- I guess just that.
16       I was going to say status of delivered and
17  direction of outbound API, but actually just filtering
18  each CSV file for a status of delivered, would identify
19  all outbound messages that Twilio has confirmed from
20  the carrier have been delivered to a particular device;
21  right?
22    A.   Yes, correct.
23    Q.   And that would, conversely, that filtering
24  would exclude inbound messages; right?
25    A.   Correct.

Page 83

1    Q.   And it would exclude outbound messages that
2  had the status of undelivered; right?
3    A.   Yes.
4    Q.   Is there some other methodology that you
5  believe that would more accurately identify the
6  outgoing text messages sent on June 30, 2017 to these
7  leads?
8        MR. RICHMOND:  Objection.  You're asking him
9  a different question, so you now made the question
10  confusing.
11       I'm going to instruct you not to answer.
12       The first question was whether or not he was
13  confirming what the document says, so what information
14  he's received at Twilio.
15       You've now referred to that but left off the
16  merely confirmed by Twilio and said, confirming what the
17  actual underlying data is.  That's a different question.
18  BY MR. LEHRMAN:
19    Q.   Does CyberX -- CyberX understands the
20  methodology that I just proposed for identifying, based
21  on these call logs, the number of outgoing
22  text messages that were sent and confirmed as delivered
23  to Twilio by carriers; right?
24    A.   Yes, I understand that.
25    Q.   And not to you, but CyberX understands that;

Page 84

1  correct?
2    A.   Yes, correct.
3    Q.   And CyberX has just confirmed that it
4  believes that that's a -- that that methodology would
5  deliver a correct result; right?
6        MR. RICHMOND:  Objection.  Refers to multiple
7  questions, vague, speculative, intended to confuse the
8  witness.
9        I'm going to instruct you not to answer.
10       You want to ask him a complete question, ask
11  him a complete question.
12  BY MR. LEHRMAN:
13    Q.   Does CyberX have a different way of
14  evaluating these call log documents to determine the
15  number of calls that have a status of delivered?
16       MR. RICHMOND:  Objection.  Calls for a legal
17  conclusion, and speculation.
18  BY MR. LEHRMAN:
19    Q.   Okay.  So, do you understand my question?
20    A.   Yes.
21    Q.   Okay.  You can answer.
22    A.   Can you repeat your question.
23       MR. LEHRMAN:  We can read it back.
24       (Record read by the reporter as follows:
25       "Does CyberX have a different way of

Page 85

1        evaluating these call log documents to
2        determine the number of calls that have a
3        status of delivered?")
4        THE WITNESS:  Yes, there would be a different
5  way to do it.
6  BY MR. LEHRMAN:
7    Q.   What's the different way that CyberX has of
8  doing this?
9    A.   We can do it from within our own CRM.
10    Q.   Has CyberX attempted to identify the number
11  of outgoing text messages that it sent that were --
12  that were -- well, strike that.
13       Has CyberX done what you just referred to?
14    A.   No.  Not that I recall.
15    Q.   Is CyberX -- but you've indicated CyberX is
16  able to do what you described; right?
17    A.   Yes, correct.
18    Q.   How long would it take CyberX to perform
19  that?
20    A.   Couple days' time or less.
21    Q.   How would CyberX perform such a search?
22    A.   We would go into our database, perform
23  database queries.
24    Q.   And what are the queries that CyberX would
25  perform to determine this?

**Page 86**

1    A.   It would depend solely on what was questioned
2  of us.
3    Q.   And when CyberX refers to its database, is it
4  referring to its admin portal, or something else?
5    A.   Something else.
6    Q.   And what's that?
7    A.   The database, where all the data resides.
8    Q.   And CyberX, when CyberX queries its database,
9  is it able to then generate a report of that query?
10    A.   Yes.
11    Q.   And in what -- and is CyberX able to export
12  the report from those queries?
13    A.   Yes.
14    Q.   And into what formats is CyberX capable of
15  exporting these reports?
16    A.   Multiple, but CSV would be the most common.
17    Q.   And does -- what data does CyberX have on
18  delivery status for these text messages that were sent
19  on June 30, 2017, if any?
20    A.   Very confident that we do.  I'd have to look
21  at those specifics of what they are.
22    Q.   What is the source of such delivery status
23  data that CyberX has in its database for the particular
24  text messages?
25    A.   Could you please repeat that or phrase it

**Page 87**

1  another way.
2    Q.   Yeah.  What's the source of the delivery
3  status data?  Is it telephone carriers, Twilio or
4  something else?
5    A.   Twilio.
6       MR. RICHMOND:  When you get a break, we'd
7  like to take one, when you get to a stopping point.
8  BY MR. LEHRMAN:
9    Q.   Is the delivery status data that CyberX has
10  in its database different than the data that's
11  reflected in Plaintiff Exhibit 14?
12    A.   I don't know without a review of it first.
13    Q.   And CyberX did not review its database in
14  preparing for today's deposition; right?
15    A.   Correct.  Not as it relates to that.
16    Q.   And CyberX specifically did not review
17  delivery status data available in its database, in
18  preparing for this deposition; right?
19    A.   Yes, correct.
20       MR. LEHRMAN:  Why don't we take a break now,
21  thanks.
22       (Recess taken.)
23  BY MR. LEHRMAN:
24    Q.   So, Mr. Pearson, I'd asked CyberX earlier
25  about a certain time frame, the time -- point in time

**Page 88**

1  when CyberX has hit the send button in its SMS manager
2  window.
3    A.   Yes.
4    Q.   From that point forward until the
5  text messages are actually sent.  This is the time
6  period that I want to ask you about again now; okay?
7    A.   Okay.
8    Q.   You clear on the time period I'm talking
9  about?
10    A.   Can you ask it again, make sure we're
11  aligned.
12    Q.   Sure.  So we previously identified and
13  inquired about a time period between two points in
14  time.  One is CyberX hitting the send button in its SMS
15  manager window, on June 30, 2017.
16    A.   Yes.
17    Q.   And that's the start time.
18       And the end time is the sending of the
19  text messages to those various leads that are on the
20  list identified by the particular unique tag you
21  previously referenced.
22    A.   Okay.
23    Q.   Okay.  Same time period.
24       Does -- and I'm going back to, again, to
25  Twilio and what Twilio did or what Twilio did not do

**Page 89**

1  during this time period; okay?
2    A.   Yes.
3    Q.   And here's my question.
4       My question is, does CyberX have knowledge
5  that any person employed by Twilio, took any action in
6  that time period in order to send the text messages
7  that were sent on June 30, 2017?
8    A.   I have no knowledge of that.
9    Q.   CyberX has no knowledge of that; correct?
10    A.   Yes.
11    Q.   Does CyberX have any reason to believe that
12  any person employed by Twilio took any action in that
13  time period to send these June 30, 2017, text messages?
14    A.   I have no reason to believe that someone
15  would.
16    Q.   You personally have no reason to believe
17  that; correct?
18    A.   Yes.
19    Q.   And, likewise, CyberX has no reason to
20  believe that; right?
21    A.   Yes.
22    Q.   Again, the telephone number 208-209-7788, was
23  that the exclusive telephone number used by CyberX to
24  send the subject text on June 30, 2017?
25    A.   Yes, correct.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

DEFAPPX0026

Page 90

1        MR. LEHRMAN:  Can we go off the record for a
2   second.  Probably done.
3        (Discussion off the record.)
4        MR. LEHRMAN:  Back on the record, and I have
5   no questions.
6
7                    EXAMINATION
8
9   BY MR. RICHMOND:
10       Q.   Mr. Pearson, my name is Bill Richmond.  I'll
11  be asking you some questions.
12            Could you briefly state your technical and
13  educational background as it relates to the platforms
14  and the business you perform at CyberX?
15       A.   Yes.  So we've been building an office
16  platform for over the last almost 13 years now, and
17  heavily involved in not just the system, but multiple
18  technical systems.  And my role is architect and
19  putting those systems together.
20       Q.   How many years have you been using the Twilio
21  system, or platform?
22       A.   I'd have to look to give you an exact number,
23  but roughly probably five years-plus now.
24       Q.   Silence means I'm skipping things.
25            If you could pull up Exhibit 14.  It is the

Page 91

1   list of numbers from Twilio that is CXG32.  Do you have
2   that in front of you, Mr. Pearson?
3        A.   Yes.
4        Q.   Great.  Was the -- was the order that Twilio
5   sent the text messages and delivered them to the
6   carriers, the order that you specified from the CRM
7   system?
8        A.   Yes.
9        Q.   And to your understanding, that was what was
10  eventually outputted on Exhibit 14 in the SMS log?
11       A.   Yes.
12       Q.   If you could hold on to 14 and take a look at
13  Exhibit 10 and 12 for me.  And it looks like in
14  Exhibits 10 and 12, both of them have a few different
15  fields at the top under the header Programmable
16  SMS Logs.
17            One field says search by message SID; another
18  says start date and time; another says end date and
19  time; and then from and to.
20            And it looks like you inputted, in
21  Exhibit 10, Mr. Northrup's number in the to, and in
22  Exhibit 12 Mr. Northrup's number in the from.
23            Is that accurate?
24       A.   Yes, correct.
25       Q.   Do you have any reason to believe that the

Page 92

1   message SID field had any relation to you being able to
2   pull the logs that are Exhibit 14 and Exhibit 13?
3        A.   Can you rephrase that for me.
4        Q.   Sure.  Do you believe that you would have
5   used the message SID field to create the logs for the
6   entire set of messages from the FleetSeek campaign, the
7   examples of which are in Exhibits 13 and 14?
8        A.   Yes.
9        Q.   And that would apply to the other
10  spreadsheets that we have not entered into evidence?
11       A.   Yes, correct.
12       Q.   Is the data in Exhibit 13 and 14, in addition
13  to the other spreadsheets that were provided in this
14  case and produced to the plaintiff, the raw data from
15  Twilio?
16       A.   Yes.
17       Q.   Was the raw data from Twilio about what
18  numbers were sent, when they were sent and what the
19  response was, whether it was delivered or not
20  delivered, uploaded into the CRM system?
21       A.   Yes.
22       Q.   Is there any other data source that the CRM
23  system would have, other than Twilio, for determining
24  the delivery or nondelivery information from the
25  text messages at issue?

Page 93

1        A.   No.
2        Q.   Given the use of the -- in Exhibit 13 on the
3   timestamps of the send date, it looks like it says the
4   time zone is UTC.  And it looks like in Exhibit --
5   looks like in Exhibit 3 the timestamps are done in EST.
6            Considering the differences of time
7   messaging, do you have any reason to believe otherwise
8   that the 2:36 P.M. Eastern Time text message that was
9   sent to Mr. Northrup is about four minutes different
10  from that same UTC time frame in Exhibit 14?
11            MR. LEHRMAN:  Form.
12            THE WITNESS:  Question is, do I understand
13  that?
14  BY MR. RICHMOND:
15       Q.   Let me rephrase it.
16            Is it your understanding that the 2:36 P.M.
17  Eastern Time, time frame for the message being sent to
18  Mr. Northrup, as reflected in Exhibit 3, the CRM, is
19  only four minutes different from the timestamp under
20  UTC, as listed by his number in Exhibit 14?
21       A.   Yes, correct.
22       Q.   Was any alteration done to the raw data that
23  was received from Twilio about what was delivered or
24  not delivered?
25       A.   No.

Page 94

1    Q.   Was -- does CyberX have any personal
2  knowledge as to whether the text messages listed in the
3  logs as delivered, whether they were delivered to a
4  cell phone, a landline, a VOIP number or some other
5  number?
6    A.   No.  I'm sorry, can you rephrase that -- are
7  you asking me do we have that knowledge?
8    Q.   Does CyberX have knowledge from Twilio, or
9  any other source, as to whether or not the numbers that
10 say delivered, were actually delivered to a mobile
11 number as opposed to simply delivered to a VOIP number,
12 which also can accept text messages?
13   A.   Yes, there is -- that delivery can contain
14 those other landlines or VOIPs, yes.
15   Q.   When you clicked on the send button in the
16 SMS broadcast system of the CRM, which is reflected on
17 Exhibit 6, to your understanding, is that the
18 equivalent of dialing the text messages?
19   A.   Yes.
20   Q.   Is it your understanding or expectation that
21 there would be any variance to the instructions
22 provided by clicking "send" as the message is
23 transmitted through the wires and system of Twilio?
24   A.   No.
25   Q.   Do you have any reason to believe that your

Page 95

1  instructions in this particular instance with these
2  particular text messages were varied, those
3  instructions being who to send to, how soon to send it
4  to them, and what message to be sent?
5    A.   You're asking me if it does?
6    Q.   Do you have any reason to believe that there
7  was variance in the instructions that you gave to
8  Twilio, about what to send, who to send it to, when to
9  send it?
10   A.   No.
11   Q.   Are you familiar with CyberX's database of
12 information as it relates to these particular
13 text messages and the campaign that they were sent in?
14   A.   Yes, I am.
15   Q.   Did you find it necessary to go back and
16 review the database to glean new information for this
17 deposition?
18   A.   No.
19   Q.   From your own experience with the database of
20 information and the Twilio spreadsheets, do you have
21 any reason to believe that there's any different
22 information about whether or not the text messages were
23 delivered or not delivered, as shown in the Twilio
24 spreadsheets, as opposed to the CRM database?
25   A.   No.  I did think about that more.  The only

Page 96

1  potential slight difference is the actual time, the
2  timing mechanism, because of the delay between our
3  system and their system.
4    Q.   In this case, did CyberX upload a list of
5  leads to an online platform, select the names and phone
6  numbers to be communicated with, draft the text message
7  and input it into the system, select a date and time of
8  delivery, and then click on the send button?
9        MR. LEHRMAN:  Form.
10       THE WITNESS:  Yes.
11 BY MR. RICHMOND:
12   Q.   Is the CRM system one in which you can
13 navigate to a website and log into the system?
14   A.   Yes.
15   Q.   In this case, did CyberX navigate to a
16 website, log into the CRM platform, determine the
17 content of the text messages at issue, type the content
18 of the message into the platform, determine whether to
19 send the messages immediately or at a different time
20 and then click "send" to initiate the campaign?
21   A.   Yes.
22       MR. LEHRMAN:  Form.
23 BY MR. RICHMOND:
24   Q.   Is the CRM system or -- back up.
25       Is the CRM system utilized by CyberX

Page 97

1  predictive of what to send, when to send it, to whom it
2  should be sent, or how to send messages?
3        MR. LEHRMAN:  Form.
4        THE WITNESS:  Can you clarify what you mean
5  by predictive.
6  BY MR. RICHMOND:
7    Q.   Sure.  Does the software itself make a
8  determination, as opposed to the human user, as to what
9  to send, when to send it, to whom it would be sent, or
10 how to send a text message?
11   A.   No.
12       MR. LEHRMAN:  Form.
13 BY MR. RICHMOND:
14   Q.   Did you yourself decide what message to send
15 in these campaigns?
16   A.   The message was provided to me, and I entered
17 it, yes.
18   Q.   Did the machine decide what message to send?
19   A.   No.
20   Q.   Did you or the machine decide when the
21 messages should be sent?
22   A.   I did.
23   Q.   And without uploading the FleetSeek list into
24 the CRM system, and then aligning the columns to map
25 the data to the CRM system, could the text messages at

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

DEFAPPX0028

Page 98

1    issue have been sent?
2        A.   No.
3        Q.   Did you manually curate the list of customers
4    on the FleetSeek list, either by aligning the
5    categories, or otherwise sorting them?
6        A.   Yes.
7            MR. RICHMOND:  Reserve and pass.
8
9                    FURTHER EXAMINATION
10
11   BY MR. LEHRMAN:
12       Q.   Mr. Pearson, just a few questions, and
13   following up on questions that Counsel just asked you.
14           CyberX had just testified in response to some
15   of Mr. Richmond's questions, and I'm not trying to
16   mischaracterize CyberX's testimony.
17           I thought the testimony was essentially that
18   the -- that the value of delivered -- looking at
19   Plaintiff Exhibit 14, one of these call logs, under
20   status field.  The value of delivered could indicate
21   that a text message was sent or delivered to a VOIP.
22           Am I understanding that correctly; that was
23   CyberX's testimony?
24       A.   You're referring to only the delivered?  Or
25   you're referring to the undelivered?

Page 99

1        Q.   Let me start with delivered.
2        A.   Okay.
3        Q.   Is that CyberX's understanding, that, looking
4    at Plaintiff Exhibit 14, under that status of
5    delivered, that delivered could mean that a particular
6    text message was sent to a VOIP number?
7        A.   It is possible, yes, for it to go through a
8    VOIP.
9        Q.   Is it also CyberX's understanding that status
10   of delivered, that in an instance when a text message
11   has been sent to a VOIP number, that a carrier could
12   confirm to Twilio the delivery status of that message
13   was delivered?
14       A.   That is possible, yes.
15       Q.   And what is the basis for CyberX's belief
16   that a delivered status of delivered could result from
17   a text message that is sent to a VOIP number?
18       A.   From past experiences, I have known that,
19   very well that you can -- because it's an SMS versus a
20   text message directly, SMS can be delivered
21   successfully over VOIP.
22       Q.   Did, at any time, CyberX perform any work to
23   determine or attempt to determine whether any of the
24   numbers in this list that we've been discussing, these
25   FleetSeek numbers, did CyberX do any work to determine

Page 100

1    whether any of them were assigned to VOIP?
2        A.   Not that I can recall.
3        Q.   Did CyberX perform any line type
4    identification test to these numbers?
5        A.   Not that I recall.
6        Q.   You know what I mean by that?
7        A.   I think so, but go ahead.
8        Q.   What I mean in this instance is a line type
9    of identification test to identify a phone number as
10   being associated with a landline, wireless device, or
11   something else.
12       A.   Uh-huh.
13       Q.   Did CyberX perform that type of line type
14   identification on these FleetSeek numbers before
15   sending text messages?
16       A.   Not that I recall.  Yeah, not that I recall.
17       Q.   Does CyberX know if it performed any line
18   type identification test to those numbers after the
19   text messages were sent?
20       A.   Not that I recall.
21       Q.   Would CyberX be able to search its business
22   records to determine whether at any time it performed
23   any type of line type identification on these numbers?
24       A.   Yes, yeah.
25       Q.   And how would CyberX go about doing that?

Page 101

1        A.   There's a -- the ability for us also within
2    the API to do what's called a lookup.  Could do a
3    lookup.
4        Q.   So would CyberX be able to go into -- would
5    this be the database or admin portal or something else?
6        A.   We'd have to go back and look at past logs
7    and run it.  We would have to run it on these numbers.
8        Q.   So let me be clear.  I'm not asking if CyberX
9    is capable of running -- performing line type
10   identifications now.
11           I want to ask, is CyberX able to look through
12   its business records or its database or its admin
13   portal or anything, to determine whether it previously
14   performed a line type identification on any of these
15   numbers?
16       A.   We can look to see if we did it previously.
17   I do not believe we did, but we can look.
18       Q.   How much time would it take for CyberX to
19   perform that operation, searching through to see if it
20   previously --
21       A.   Probably a couple days.
22       Q.   -- did line type identifications?
23           MR. RICHMOND:  Note that as something to
24   find.
25           MR. LEHRMAN:  Thank you, sir.  That's all I

Page 102

```
 1   have.
 2
 3                    FURTHER EXAMINATION
 4
 5   BY MR. RICHMOND:
 6        Q.   Mr. Pearson, just a couple more questions.
 7        A -- telephone carriers can include both
 8   mobile and landlines within the same carrier; correct?
 9   For example, AT&T could have both mobile, landline, and
10   VOIP services that it offers?
11        A.   Yes, correct.
12        Q.   Is another way to be able to determine
13   whether or not a text message was actually delivered
14   and/or received by the recipient, is to obtain the
15   carrier's own statements for the users to determine if
16   it shows up on their bill as a received text message?
17             MR. LEHRMAN:  Form.
18             THE WITNESS:  Yeah, it's possible.
19   BY MR. RICHMOND:
20        Q.   Do you have any recollection --
21        A.   I was going to say it's possible, not that I
22   have got knowledge of.
23        Q.   You haven't seen any carrier statements for
24   these phone numbers?
25        A.   Correct.
```

Page 103

```
 1        Q.   For the API lookup, the information that
 2   Mr. Lehrman was asking for, is that something that you
 3   can look up to see whether a prior lookup was done, or
 4   is it to do a lookup for a date in the past?
 5        A.   Yeah, we can look to see if it was executed
 6   or not, if a lookup was or was not done.
 7        Q.   So you could say, for example, we did do a
 8   lookup on that data set and here's the result, or we
 9   did a lookup on June -- or on July 1, 2017, to see what
10   was the data?
11        A.   Correct.
12        Q.   And is that data that you believe would still
13   be in the system if it existed?
14        A.   Yes.
15        Q.   Can you get that data to Mr. Lehrman in the
16   next couple days?
17        A.   Yes.
18             MR. RICHMOND:  Reserve and pass.
19             MR. LEHRMAN:  Read or waive?
20             MR. RICHMOND:  We'll waive.
21             THE REPORTER:  Counsel, do you want a copy of
22   the transcript?
23             MR. RICHMOND:  Yes.
24             (Whereupon, the deposition adjourned at
25             4:27 P.M.)
```

Page 104

```
 1                  CERTIFICATE OF REPORTER
 2        I, BRANDON D. COMBS, a Certified Shorthand
 3   Reporter, hereby certify that the witness in the
 4   foregoing deposition was by me duly sworn to tell the
 5   truth, the whole truth, and nothing but the truth in the
 6   within-entitled cause;
 7        That said deposition was taken in shorthand by
 8   me, a disinterested person, at the time and place
 9   therein stated, and that the testimony of the said
10   witness was thereafter reduced to typewriting, by
11   computer, under my direction and supervision;
12        That before completion of the deposition,
13   review of the transcript was not requested.  If
14   requested, any changes made by the deponent (and
15   provided to the reporter) during the period allowed are
16   appended hereto.
17        I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22        DATED: March 19, 2019
23
24        _____
25   BRANDON D. COMBS, TEXAS CSR 10927, CALIFORNIA CSR 12978
```

# EXHIBIT A-4

| From | To | Body | Status | SentDate | ApiVersion | NumSegm | ErrorCode | AccountSid | Sid | Direction | Price | PriceUnit |
|------|-----|------|--------|----------|------------|---------|-----------|------------|-----|-----------|-------|-----------|
| 5013376363 | 2082097788 | you cant o | received | 2017-06-30 19:13:23 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM1022636fe5697286150fd31f723e9487 | inbound | -0.0075 | USD |
| 6788988577 | 2082097788 | Who is thi: | received | 2017-06-30 19:06:05 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMddbca937f536ba5818b122eaf7e906e4 | inbound | -0.0075 | USD |
| 8137489905 | 2082097788 | Stop | received | 2017-06-30 18:54:31 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMd237e827f4d2212b9020f44d528be05f | inbound | -0.0075 | USD |
| 2082097788 | 7046345711 | Hate the h | delivered | 2017-06-30 18:52:09 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMe88a07cd9f844642838ff856fe21cd7d | outbound-api | -0.0075 | USD |
| 2082097788 | 7127433611 | Hate the h | undelivered | 2017-06-30 18:52:00 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM1ff301f3a5774760a960d252e3bd9d0b | outbound-api | -0.0075 | USD |
| 2082097788 | 7123232491 | Hate the h | undelivered | 2017-06-30 18:51:51 | L | 1 | 30003 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMbd24f45e4a6f4075b46a21f6dcfd9ba1 | outbound-api | -0.0075 | USD |
| 2082097788 | 7602403957 | Hate the h | delivered | 2017-06-30 18:51:42 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMd2405196c2634848aab7fda803f24dde | outbound-api | -0.0075 | USD |
| 2082097788 | 2086283656 | Hate the h | delivered | 2017-06-30 18:51:33 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM95c47b291eb44c588a9531d688a6395a | outbound-api | -0.0075 | USD |
| 2082097788 | 6058867174 | Hate the h | undelivered | 2017-06-30 18:51:24 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMe99310b0b6704bd88e5fe2563714b608 | outbound-api | -0.0075 | USD |
| 2082097788 | 3025302264 | Hate the h | delivered | 2017-06-30 18:51:15 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM78b1159a284f4248923e99da35097f7e | outbound-api | -0.0075 | USD |
| 2082097788 | 4137360314 | Hate the h | undelivered | 2017-06-30 18:51:06 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM06a26732581f4db0a1b76b18cd709086 | outbound-api | -0.0075 | USD |
| 2082097788 | 4358645948 | Hate the h | delivered | 2017-06-30 18:50:57 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMbc007968c3df460f846a1f54fffa3a02 | outbound-api | -0.0075 | USD |
| 2082097788 | 6265754736 | Hate the h | undelivered | 2017-06-30 18:50:48 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMb82e7df57aea4f869a8533a5fb6452cb | outbound-api | -0.0075 | USD |
| 2082097788 | 3366351366 | Hate the h | delivered | 2017-06-30 18:50:39 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM53e017aab1924b88b797173d5e02f095 | outbound-api | -0.0075 | USD |
| 2082097788 | 3524292803 | Hate the h | undelivered | 2017-06-30 18:50:30 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMf45e7492063b4a258548391797e0da15 | outbound-api | -0.0075 | USD |
| 2082097788 | 5302513668 | Hate the h | delivered | 2017-06-30 18:50:21 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM0b112f59937e408fa753cab17374e2a4 | outbound-api | -0.0075 | USD |
| 2082097788 | 2292460117 | Hate the h | undelivered | 2017-06-30 18:50:12 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM3b563526b1424f23b30f2d4d22c87e83 | outbound-api | -0.0075 | USD |
| 2082097788 | 7637533218 | Hate the h | undelivered | 2017-06-30 18:50:12 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM6cabaa6870224da39f526d2c4a48398f | outbound-api | -0.0075 | USD |
| 2082097788 | 3088584842 | Hate the h | undelivered | 2017-06-30 18:50:03 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMf80747b2ecbc4ef4876dd3ab55e58da5 | outbound-api | -0.0075 | USD |
| 2082097788 | 7016692336 | Hate the h | undelivered | 2017-06-30 18:50:03 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM7b84ecf10e0a4acea3aa58e92e0de14d | outbound-api | -0.0075 | USD |
| 2082097788 | 3083465341 | Hate the h | delivered | 2017-06-30 18:49:54 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM572a4f1361c643b7b3a31fb2f7185372 | outbound-api | -0.0075 | USD |
| 2082097788 | 6126558980 | Hate the h | delivered | 2017-06-30 18:49:54 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM624ed39e2f6b4abd8fcccddc0dfff7a6 | outbound-api | -0.0075 | USD |
| 2082097788 | 6414877745 | Hate the h | undelivered | 2017-06-30 18:49:45 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMf384c51ded36451dbf29e4c35dfbaf55 | outbound-api | -0.0075 | USD |
| 2082097788 | 4196927441 | Hate the h | undelivered | 2017-06-30 18:49:45 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM38728ab11d514fbd8b5d8708eab60703 | outbound-api | -0.0075 | USD |
| 2082097788 | 9128635979 | Hate the h | undelivered | 2017-06-30 18:49:36 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMec5fa4d888d14bc6b565ece761753196 | outbound-api | -0.0075 | USD |
| 2082097788 | 4088471998 | Hate the h | delivered | 2017-06-30 18:49:36 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM47b3227cc6874b1a95e377cba94fe682 | outbound-api | -0.0075 | USD |
| 2082097788 | 9095861430 | Hate the h | delivered | 2017-06-30 18:49:28 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMae1db85959ca45558db82f3f4fd3aa79 | outbound-api | -0.0075 | USD |
| 2082097788 | 2073656106 | Hate the h | undelivered | 2017-06-30 18:49:27 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMb394b2db7d69465daed6c024938b9456 | outbound-api | -0.0075 | USD |
| 2082097788 | 2538562240 | Hate the h | undelivered | 2017-06-30 18:49:27 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM663368800894455b4395216ff2daad5 | outbound-api | -0.0075 | USD |
| 2082097788 | 2082378629 | Hate the h | undelivered | 2017-06-30 18:49:25 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM6d29387dc09047e1ab647c4e8a77b101 | outbound-api | -0.0075 | USD |
| 2082097788 | 6054326865 | Hate the h | delivered | 2017-06-30 18:49:19 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMd714eccb409f4a66a4f554f9215f1ddf | outbound-api | -0.0075 | USD |
| 2082097788 | 8185666838 | Hate the h | undelivered | 2017-06-30 18:49:18 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMd0d98643bc274746ba9a6ddc8b57b2d8 | outbound-api | -0.0075 | USD |
| 2082097788 | 7403792824 | Hate the h | undelivered | 2017-06-30 18:49:18 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMf4daa6640b134f9c959166d71f8576d7 | outbound-api | -0.0075 | USD |
| 2082097788 | 9035882848 | Hate the h | delivered | 2017-06-30 18:49:16 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM43ab8d917d454fd2891c7f3973c90388 | outbound-api | -0.0075 | USD |
| 2082097788 | 2073574665 | Hate the h | delivered | 2017-06-30 18:49:13 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM0f4190fbbbd74d6dae4288b78fd18775 | outbound-api | -0.0075 | USD |
| 2082097788 | 7315499515 | Hate the h | delivered | 2017-06-30 18:49:10 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM67f411294570411 8a499478ed7eea1b6 | outbound-api | -0.0075 | USD |
| 2082097788 | 7042897542 | Hate the h | delivered | 2017-06-30 18:49:09 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM3ce8820d3e454530ba06ff8ca03e43f | outbound-api | -0.0075 | USD |
| 2082097788 | 6016372802 | Hate the h | undelivered | 2017-06-30 18:49:09 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM578fa20ca84044ada0a597a8c296d10c | outbound-api | -0.0075 | USD |
| 2082097788 | 8036250549 | Hate the h | delivered | 2017-06-30 18:49:07 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMc21be93fd3ea45c7a0f5861fc7a58cbc | outbound-api | -0.0075 | USD |
| 2082097788 | 2188432723 | Hate the h | delivered | 2017-06-30 18:49:04 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM858b78077bb84dd086fcb457a99005fc | outbound-api | -0.0075 | USD |
| 2082097788 | 6127188727 | Hate the h | undelivered | 2017-06-30 18:49:01 | L | 1 | 30003 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMfafcd141ceb649dc828dea91437dc7df | outbound-api | -0.0075 | USD |
| 2082097788 | 9563816532 | Hate the h | delivered | 2017-06-30 18:49:00 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM4e696e3d0bf643e2946121ee2e8caa44 | outbound-api | -0.0075 | USD |
| 2082097788 | 6058543495 | Hate the h | undelivered | 2017-06-30 18:49:00 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM8389a245de04436bbda21c78f07a79e3 | outbound-api | -0.0075 | USD |
| 2082097788 | 6037789722 | Hate the h | delivered | 2017-06-30 18:48:57 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM88986d897c454faa85c27346faf30ce | outbound-api | -0.0075 | USD |
| 2082097788 | 3609447407 | Hate the h | delivered | 2017-06-30 18:48:55 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM93927299416347ae99a4853071648c17 | outbound-api | -0.0075 | USD |
| 2082097788 | 7142670325 | Hate the h | delivered | 2017-06-30 18:48:52 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SMbd4581f25c6a446cae4c737ca18d4955 | outbound-api | -0.0075 | USD |
| 2082097788 | 5038295370 | Hate the h | undelivered | 2017-06-30 18:48:51 | L | 1 | 30005 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM33ed877372e44185bfd157c1e04972d7 | outbound-api | -0.0075 | USD |
| 2082097788 | 5034372302 | Hate the h | delivered | 2017-06-30 18:48:51 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM4fe0fbecf2a746238ef40b2be1eaedaf | outbound-api | -0.0075 | USD |
| 2082097788 | 8123382511 | Hate the h | delivered | 2017-06-30 18:48:48 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM1feefe731c6d4eb29864152e86e8037b | outbound-api | -0.0075 | USD |
| 2082097788 | 8286490068 | Hate the h | delivered | 2017-06-30 18:48:46 | L | 1 | 0 | AC7df004f7fb8e178f04c4e0d8b4ae9045 | SM87770ef86a7d4830bef468b9c71cf114 | outbound-api | -0.0075 | USD |

3/11 EXHIBIT 14

tibbles'

DEFAPPX0032

CXG 00032



# EXHIBIT B

DEFAPPX0033

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| JOHN NORTHRUP, Individually and on behalf of a Class of Similarly Situated Individuals, §§§§§ | |
| Plaintiff, § | **Civ. No. 8:17-cv-01890-CEH-JSS** |
| § | |
| v. §§ | |
| § | |
| CyberX Group, LLC, et al., §§ | |
| Defendants. § | |

### DECLARATION OF ANDREW LIN

I, Andrew Lin, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an attorney with the law firm of Platt Cheema Richmond PLLC, licensed in the State of Texas, and represent Defendants Innovative Health Insurance Partners, LLC, CyberX Group, LLC, David E. Lindsey; and Independent Truckers Group, Inc. in connection with this action. I make this Declaration based on my personal knowledge and in support of Defendants' Motion for Summary Judgment.

2.      Attached hereto as Exhibit 1 is a true and correct copy of Twilio's Terms of Service, effective May 24, 2016, retrieved from https://www.twilio.com/legal/tos on June 20, 2018.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 25, 2018.

_____
Andrew Lin

DEFAPPX0034

# EXHIBIT B-1

Sign up     Menu

Legal ⌄

# Twilio Terms of Service

LAST UPDATED MAY 24, 2016

## Summary of Changes to Twilio's Terms of Service

*We've updated our Terms of Service ("Terms"), which will be effective starting May 24, 2016. If you want to review our old Terms of Service, effective before May 24, 2016 click here.*

On May 24, 2016, we made some tweaks to the Terms of Service to address the new Twilio Marketplace Add-ons and also to provide a "human readable" translation of the terms.

## What we have NOT changed

We have not changed your ability to use our products and services. You may continue to access your Twilio account and use our products and services as you always have.

If you have a separate contract with Twilio covering your account and use of our services, these new Terms will not apply to you.

## What we HAVE changed

### February 1, 2016 Changes:

We have changed the format and tone of the Terms to make them easier to understand by taking out as much legalese as our lawyers will allow

**EXHIBIT B**

DEFAPPX0036

**EXHIBIT 1**

Sign up     Menu

certain phone numbers (we'll let you know which), you must now provide an address.

**5. Our Use and Storage of Customer Data:** We have added a clearer definition of "customer data" and explained when we may be required to disclose it. We've also added a link to our update privacy notices. Check it out here.

**6. Restrictions:** (f) If you have purchased a short code through Twilio, then you had to indicate how you are going to use it and you may not change this use without Twilio's approval. We'll approve a change if we can, but it's not always up to us. (g) If you don't use the Twilio numbers in your account, we can reclaim them, although we will tell you before we do. (h) In general, you may port away your phone numbers as long as certain requirements are met.

**7. Export Controls:** You must now promise to comply with all export laws and regulations.

**8. Affiliates:** Your affiliates (e.g., subsidiaries, parent companies, etc.) may order Twilio services under these Terms.

**10.2. Suggestions and Contributions:** Please tell us what you think of our services, send us suggestions about improvements and additions, but please understand that we can use your feedback free of charge or any other obligations.

**11.2 Beta Service:** If you use any of our services while they are in a beta stage, you understand that they may have some bugs that still need to be worked out.

**May 24, 2016 Updates:**

We did not make any updates that will impact your use of any existing Twilio products or services.

Instead, we just added a section to address the new Twilio Marketplace and your use of Add-ons.

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0037

While we've done our best to make our Terms complete, readable, and understandable, you may still have additional questions. We get that. So, feel free to contact our support team at help@twilio.com.

Or, if you prefer, you may write to us at:

Twilio Inc.
375 Beale Street, Suite 300
San Francisco, CA 94105

Twilio Ireland Limited,
25-28 North Wall Quay
Dublin 1, Ireland

# Twilio Terms of Service

## LAST UPDATED MAY 24, 2016

Ahoy! And welcome to Twilio!

Twilio is a cloud communications company. Our services enable connectivity and the easy integration of telecommunications capabilities into software applications, including mobile, web-based and desktop applications.

This is our terms of service. As a courtesy to you, on the left side, we've done our best to translate the legalese into a "human readable" format (though our legal team assures us that

**EXHIBIT B**

DEFAPPX0038

EXHIBIT 1

Sign up        Menu

Unless you work for a company that has negotiated a separate agreement with us, these are the terms that apply to your use of Twilio. You should read them.

And, heads up, you should really check out Sections 11 and 13 because they limit our liability to you if something goes wrong.

Also, if we get into a dispute, we'll have to figure it out in arbitration. Check out Section 17 for more details.

Twilio provides its Services subject to the terms and conditions in this Terms of Service ("*Terms*" or "*Agreement*"). When we refer to our "*Services*" in these Terms, we mean to include the whole enchilada -- our platform services, which includes all of our programs, features, functions and report formats, instructions, code samples, the TwiML markup language, on-line help files and technical documentation, our website, account portal, technical support, Add-ons as well as any upgrades or updates to any of these, made generally available by us, and includes any of our SDKs, APIs or software provided to you in connection with your use of our services, and our connectivity services.

To be eligible to register for a Twilio account and use Twilio's Services, you must review and accept the terms of this Agreement by clicking on the "I Accept" button or other mechanism provided. **PLEASE REVIEW THESE TERMS CAREFULLY. ONCE ACCEPTED, THESE TERMS BECOME A BINDING LEGAL COMMITMENT BETWEEN YOU AND TWILIO. IF YOU DO NOT AGREE TO BE BOUND BY THESE TERMS, YOU SHOULD NOT CLICK THE "I ACCEPT" BUTTON AND YOU SHOULD NOT USE TWILIO'S SERVICES.**

In this Agreement, "we," "us," "our" or "Twilio" will refer to Twilio Inc., 375 Beale Street, Suite 300, San Francisco, CA 94105. And, the terms "you," "your" and "Customer" will refer to you. If you are registering for a Twilio account or using Twilio's services on behalf of an organization, you are agreeing to these terms for that organization and promising Twilio that you have the authority to bind that organization to these Terms (and, in which case, the terms "you" and "your" or "customer" will refer to that organization). The exception to this is if that organization has a separate contract with Twilio covering your account and use of our Services, in which case that contract will govern your account and use of Twilio's Services.

**EXHIBIT B**

**EXHIBIT 1**

DEFAPPX0039

Sign up     Menu

IN ADDITION, DISPUTES ABOUT THESE TERMS OR RELATING TO YOUR TWILIO ACCOUNT OR TWILIO'S SERVICES GENERALLY MUST BE RESOLVED BY BINDING ARBITRATION AND ON AN INDIVIDUAL BASIS ONLY. For more details, go to Section 17.

If you have any questions, you can reach the Twilio team at twilio.com/help/contact.

If you are a U.S. federal government user or otherwise accessing or using any Twilio service in a U.S. federal government capacity, this Amendment to these Terms applies to you.

1. Changes to These Terms

2. Changes to Our Services

3. Your Account(s)

4. Access and Use of Our Services

5. Our Use and Storage of Customer Data

6. Restrictions

7. Export Controls

8. Affiliates

9. Add-ons

10. Fees, Payment Terms, Taxes

11. Ownership and Confidentiality

12. Warranties and Disclaimers

13. Indemnification

14. Exclusion of Damages; Limitations of Liability

15. Termination of These Terms

16. Survival

17. General

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0040

Sign up      Menu

# 1. Changes to These Terms

These terms might change. But we'll send you an email and let you know before we make any significant changes that impact you or your use of our services. If you keep using Twilio after the terms change, then you have accepted those changes.

We may revise these Terms from time to time. If we do, those revised Terms will supersede prior versions. Unless we say otherwise, revisions will be effective upon the effective date indicated at the top of these Terms. We will provide you advance notice of any material revisions. This notice will be provided via the account portal and/or via an email to the email address we have on file. For other revisions, we will update the effective date of these Terms at the top of the page. We encourage you to check the effective date of these Terms whenever you visit Twilio's website or account portal. Your continued access or use of our Services constitutes your acceptance of any revisions. If you don't agree to the revisions, you should stop using Twilio's Services and we are not obligated to provide you with the Services.

# 2. Changes to Our Services

We are always looking to innovate and make Twilio better, so our SLA (which stands for "service level agreement") and APIs may change over time. We will let you know in advance if any API changes aren't backwards-compatible.

The features and functions of our Services, including our APIs, and Twilio's service level agreement (SLA), may change over time. It is your responsibility to ensure that calls or requests you make to our Services are compatible with our then-current Services. Although we try to avoid making changes to our Services that are not backwards compatible, if any such changes become necessary, we will use reasonable efforts to let you know at least sixty (60) days prior to implementing those changes.

# 3. Your Account(s)

**EXHIBIT B**

**EXHIBIT 1**

DEFAPPX0041

Sign up    Menu

have to keep it up to date.

You are responsible for anything that happens under your account.

Also, for some phone numbers, we need to have a physical address on file for you. So, please send us your new physical address if you move.

---

To use our Services, you will be asked to create an account. As part of the account creation process, you'll be asked to provide your email address, create a password, and verify that you're a human being by providing a telephone number to which we'll send you a verification code to enter into the form. Until you apply for an account, your access to our Services will be limited to what is available to the general public. When registering an account, you must provide true, accurate, current and complete information about yourself as requested during the account creation process. You must also keep that information true, accurate, current and complete after you create your account. You may also create multiple accounts as well as sub-accounts.

You are solely responsible for all use (whether or not authorized) of our Services under your account(s) and subaccount(s), including for the quality and integrity of your Customer Data and each of your applications. You are also solely responsible for all use and for all acts and omissions of anyone that has access to your application ("*End Users*"). You agree to take all reasonable precautions to prevent unauthorized access to or use of our Services and will notify us promptly of any unauthorized access or use. We will not be liable for any loss or damage arising from unauthorized use of your account.

For the purchase of any phone number for which Twilio is required to have an address for you on record, it is your obligation to provide us with an accurate and current address to associate with that number. You are responsible for updating that address within fifteen (15) days of a change of address.

## 4. Access and Use of Our Services

---

We want to make our services available for you to use 24/7, but things happen that occasionally (very occasionally) make Twilio unavailable. If our service is ever available less than we commit it to be in our SLA, then we will give you a service credit (check out our SLA).

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0042

Sign up      Menu

We will make our Services available to you in accordance with our SLA, which may be updated from time to time.

You may use our Services, on a non-exclusive basis, solely in strict compliance with these Terms and the Twilio's Acceptable Use Policy ("*AUP*"), which may be updated from time to time, and applicable law, including:

a. Using our Services as needed to develop your software applications that interface with our Services ("*Your Applications*") or provide Services through Your Applications,

b. Making our Services available to End Users of Your Applications in connection with the use of each of Your Applications, and

c. Otherwise using our Services solely in connection with and as necessary for your activities under these Terms.

## 5. Our Use and Storage of Customer Data

Please read our privacy policy. If you don't agree to it, stop using Twilio.

We are not a data storage company. So we don't promise to keep or store your data on Twilio.

In fact, we might have to disclose your data if:

- The law requires

- We need to protect Twilio, other customers or the public, or

- There is an emergency.

You acknowledge that you have read Twilio's Privacy Policy and understand that it sets forth how we will collect, store, and use your Customer Data. "*Customer Data*" consists of information made available to us through your use of our Services under these Terms, which includes information such as your name, contact information, billing records, call or messaging logs, and traffic routing information, as well as the content of

**EXHIBIT B**

DEFAPPX0043

**EXHIBIT 1**

Sign up   Menu

Except as agreed by Twilio and you in writing, Twilio may periodically delete your Customer Data. Further, data storage is not guaranteed by us and you agree that we will not have any liability whatsoever for any damage, liabilities, losses, or any other consequences that you may incur relating to the loss or deletion of Customer Data.

You further acknowledge and agree that we may access or disclose Customer Data, including the content of communications stored on our systems, if: (i) we believe that disclosure is reasonably necessary to comply with any applicable law, regulation, legal process or government request, (ii) to enforce our agreements and policies, (iii) to protect the security or integrity of our services and products, (iv) to protect ourselves, our other customers, or the public from harm or illegal activities, or (v) to respond to an emergency which we believe in good faith requires us to disclose data to assist in preventing a death or serious bodily injury.

## 6. Restrictions

Some "dos and don'ts" on Twilio:

a. Don't transfer our services, resell them, etc., except as allowed under Section 4.

b. Don't use Twilio to try to contact emergency services unless you have agreed to Twilio's special "911 Terms". (If you aren't sure if you have, then you probably haven't.)

c. Don't use Twilio to break the law, to violate these terms, to violate our AUP, or to violate someone else's rights.

d. Do make sure that Twilio is allowed to use your data as needed to provide you the service.

e. Don't reverse engineer, etc. any software we provide.

f. If you buy a short code from us, only use it how you said you would use it.

If you don't send enough traffic on a phone number, then we may have to take it back. This is because some states require a minimum amount of use for each phone number. If the minimum isn't met, they take back those numbers so that they can give to someone else who's going to actually use them. This is definitely a big deal in regions that are running out of phone numbers with certain area codes.

**EXHIBIT B**

DEFAPPX0044

EXHIBIT 1

Sign up      Menu

has been in your account more than 90 days.

---

We are excited to see what you build with our Services. But, you should know there are some restrictions on what you can do with them.

a. Except as provided in Section 4 (Access and Use of Our Services), you agree not to transfer, resell, lease, license or otherwise make available our Services to third parties or offer them on a standalone basis.

b. You will not attempt to use our Services to access or allow access to Emergency Services, unless you do so consistent with, and have agreed to, the Twilio Inc. 911 – Terms and Conditions.

c. You will ensure that our Services are used in accordance with all applicable Law and third party rights, as well as these Terms and the Twilio AUP, as amended from time to time.

d. You will ensure that we are entitled to use your Customer Data, including content of communications stored on our systems, as needed to provide our Services and will not use our Services in any manner that violates any applicable law.

e. Except as allowed by applicable law, you will not reverse engineer, decompile, disassemble or otherwise create, attempt to create or derive, or permit or assist anyone else to create or derive the source code of any software provided in connection with our Services.

f. If you have purchased a short code, then you will not change your use of that short code from the use stated in your application to the carrier for approval of the short code without first obtaining an amendment to your application or re-applying to the carrier for approval of the short code under the new use.

g. We reserve the right to reclaim any phone number from your account and return that number to the relevant numbering plan if you do not send sufficient traffic over that phone number such that the phone number is unutilized or underutilized, as defined by any local, federal, and/or national regulatory agency and/or governmental organization with oversight over the relevant phone number and numbering plan. If we seek to reclaim a phone number from your account, excluding suspended and trial accounts, we will send you an email at least two (2) weeks' in advance telling you that we are reclaiming the phone number, unless we're otherwise prevented from doing so by the applicable regulatory agency or governmental organization. We also reserve the right to reclaim phone numbers from accounts suspended for failure to pay and/or suspended for suspected fraud, and to reclaim phone numbers in free trial accounts that are unutilized for more than thirty (30) days.

h. You acknowledge that we are the "customer of record" for all phone numbers provided as part of our Services. As the customer of record, Twilio has certain rights with respect to porting phone numbers. You understand and agree that you may use the phone numbers provided as part of our Services subject to

**EXHIBIT B**

DEFAPPX0045

EXHIBIT 1

Sign up   Menu

more than 90 days prior to the port-away date.

# 7. Export Controls

You must follow U.S. export and economic sanctions laws.

Also, the U.S. government publishes lists of people that U.S. companies aren't allowed to do business with. If you use Twilio, then you are swearing that neither you nor your company is on any of those lists.

Our Services, including any software we may provide in connection with those Services, may be subject to applicable U.S. export control laws and economic sanctions regulations. In receiving this software or our Services, you agree to comply strictly with all domestic and international export laws and economic sanctions regulations as they apply to this software and our Services, and to the extent consistent with these Terms, to obtain any necessary license or other authorization to export, re-export, or transfer such software or our other aspects of our Services. These laws include restrictions on destinations, End Users, and end use. Without limitation, you may not transfer any such software or other aspect of our Service without U.S. government authorization to any entity on a U.S. government exclusion list (e.g., the Department of Commerce's List of Denied Persons, Entity, or Unverified List, and the Treasury Department's List of Specially Designated Nationals and Consolidated Sanctions List). You represent that you are not on a U.S. government exclusion list or under the control of or an agent for any entity on such a list, and you further warrant that you will immediately discontinue use of our software and Services if you become placed on any such list or under the control of or an agent for any entity placed on such a list.

# 8. Affiliates

Your affiliates (businesses that your business controls) can use Twilio, but you will be responsible for everything that they do when they're using Twilio.

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0046

Sign up    Menu

are subject to these Terms. You will be responsible for the acts and omissions of your affiliates in connection with each affiliate's use of our Services.

## 9. Add-ons

Add-ons that you get through the Twilio Marketplace are not Twilio products, but, instead, are being offered by third parties ("**Add-on Partners**"). Add-on Partners are responsible for their Add-ons, not Twilio. So, if something goes wrong with an Add-on, you need to go to the Add-on Partner for help.

9.1 Twilio may make available through the Twilio Services additional features, functionality, and services offered by its third-party partners ("*Add-ons*"). Your use of Add-ons is subject to these Terms and to the applicable fees. You acknowledge for each Add-on you purchase through the Twilio Services, these Terms constitute a binding agreement between you and the third party licensor of that Add-on ("*the Add-on Partner*") only. The Add-on Partner of each Add-on is solely responsible for that Add-on, the content therein, and any claims that you or any other party may have relating to that Add-on or your use of that Add-on. You acknowledge that you are purchasing the license to each Add-on from the Add-on Partner of that Add-on; Twilio is acting as agent for the Add-on Partner in providing each such Add-on to you; Twilio is not a party to the license between you and the Add-on Partner with respect to that Add-on; and Twilio is not responsible for that Add-on, the content therein, or any claims that you or any other party may have relating to that Add-on or your use of that Add-on. You acknowledge and agree that Twilio, and Twilio's subsidiaries, are third party beneficiaries of the agreement between you and the Add-on Partner for each Add-on, and that Twilio will have the right (and will be deemed to have accepted the right) to enforce such license against you as a third party beneficiary thereof.

When you buy an Add-on, you are telling Twilio that it's okay for us to give the Add-on Partner information about you that they need so that they can let you use the Add-on.

9.2 By purchasing an Add-on, you grant Twilio permission to share your Application, Content, and user information with the Add-on Partner as necessary to enable and provide you the Add-on.

**EXHIBIT B**

DEFAPPX0047

EXHIBIT 1

Sign up    Menu

**9.3** The license granted to you to use any Add-on is personal to you, and is not sublicensable to your End Users. You may not provide or resell Add-ons to others.

## 10. Fees, Payment Terms, Taxes

You agree to pay the fees generated under your account.

**10.1 Fees.** You agree to pay the usage fees set forth in your "Rate Schedule" (which is either our standard schedule of fees, as may be updated from time to time, and/or any other order forms for our Services ordered by you and accepted in writing by us). In addition, you agree to pay any applicable support fees in connection with your order of any support services pursuant to our Support Terms.

You also agree to pay all applicable taxes.

If you are exempt from paying any taxes, though, please let us know and send us proof.

**10.2 Taxes.** Unless otherwise stated in your Rate Schedule, you are responsible for and shall pay all applicable taxes. This includes all federal, state and local taxes, fees, charges, carrier surcharges or other similar exactions, imposed on or with respect to our Services whether these taxes are imposed directly on you or on Twilio and include, but are not limited to, sales and use taxes, utility user's fees, excise taxes, VAT, any other business and occupations taxes, 911 taxes, franchise fees and universal service fund fees or taxes. For purposes of this section, taxes do not include any taxes that are imposed on or measured by the net income, property tax or payroll taxes of Twilio. You understand and agree that the detail of taxes charged will be made available to you through Twilio's customer portal as a csv file for download for a period of twelve (12) months after such taxes are incurred.

If you're exempt from any taxes for any reason, send an email to our Tax Department at legalnotices@twilio.com with an executed, signed and dated valid exemption certificate. Once our Tax Department has received and approved your exemption certificate, we will exempt you from those taxes on a

**EXHIBIT B**

DEFAPPX0048

**EXHIBIT 1**

You agree to pay all fees that you owe to Twilio in US dollars no later than 30 days after the date of the invoice.

If you don't pay on time, then we may send you a late notice. If we don't get your payment within 10 days after the date on the late notice, then we may charge a late fee and/or suspend your account. Please pay us on time.

**10.3 Payment Terms.** Subject to certain credit requirements as determined by us, we may let you pay amounts due under these Terms in arrears. If we let you to do that, you will make all of the payments due hereunder within thirty (30) days of the date of the invoice.

Unless you and Twilio agree otherwise in writing, all fees due under these Terms are payable in United States dollars. Payment obligations can't be canceled and fees paid are non-refundable. Subject to Section 10.4 (Fee Disputes), if you are overdue on any payment and fail to pay within ten (10) business days of a written notice of your overdue payment, then we may assess and you must pay a late fee. The late fee will be either 1.5% per month, or the maximum amount allowable by law, whichever is less. Subject to Section 10.4 (Fee Disputes) and following the overdue notice, we may also suspend our Services to your account until you pay the amount you are overdue plus the late fee.

If you ever think that we charged you the wrong amount and you want to dispute it, then let us know, in writing, within 60 days of date on the invoice.

**10.4 Fee Disputes.** You must notify us in writing if you dispute any portion of any fees paid or payable by you under this Agreement. You must provide that written notice to us within sixty (60) days of the applicable charge and we will work together with you to resolve the applicable dispute promptly. If you do not provide us with this written notice of your fee dispute within this 60 day period, you will not be entitled to dispute any fees paid or payable by you.

**EXHIBIT B**

**EXHIBIT 1**

Sign up    Menu

happen as a result.

---

**10.5 Suspension.** If your use of our Services exceeds the amounts prepaid by you or of if you fail to pay any amounts due by you under Section 10 of the Agreement, we may suspend our Services associated with your account without prior notice to you. We will have no liability for any damage, liabilities, losses (including any loss of data or profits) or any other consequences that you may incur with connection with any suspension of our services pursuant to this section.

# 11. Ownership and Confidentiality

---

What's ours is ours, and what's yours is yours.

---

**1.1 General.** As between you and Twilio, we exclusively own and reserve all right, title and interest in and to our Services. As between you and Twilio, you exclusively own and reserve all right, title and interest in Your Applications and the content of any communications sent through integration with our Services.

---

Please let us know what you think about Twilio and our services. By the way, though, if you send us feedback, then we can use it and we don't owe you anything for it.

---

**11.2 Suggestions and Contributions.** We welcome your feedback on our Services. But please know that by submitting suggestions or other feedback about our Services ("*Contributions*") you agree that:

1. we are not under any obligation of confidentiality with respect to your Contributions;

2. we may use or disclose (or choose not to use or disclose) your Contributions for any purpose and in any way;

3. you irrevocably, non-exclusively license to us rights to exploit your Contributions; and

4. you are not entitled to any compensation or reimbursement of any kind from us under any circumstances for your Contributions.

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0050

Sign up       Menu

with these terms. Finally, we both agree to be honest about our relationship with each other -- no shenanigans, please.

---

**11.3 Use of Marks.** Subject to these Terms, we both grant each other the right to use and display each other's name and logo (the Licensor Marks) on our respective websites and in other promotional materials solely in connection with each of our respective activities under these Terms. All of this use of the Licensor Marks will be in accordance with the each other's applicable usage guidelines and will inure to the benefit of Licensor. The one of us using the other's Licensor Marks under this subsection will not use, register or take other action with respect to any of the Licensor Marks, except to the extent allowed in advance in writing by the one of us whose Licensor Marks are being used. In using the Licensor Marks under this subsection, the one of us using the other's Licensor Marks will always use the then-current Licensor Marks and will not add to, delete from or modify any of Licensor Marks. The one of us using the other's Licensor Marks will not, at any time, misrepresent the relationship between us. The one using the other's Licensor Marks will not present itself as an affiliate or other legal agent of the one of us whose Licensor Marks are being used. The rights to use and display each other's Licensor Marks under this subjection will end automatically in the event these Terms terminate.

---

We both agree not to tell anyone else about confidential information that we get from each other. Also, we both agree to only use each other's confidential information as agreed to in these terms.

---

**11.4 Confidentiality.** "*Confidential Information*" means any information or data, regardless of whether it is in tangible form, disclosed by either party that is marked or otherwise designated as confidential or proprietary or that should otherwise be reasonably understood to be confidential given the nature of the information and the circumstances surrounding disclosure. "Confidential Information" does not include any information which: (i) is publicly available through no fault of receiving party; (ii) was properly known to receiving party, without restriction, prior to disclosure by the disclosing party; (iii) was properly disclosed to receiving party, without restriction, by another person without violation of disclosing party's rights; or (iv) is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information

Each party agrees that it will use the Confidential Information of the other party solely in accordance with the provisions of this Agreement and it will not disclose such information to any third party without the other party's prior written consent, except as otherwise permitted hereunder. Each party agrees to exercise due care

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0051

Sign up     Menu

Information of the other party as required by law, upon prior written notice to the other party (where allowed by law); provided that such party will use its reasonable efforts to minimize such disclosure to the extent permitted by applicable law.

Money alone may not be enough to make us whole if one of us breaks our promise of confidentiality. So, we both can seek other remedies (like gag orders), if needed.

**11.5 Injunctive Relief.** The parties expressly acknowledge and agree that no adequate remedy exists at law for an actual or threatened breach of this Section 11 and that, in the event of an actual or threatened breach of the provisions of this Section, the non-breaching party will be entitled to seek immediate injunctive and other equitable relief, without waiving any other rights or remedies available to it. Each party will promptly notify the other in writing if it becomes aware of any violations of the confidentiality obligations set forth in this Section.

## 12. Warranties and Disclaimers

Except for our SLA and other terms about Twilio's support, we are offering our products and services "as is."

**12.1 NO WARRANTY.** WITHOUT LIMITING TWILIO'S EXPRESS WARRANTIES AND OBLIGATIONS UNDER THESE TERMS, TWILIO HEREBY DISCLAIMS ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT, AND FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES RELATED TO THIRD-PARTY EQUIPMENT, MATERIAL, SERVICES OR SOFTWARE. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS SECTION 12 AND TWILIO'S SLA (AND SUPPORT TERMS), TWILIO'S SERVICES ARE PROVIDED "AS IS" TO THE FULLEST EXTENT PERMITTED BY LAW. TO THE EXTENT THIS DISCLAIMER CONFLICTS WITH APPLICABLE LAW, THE SCOPE AND DURATION OF ANY APPLICABLE WARRANTY WILL BE THE MINIMUM PERMITTED UNDER THAT LAW.

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0052

Sign up     Menu

**12.2 BETA SERVICES.** FROM TIME TO TIME, YOU MAY HAVE THE OPTION TO PARTICIPATE IN A PROGRAM WITH TWILIO WHERE YOU GET TO USE ALPHA OR BETA SERVICES, PRODUCTS, FEATURES AND DOCUMENTATION ("BETA SERVICES") OFFERED BY US. THESE BETA SERVICES ARE NOT GENERALLY AVAILABLE AND MAY CONTAIN BUGS, ERRORS, DEFECTS OR HARMFUL COMPONENTS. ACCORDINGLY, WE ARE PROVIDING THE BETA SERVICES TO YOU "AS IS." WE MAKE NO WARRANTIES OF ANY KIND WITH RESPECT TO THE BETA SERVICES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. NOTWITHSTANDING ANY PUBLISHED DOCUMENTATION THAT STATES OTHERWISE, TWILIO DOES NOT WARRANT THAT THE BETA SERVICES WILL BE ERROR-FREE OR THAT THEY WILL MEET ANY SPECIFIED SERVICE LEVEL, OR WILL OPERATE WITHOUT INTERRUPTIONS OR DOWNTIME.

# 13. Indemnification

If someone comes after Twilio about something you've done with our products or services, then you have to fight that fight and reimburse us for any money we have to spend related to that fight.

You will defend, indemnify and hold Twilio and its affiliates harmless against any actual or threatened claim, loss, liability, proceeding, third-party discovery demand, governmental investigation or enforcement action arising out of or relating to your activities under these Terms or your acts or omissions in connection with the provision of Your Application, including, without limitation, any intellectual property claims relating to the Your Application and any violation by you or your End Users of the terms of Section 6 (Restrictions) ("*Claim*"). We and our affiliates will cooperate as fully as reasonably required in the defense of any Claim, at your expense. We reserve the right, at your expense, to retain separate counsel for ourselves in connection with any Claim or, if you have not responded reasonably to the applicable Claim, to assume the exclusive defense and control of any Claim in which you are a named party and that is otherwise subject to indemnification under this Section 13 (Indemnification). You will pay all costs, reasonable attorneys' fees and any settlement amounts or damages awarded against us in connection with any Claim. You will also be liable to us for any costs and attorneys' fees we incur to successfully establish or enforce our right to indemnification under this Section.

# 14. Exclusion of Damages; Limitations of Liability

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0053

Sign up    Menu

are capped at the amount you've paid us in the 12-month period prior to the damages.

Again, you may not to use Twilio to call for emergency services. If something bad happens because you or someone using Twilio under your account tries but is unable to reach emergency services, then Twilio is not and cannot be held responsible.

EXCEPT FOR LIABILITY ARISING FROM VIOLATIONS OF SECTIONS 6 (RESTRICTIONS), 11 (OWNERSHIP) OR 13 (INDEMNIFICATION), UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, WILL TWILIO BE LIABLE TO YOU FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY CHARACTER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF GOODWILL, LOST PROFITS, LOST SALES OR BUSINESS, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, LOST DATA, OR FOR ANY AND ALL OTHER DAMAGES OR LOSSES, EVEN IF WE HAD BEEN ADVISED, KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT AS DESCRIBED IN THIS SECTION 14, UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, WILL TWILIO BE LIABLE TO YOU FOR ANY DIRECT DAMAGES, COSTS OR LIABILITIES IN EXCESS OF THE AMOUNTS PAID BY YOU DURING THE TWELVE (12) MONTHS PRECEDING THE INCIDENT OR CLAIM.

THE PROVISIONS OF THIS SECTION 14 ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN THE PARTIES, AND THE PARTIES HAVE RELIED ON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

TWILIO'S SERVICES ARE NOT INTENDED TO SUPPORT OR CARRY EMERGENCY CALLS OR SMS MESSAGES TO ANY EMERGENCY SERVICES. NEITHER TWILIO NOR ITS REPRESENTATIVES WILL BE LIABLE UNDER ANY LEGAL OR EQUITABLE THEORY FOR ANY CLAIM, DAMAGE, OR LOSS (AND CUSTOMER WILL HOLD TWILIO HARMLESS AGAINST ANY AND ALL SUCH CLAIMS) ARISING FROM OR RELATING TO THE INABILITY TO USE OUR SERVICES TO CONTACT EMERGENCY SERVICES.

# 15. Termination of These Terms

These Terms become effective on the day you click "I accept" or when you or someone else starts using Twilio under your account.

**EXHIBIT B**

DEFAPPX0054

EXHIBIT 1

Sign up     Menu

all Renewal Periods will be referred to in this agreement as the "Terms Period".

We may terminate your account and suspend your services for any reason 60 days after we give you notice.

If you significantly breach these terms, and don't fix the breach within five (5) days of us telling you about the breach, then we may terminate or suspend your account.

We can suspend your account for not paying us as described in Section 10.5. And, we can suspend your account immediately if you violate our AUP, send fraudulent traffic, negatively impact our service operations, legal conditions make it impractical for Twilio to operate, or you go out of business. We'll try to let you know if we need to suspend your account.

**15.2 Termination and Suspension of Services.** Either party may terminate your account for any reason upon 60 days written notice to the other party. Either party may also terminate or suspend your account in the event the other party commits any material breach of these Terms and fails to fix that breach within 5 days after written notice of that breach. If we terminate these Terms due to your material breach, we may terminate or suspend of your account(s) as well.

In addition to suspension of our services for non-payment of fees as described in Section 10.5 (Suspension), we may also suspend our Services immediately for cause if: (a) you violate (or give us reason to believe you have violated) the Twilio AUP; (b) there is reason to believe the traffic created from your use of our Services or your use of our Services is fraudulent or negatively impacting the operating capability of our Services; (c) we determine, in our sole discretion, that providing our Services is prohibited by law, or it has become impractical or unfeasible for any legal or regulatory reason to provide our Services; or (d) subject to applicable law, upon your liquidation, commencement of dissolution proceedings, disposal of your assets or change of control, a failure to continue business, assignment for the benefit of creditors, or if you become the subject of bankruptcy or similar proceeding. If we suspend our Services to your account, we will make a reasonable attempt to notify you.

16. Survival                              **EXHIBIT B**                    DEFAPPX0055

EXHIBIT 1

Sign up     Menu

Upon termination or expiration of these Terms, your payment obligations, the terms of this Section 15, and the terms of the following Sections will survive (i.e. still apply): Section 5 (Our Use and Storage of Customer Data), Section 6 (Restrictions), Section 11 (Ownership and Confidentiality), Section 12 (Warranties and Disclaimer), Section 13 (Indemnification), Section 14 (Exclusion of Damages; Limitation of Liability) and Section 17 (General).

## 17. General

We both agree to follow the law.

**17.1 Compliance with Laws.** Both you and Twilio will comply with the applicable law relating to each of our respective activities under these Terms, including privacy and data protection laws and applicable rules established by the Federal Communications Commission.

Just because we don't enforce some part of these terms against you now doesn't mean we can't start enforcing them against you later.

**17.2 No Waiver.** Twilio's failure to enforce at any time any provision of these Terms or our AUP does not waive our right to do so later. And, if we do expressly waive any provision of these Terms or our AUP, that does not mean it is waived for all time in the future. Any waiver must be in writing and signed by and us to be legally binding.

You cannot just transfer these terms or your obligations under these terms to someone else without our permission.

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0056

Sign up    Menu

These terms don't create any special relationship between us, like employer-employee, joint venture, or a partnership. Nothing will change that.

We both will be responsible for our own employees.

**17.4 Relationship.** You and Twilio are independent contractors in the performance of each and every part of these Terms. Nothing in these Terms is intended to create or shall be construed as creating an employer-employee relationship or a partnership, agency, joint venture, or franchise. You and Twilio will be solely responsible for all of our respective employees and agents and our respective labor costs and expenses arising in connection with our respective employees and agents. You and Twilio will also be solely responsible for any and all claims, liabilities or damages or debts of any type that may arise on account of each of our respective activities, or those of each of our respective employees or agents, in the performance of these Terms. Neither you nor Twilio has the authority to commit the other of us in any way and will not attempt to do so or imply that it has the right to do so.

Except as described in Section 18, if any part of these terms is not enforceable, the rest of the terms will still be enforceable.

**17.5 Unenforceability.** Except as described in Section 18 (Agreement to Arbitrate), if any provision of these Terms is held by a court or other tribunal of competent jurisdiction to be unenforceable, that provision will be limited or eliminated to the minimum extent necessary to make it enforceable and, in any event, the rest of these Terms will continue in full force and effect.

If you need to notify us, you must use our headquarters' address and send a copy to legalnotices@twilio.com.

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0057

Sign up      Menu

legalnotices@twilio.com, Attn: General Counsel.

---

This is the only set of terms that governs our relationship.

---

**17.7 Entire Agreement.** Except as provided in these Terms and any attachments to these Terms, these Terms supersede all prior and contemporaneous proposals, statements, sales materials or presentations and agreements, oral and written. No oral or written information or advice given by Twilio, its agents or employees will create a warranty or in any way increase the scope of the warranties in these Terms.

---

If one of us can't keep our promises because something crazy happens beyond our control (think earthquake, massive power outage, war), then that doesn't count as a breach of these terms.

---

**17.8 Force Majeure.** No failure, delay or default in performance of any obligation of a party shall constitute an event of default or breach of these Terms to the extent that such failure to perform, delay or default arises out of a cause, existing or future, that is beyond the control and without negligence of such party, including action or inaction of governmental, civil or military authority; fire; strike, lockout or other labor dispute; flood, terrorist act; war; riot; theft; earthquake and other natural disaster. The party affected by such cause shall take all reasonable actions to minimize the consequences of any such cause.

---

If you're affiliated with a government entity, these terms still apply to your use of Twilio.

---

**17.9 Government Terms.** We provide our Services, including related software and technology, for ultimate federal government end use solely in accordance with the terms of these Terms. If you (or any of your End Users) are an agency, department, or other entity of any government, the use, duplication, reproduction, release, modification, disclosure, or transfer of our services, or any related documentation of any kind,

**EXHIBIT B**

DEFAPPX0058

**EXHIBIT 1**

Other than arbitration (see the next section), if we can't agree on something and we end up having a legal dispute, then California laws will apply. We definitely don't want to, but, if we have to go to court, then it will be in San Francisco, California. Court isn't a great option, but at least we'll be in one of the best cities in the world!

**17.10 Governing Law and Venue.** The enforceability and interpretation of Section 18 (Agreement to Arbitrate) will be determined the Federal Arbitration Act (including its procedural provisions). Apart from Section 18, these Terms will be governed by and interpreted according to the laws of the State of California without regard to conflicts of laws and principles that would cause laws of another jurisdiction to apply. These Terms will not be governed by the United Nations Convention on Contracts for the International Sale of Goods. Except as provided in Section 18 (Arbitration), any legal suit, action or proceeding arising out of or related to these Terms or our Services shall be instituted in either the state or federal courts of San Francisco, California, and we each consent to the personal jurisdiction of these courts.

# 18. Agreement to Arbitrate

Please, please, please reach out to our Customer Support Team (they're amazing!) before bringing a legal case.

Before bringing a formal legal case, please first try contacting our Customer Support. Most disputes can be resolved that way.

If our Customer Support Team can't help you, then we both agree to go to binding arbitration, again, in San Francisco, California.

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0059

Sign up     Menu

**18.1 We Both Agree to Arbitrate.** If we can't resolve our dispute through our customer support, you or any of your affiliates on one hand and Twilio and any of Twilio's affiliates on the other hand, all agree to resolve any dispute arising under these Terms, or Privacy Notices, or in relation to our Services by binding arbitration in San Francisco, California, or in another location that we have both agreed to.

This applies to all claims under any legal theory, unless the claim fits in one the exceptions below in Subsection 18.2 (Exceptions to Agreement to Arbitrate). It also applies even after you have stopped using your Twilio account or have deleted it. If we have a dispute about whether this agreement to arbitrate can be enforced or applies to our dispute, we all agree that the arbitrator will decide that, too.

Despite what we said above, there are some disputes that won't go to arbitration, but to court, like IP disputes and disputes about your violation of our AUP.

We also don't have to arbitrate small claims court cases.

**18.2 Exceptions to Agreement to Arbitrate.** You and your affiliates on one hand, and Twilio and its affiliates on the other hand, agree that we will go to court to resolve disputes relating to:

1. Your, your affiliate's, Twilio's or Twilio's affiliates intellectual property (e.g., trademarks, trade dress, domain names, trade secrets, copyrights or patents); or

2. Your violation of Twilio's AUP.

Also, any of us can bring a claim in small claims court either in San Francisco, California, or the county where you live, or some other place we both agree on, if it qualifies to be brought in that court.

In addition, if any of us brings a claim in court that should be arbitrated or any of us refuses to arbitrate a claim that should be arbitrated, the other of us can ask a court to force us to go to arbitration to resolve the claim (i.e., compel arbitration). Any of us may also ask a court to halt a court proceeding while an arbitration proceeding is ongoing.

**EXHIBIT B**

EXHIBIT 1

DEFAPPX0060

Sign up    Menu

then we'll go to arbitration through AAA with only one arbitrator (one is so much easier). And remember, the arbitrator's decision will be final and binding.

**18.3 Details of Arbitration Procedure.** Prior to filing any arbitration, both parties jointly agree to seek to resolve any dispute between us by mediation conducted by the American Arbitration Association (AAA), with all mediator fees and expenses paid equally by the parties. If mediation is not successful, either party may initiate an arbitration proceeding with AAA. You can look at AAA's rules and procedures on their website http://www.adr.org or you can call them at 1-800-778-7879.

The arbitration will be governed by the then-current version of AAA's Commercial Arbitration Rules (the "Rules") and will be held with a single arbitrator appointed in accordance with the Rules. To the extent any thing described in this Section 18 conflicts with the Rules, the language of this Section 18 applies.

Each of us will be entitled to get a copy of non-privileged relevant documents in the possession or control of the other party and to take a reasonable number of depositions. All such discovery will be in accordance with procedures approved by the arbitrator. This Section 18 does not alter in any way the statute of limitations that would apply to any claims or counterclaims asserted by either party.

The arbitrator's award will be based on the evidence admitted and the substantive law of the State of California and the United States, as applicable, and will contain an award for each issue and counterclaim. The award will provide in writing the factual findings and legal reasoning for such award. The arbitrator will not be entitled to modify these Terms.

Except as provided in the Federal Arbitration Act, the arbitration award will be final and binding on the parties. Judgment may be entered in any court of competent jurisdiction.

We both agree not to bring a class action suit against the other.

If for some reason a court decides that this term isn't enforceable, then the entire Section 18 will go away.

**EXHIBIT B**

DEFAPPX0061

EXHIBIT 1

Sign up     Menu

action. The arbitrator cannot combine more than one person's or entity's claims into a single case, and cannot preside over any consolidated, class or representative proceeding (unless we agree otherwise). And, the arbitrator's decision or award in one person's or entity's case can only impact the person or entity that brought the claim, not other Twilio customers, and cannot be used to decide other disputes with other customers.

If a court decides that this Subsection 18.4 (Class Action Waiver) is not enforceable or valid, then the entire Section 18 (Agreement to Arbitrate) will be null and void (i.e., go away). But, the rest of the Terms will still apply.

## 19. Fun

Let your imagination run wild with Twilio!

You understand and acknowledge that developing applications should be fun and easy, and by using our Services, you agree to let your imagination run wild.

## For Customers who reside in the European Union only:

If you are in the EEAU, Switzerland, or are otherwise subject to the territorial scope of the national implementations of Directive 95/46/EC or the upcoming General Data Protection Regulation, you can request our data protection addendum here. For more information about Twilio's compliance with the GDPR, please visit https://www.twilio.com/gdpr.

A. Data Protection Addendum. Twilio customers wishing to execute the GDPR Twilio Data Protection Addendum (DPA) may do so by submitting a request here. Upon receipt of your request we will send you a pre-signed version of the DPA ready for execution.

**EXHIBIT B**
**EXHIBIT 1**

DEFAPPX0062

Sign up    Menu

**B.** You will ensure that Twilio is enabled to use all Customer Data as necessary to provide the Services.

Some things may change, but the main parts of our service will be available to you during the term.

**C.** The primary characteristics of the Services, as agreed upon between you and Twilio will remain available to you during the Terms Period.

If you reside in Germany, we promise that Twilio will, for the most part, work as advertised for 12 months from your acceptance of these terms. That's as far as it goes though.

**D.** For Customers who reside in Germany, the following shall apply in relation to Warranties.

  a. Twilio warrants that for a period of 12 months from that date on which you enter into this Agreement, the Services will materially comply with the specifications as agreed upon between you and Twilio;

  b. Any and all further warranties are excluded.

You will have a reasonable period from the date of a charge to dispute it.

**E.** Despite Section 9.4 (Disputes) above, you will have a reasonable period from the date of any charge to dispute such charge.

**EXHIBIT B**

**EXHIBIT 1**

DEFAPPX0063

Sign up      Menu

any significant breaches.

In either case, we're not going to be liable to the other for indirect damages (like lost profits). Instead, we'll only be liable to each other for direct (actual) damages and damages that anyone should have known could happen.

**F.** The following shall apply in relation to the limitation of liability:

    a. The Parties shall only be fully liable for intent and gross negligence as well as damages caused by injury to life, body or health;

    b. In an event of slight negligence, the Parties shall be liable only for breaches of a material contractual obligation (cardinal duty). A "cardinal duty" in the sense of this provision is an obligation whose fulfillment makes the processing of this Agreement possible in the first place and on the fulfillment of which the other Party may therefore generally rely;

    c. In any of the above mentioned cases, the Parties shall not be liable for any lack of commercial success, lost profits and indirect damages

    d. Liability in accordance with the above clauses shall be limited to the typical, foreseeable damages: and

    e. Except where otherwise stated in this Agreement, the Parties shall not be liable for any loss or damage or any costs, expenses or other claims including without limitation loss of profit, business, revenue, goodwill or anticipated savings, loss of any data or information and/or special or indirect loss or consequential loss or otherwise which arise out of or in connection with this Agreement.

If we make significant changes to these terms, then we'll tell you about them (in writing) at least 30 days before we make the change.

**G.** Twilio may amend or modify this Agreement from time to time, in which case the new Agreement will supersede prior versions. Twilio will notify Customer via e-mail not less than 30 days prior to the effective date of any such amendment or modification and will inform you about the intended amendments or modifications. If you do not object to the amendment or modification within 30 days from aforementioned notice, such non-

**EXHIBIT B**

**EXHIBIT 1**

DEFAPPX0064

# We can't wait to see what you build.



ABOUT TWILIO

LEGAL

PRIVACY

TWILIO.ORG

PRESS & MEDIA

SIGNAL

INVESTORS

JOBS

COPYRIGHT © 2018 TWILIO, INC.
ALL RIGHTS RESERVED.

**EXHIBIT B**

**EXHIBIT 1**

DEFAPPX0065