**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JOHN NORTHRUP, individually and on
behalf of a class of similarly situated
individuals,

    Plaintiff,

v.                                                       Case No: 8:17-cv-1890-T-36JSS

Innovative Health Insurance Partners, LLC;
CyberX Group, LLC; David E. Lindsey; and
Independent Truckers Group, Inc.,

    Defendants.
_____/

## **O R D E R**

This cause comes before the Court upon Defendants' Motion for Summary Judgment (Doc. 94), Plaintiff's response in opposition (Doc. 97), and the parties' Stipulation of Agreed Material Facts (Doc. 96). Defendants argue they are entitled to summary judgment on Plaintiff's Telephone Consumer Protection Act claims because the text messages at issue were not sent with an automatic telephone dialing system as defined by the statute. The Court, having considered the parties' submissions and being fully advised in the premises, and with the benefit of the Eleventh Circuit's recent opinion on the issue, will grant Defendants' Motion for Summary Judgment.

    **I.**    **STATEMENT OF FACTS[1]**

Plaintiff, John Northrup ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action against Defendant Innovative Health Insurance Partners, LLC ("Innovative Health"), Defendant CyberX Group, LLC ("CyberX"), Defendant David E. Lindsey ("Lindsey"),

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Stipulation of Agreed Material Facts ("SF") (Doc. 96).

and Defendant Independent Truckers Group, Inc. ("Independent Truckers") (collectively, "Defendants"), for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq*. Plaintiff's claims stem from a text message sent to his cellular telephone number, which he received on June 30, 2017 at 2:40 p.m. eastern time. Doc. 38 at ¶ 32; SF at ¶¶ 1, 7. The text message read as follows: "Hate the high price of Obama Care? Call for a free $250 rewards card and free healthcare quote. TRUCKER plans start less than $59 a month. 214-396-6822." *Id.* at ¶ 7.

The text message was related to a healthcare product maintained by Independent Truckers. *See id.* at ¶ 4. Independent Truckers had outsourced the functions related to the product to Innovative Health. *Id.* Innovative Health, in turn, decided to market Independent Truckers and its healthcare product via text message. *Id.* at ¶ 5. To accomplish this, Innovative Health contracted with CyberX to execute the campaign and send the text message to various phone numbers. *Id.* Innovative Health drafted the content of the text message, and CyberX purchased a spreadsheet containing a list of customer lead data, including phone numbers, from a third-party company called FleetSeek. *Id.* at ¶¶ 3, 6, 10-11.

On June 30, 2017, Christopher Pearson ("Pearson"), the co-founder and president of CyberX, uploaded the spreadsheet containing customer data to the CyberX contact management software, 212CRM. *Id.* at ¶ 10. Upon uploading the spreadsheet, Pearson reviewed the data for errors. *Id.* at ¶ 12. Pearson initiated the sending of text messages by pointing and clicking on the "SEND" button in 212CRM. *Id.* at ¶ 13. The 212CRM system then communicated the dialing/delivery instructions to a web-based software application, the Twilio Platform ("Twilio"), which allows a user to direct Twilio to send text messages to specific phone numbers as provided by the user. *Id.* at ¶ 1-3, 14.

Over the next few hours, Twilio delivered the messages to the appropriate phone carriers exactly as instructed by Pearson's commands in 212CRM. *Id.* at ¶ 14. Twilio sent only the requested message content, to the requested recipient numbers, in the requested order. *Id.* at ¶ 15. Twilio completed the message delivery and generated a report setting out the messaging data and responses. *Id.* at ¶ 16.

The numbers to which the messages were sent by CyberX on June 30, 2017 were solely from the purchased list. *Id.* at ¶ 17. Twilio did not generate the phone numbers for any of the text messages, and cannot generate phone numbers. Doc. 94, Exh. A, Declaration of Pearson ("Pearson Decl.") at ¶ 10. The 212CRM system did not generate the phone numbers for any of the text messages, and cannot generate phone numbers. *Id.*

## II.     LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine" only if a reasonable jury, considering the evidence present, could find for the

3

nonmoving party, and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 Fed. Appx. 852, 858 (11th Cir. 2006).

### III. DISCUSSION

The TCPA protects individual consumers from receiving intrusive and unwanted phone calls. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Relevant here, the TCPA prohibits[2] any person from "mak[ing] any call[3] (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii) (footnotes added). The TCPA defines an automatic telephone dialing system ("ATDS") as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* at § 227(a)(1).

The statutory definition of an ATDS had raised more questions than answers over the past several years. As the D.C. Circuit has explained: The definition "naturally raises two questions: (i) when does a device have the 'capacity' to perform the two enumerated functions; and (ii) what

---

[2] A party contacted in violation of the TCPA may recover, for each such violation, the greater of his or her actual monetary losses or $500 in damages, and the Court, in its discretion, may "increase the amount of the award to an amount equal to not more than 3 times the amount available" if it finds that the defendant's violation of the TCPA was willful or knowing. 47 U.S.C. § 227(b)(3)(B)-(C).

[3] Under the TCPA, a text message is a call. *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015) ("The prohibition against auto dialed calls applies to text message calls as well as voice calls.").

precisely are those functions?" *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 695 (D.C. Cir. 2018).

Since the TCPA's enactment in 1991, the Federal Communications Commission (the "FCC")—the agency charged with promulgating TCPA regulations—has set forth a number of rules and decisions attempting, in part, to resolve such questions. *Id.* at 693, 701, 712 (citing *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act. of 1991*, 18 FCC Rcd. 14014 (2003); *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act. of 1991*, 23 FCC Rcd. 559 (2008); *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act. of 1991*, 27 FCC Rcd. 1830 (2012); *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act. of 1991*, 30 FCC Rcd. 7961 (2015)).

The FCC's last ruling in 2015 sought, in part, to further explain what devices for making calls qualified as an ATDS. *Id.* at 693. The 2015 FCC ruling addressed at least two things in this respect. First, it "declined to define a device's 'capacity' in a manner confined to its 'present capacity'" and instead construed the term "capacity" to include a device's "potential functionalities" such as those enabled with software modifications. *Id.* at 693-94. Second, it addressed what functions a device should need to perform for it to be considered an ATDS. *Id.* at 694. It explained that the basic function of an ATDS is to "dial numbers without human intervention." *Id.* Yet, the FCC declined to confirm that an ATDS is not an ATDS unless it has the ability to dial numbers without human intervention. *Id.*

On March 16, 2018, the D.C. Circuit in *ACA Int'l* set aside the FCC's 2015 ruling in part. The *ACA Int'l* court held that the FCC's interpretation of "capacity" was unreasonably expansive because it would mean that any smartphone could qualify as ATDS, given that smartphones have the ability to "gain ATDS functionality by downloading an app." *Id.* at 700.

5

The *ACA Int'l* court also held that the FCC's functionality explanation was inadequate because it offered competing interpretations regarding "whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed," or whether it was "enough if the device can call from a database of telephone numbers generated elsewhere." *Id.* at 701 (emphasis in original). The FCC's 2015 order had impermissibly determined both (1) that equipment is an ATDS only if it generates and dials random or sequential numbers and (2) that equipment is an ATDS if it lacks the capacity to generate and dial random or sequential numbers. *Id.* at 702-03 ("It might be permissible for the [FCC] to adopt either interpretation. But the [FCC] cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order."). Similarly contradictory, the *ACA Int'l* court noted, was the FCC's explanation that the basic function of an ATDS was to dial without human intervention and its simultaneous refusal to confirm that an ATDS is not an ATDS unless it has the ability to dial without human intervention. *Id.* at 703 ("Those side-by-side propositions are difficult to square.").

The *ACA Int'l* opinion led to a divide among the courts concerning the correct interpretation of the statutory definition of ATDS. The Third Circuit was the first appellate court to offer additional analysis following the D.C. Circuit's opinion. *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018). Tracking the discussion in *ACA Int'l*, the Third Circuit held a device qualifies as an ATDS when it has "the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers." *Id.* at 121. In connection with these proclamations, the Third Circuit affirmed the lower court's grant of summary judgment in favor of defendant, finding plaintiff failed to present any "evidence that creates a genuine dispute

of fact as to whether [defendant's system] had the present capacity to . . . generat[e] random or sequential telephone numbers." *Id.*[4]

The circuit split was born a few months later when the Ninth Circuit issued its opinion in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1043 (9th Cir. 2018). Reviewing the statutory definition of ATDS anew, the *Marks* Court rejected the Third Circuit's opinion in *Dominguez* and held an "ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically." *Id.* at 1052. Accordingly, the Ninth Circuit clarified, an ATDS is "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers." *Id.*

On January 27, 2020, the Eleventh Circuit resolved two consolidated district court appeals involving unwanted calls that were purportedly made using ATDSs. *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301 (11th Cir. 2020). Determining where it stood among the split, the Eleventh Circuit held a device is not an ATDS if (1) it does not use randomly or sequentially generated numbers or (2) it requires human intervention. *Id.* at 1304-05.

On appeal, defendants asked the Court to interpret an ATDS as a device which "must (1) store telephone numbers using a random or sequential number generator and dial them or (2) produce such numbers using a random or sequential number generator and dial them." *Id.* at 1306. Plaintiffs, on the other hand, asked the Court to interpret an ATDS as a device that "must (1) store telephone numbers and dial them or (2) produce such numbers using a random or sequential

---

[4] The Second Circuit issued an opinion a few days later. *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018). In *King*, the Second Circuit stated it was persuaded by the reasoning in *ACA Int'l* that an interpretation of "capacity" to include a device's potential functionalities after modification "extends the statute too far." *Id.* Instead, the Second Circuit "agree[d] with the D.C. Circuit that the term 'capacity' is best understood to refer to the functions a device is currently able to perform." *Id.* The Second Circuit did not reach various other "complicated questions," such as whether dialing plaintiff's number from a list affected the analysis, instead it remanded the matter to the district court for further proceedings. *Id.* at 481-82.

7

number generator and dial them." *Id.* The difference is that under plaintiffs' reading, "the statute extends to phone calls that target a pre-existing list of prospects . . . even though they were not randomly or sequentially identified." *Id.*

After reviewing the statutory definition of ATDS in combination with conventional rules of grammar and punctuation, regulatory history, legislative history, context, and Constitutional avoidance principles, the Eleventh Circuit sided with defendants. *Id.* at 1306-11. Rejecting plaintiffs' interpretation and the Ninth Circuit's reasoning in *Marks*, the Eleventh Circuit held the clause "using a random or sequential number generator" modified both the terms "store" and "produce." *Id.* at 1306. Faced with the issue of what it means to "store" telephone numbers using a number generator, the Eleventh Circuit explained that "[s]omewhere between identification and production, storage" necessarily occurs. *Id.* at 1307. Faced next with the question of superfluity, the Court found reason in the regulatory record, context, and contemporaneous understanding. *Id.*

The Eleventh Circuit also looked to the legislative history of the TCPA, finding, at the time of enactment in 1991, "the be-all and end-all of the law" was to "eradicate machines that dialed randomly or sequentially generated numbers." *Id.* at 1311. It also shared the D.C. Circuit's concerns in *ACA Int'l* about interpreting "capacity" to mean "potential." *Id.* at 1309-10. The Court stated:

> In the age of smartphones, it's hard to think of a phone that does not have the capacity to automatically dial telephone numbers stored in a list, giving [the TCPA] an "eye-popping" sweep. Suddenly an unsolicited call using voice activated software (think Siri, Cortana, Alexa) or an automatic "I'm driving" text message could be a violation worth $500. Not everyone is a telemarketer, not even in America. One would not expect to find this exponential expansion of coverage in a law targeting auto-dialers and randomly generated numbers—an expansion by the way that would moot much of the Fair Debt Collection Act's application to telephone debt collection efforts.
>
> Constitutional avoidance principles also support our interpretation. Would the First Amendment really allow Congress to punish every unsolicited call to a cell phone?

> That is a G too far. And how could it be consistent with the First Amendment to make exceptions for calls with a specific content, such as the exception for calls about government debts?

*Id.* (internal citations omitted).

The Eleventh Circuit's holding that a device qualifies as an ATDS only if it uses a random or sequential number generator[5] resolved a large part of the consolidated appeals. One of the two appeals, taken from the Middle District of Florida and involving plaintiff Melanie Glasser (the "Glasser case"), was also affirmed for a second reason: the device there "required human intervention and thus was not an [ATDS] in the first place." *Id.* at 1312.

> The device in the Glasser case, called "Intelligent Mobile Connect," operated as follows.
>
> Each week, a Hilton marketing team creates a set of parameters about whom they want sales agents to contact. The team programs the system with these criteria, and the system selects customer records that fit the bill. The system then sends these numbers to Hilton employees who review the telephone numbers in a computer application. On their screens, the employees see a telephone number and button labeled "make call." Unless and until the employee presses this button, no call goes out. Once the button is pressed, the system dials the number and connects anyone who answers with a sales agent.

*Id.* Such a system, which "require[d] a human's involvement before it places any calls," obliged "far more from its human operators than just turning on the machine or initiating its functions." *Id.*

The Eleventh Circuit's conclusions in *Glasser* dictate the result here. Neither 212CRM nor Twilio qualify as an ATDS for the reasons that (1) neither had the capacity to randomly or sequentially generate numbers and (2) both require human intervention. The Court discusses both considerations below.

### A. Random or Sequential Number Generator

---

[5] Most recently, on February 19, 2020, the Seventh Circuit sided with the Third and Eleventh Circuits when it held that, to be an ATDS, a device must have the "capacity to generate random or sequential numbers." *Gadelhak v. AT&T Servs., Inc.*, __F.3d __, No. 19-1738, 2020 WL 808270, *8 (7th Cir. Feb. 19, 2020).

Defendants contend they are entitled to summary judgment because neither 212CRM nor Twilio qualify as an ATDS. Doc. 94 at pp. 13-15. Neither system is an ATDS, Defendants assert, because neither had the capacity to generate random or sequential numbers. Rather than generate phone numbers to be dialed, both 212CRM and Twilio utilized numbers provided from another source.

Plaintiff, who filed his response in this case before the Eleventh Circuit's opinion in *Glasser*, cites to *Marks* in support of his position that a telephone dialing system that dials from a prepared list of phone numbers rather than numbers it generates may still be an ATDS. Doc. 97 at p. 10. Given that *Glasser* rejected *Marks*, however, Plaintiff can no longer rely on this argument.

Plaintiff also argues that the Court should look to past FCC rulings, before 2015, to interpret the statutory definition of ATDS. According to Plaintiff, *ACA Int'l* only invalidated the 2015 FCC ruling, not previous FCC rulings. Citing a district court opinion issued before *Glasser*, Plaintiff argues the FCC's 2003, 2008, and 2012 rulings support Plaintiff's position that a device may be an ATDS regardless of whether numbers are randomly or sequentially generated or come from a prepared list, and that those rulings are binding on this Court. This argument, too, is invalid in light of *Glasser*. Reviewing a similar argument on appeal, the *Glasser* Court concluded the D.C. Circuit in *ACA Int'l* "wiped the slate clean." 948 F.3d at 1310.

Defendants cite to record evidence showing neither 212CRM nor Twilio can generate random or sequential numbers. Rather than create numbers to be dialed, 212CRM and Twilio use prepared lists of numbers provided by a user. SF at ¶¶ 2-3, 17; Pearson Decl. at ¶¶ 3-5, 7, 10. In this case, CyberX's president, Pearson, provided 212CRM and Twilio with the purchased phone numbers from FleetSeek contained in the spreadsheet. SF at ¶¶ 10-15. 212CRM processed and Twilio delivered messages to only those phone numbers uploaded by Pearson. *Id.*

Evidence that neither 212CRM nor Twilio can generate random or sequential numbers is provided in the parties' Statement of Material Undisputed Facts. For the most part, Plaintiff does not contest that neither 212CRM nor CyberX could generate random or sequential numbers. In a seemingly last ditch effort, however, Plaintiff alleges "212CRM generated the phone numbers for the text messages dispatched . . . from a FleetSeek database." Doc. 97 at p. 3. As an initial matter, Plaintiff's allegation is just that—an allegation. Plaintiff provides no record citation for his position that 212CRM had the ability to "generate" anything. In any event, though, Plaintiff's assertion makes no sense: in the same breath, Plaintiff alleges both that 212CRM "generated" phone numbers and that the phone numbers came from third party FleetSeek. But if the phone numbers came from a third party and text messages were only sent to those phone numbers, as the record evidence shows, 212CRM would not have generated phone numbers.

Defendants have identified undisputed record evidence showing that 212CRM and Twilio cannot generate random or sequential numbers. Viewing the evidence in a light most favorable to Plaintiff, Plaintiff has not designated specific facts creating a genuine issue of material fact. Because neither 212CRM nor Twilio have the capacity to generate random or sequential numbers, as a matter of law, neither is an ATDS. Therefore, Defendants are entitled to summary judgment.

### B. Human Intervention

Defendants are also entitled to summary judgment based on the second consideration discussed in *Glasser*—human intervention.

Defendants argue the amount of human intervention exercised by CyberX in sending the text messages through 212CRM and Twilio makes the two devices fall outside the definition of ATDS. Doc. 94 at p. 8. Defendants direct the Court to record evidence describing the steps CyberX's president, Pearson, took to have the messages sent through 212CRM and Twilio.

11

First, Pearson navigated to the CyberX application, 212CRM, and logged in. Doc. 94, Exh. A-3, Deposition of Pearson ("Pearson Depo.") at 96:12-96:21. Next, Pearson uploaded the spreadsheet containing purchased customer data (including phone numbers) to 212CRM. *Id.* at 22:5-22:6, 23:1-23:9; Pearson Decl. at ¶ 3. Next, Pearson reviewed the uploaded spreadsheet, checking for errors and manually aligning the data columns. Pearson Depo. at 22:2-22:11, 24:20-24:23; Pearson Decl. at ¶ 4. After managing the data in 212CRM, Pearson then typed the content of the message to be sent. Pearson Depo. at 26:18-26:22, 32:25-33:5; Pearson Decl. at ¶ 5. Pearson then set a sending interval, communicating to 212CRM how many messages to send in a certain period of time. Pearson Decl. at ¶ 6. Lastly, Pearson pointed and clicked on a "send" button to begin the process of immediately communicating instructions to Twilio to send the chosen message to the uploaded phone numbers. Pearson Depo. at 62:19-62:24; Pearson Decl. at ¶¶ 6-7.

Plaintiff does not dispute that Pearson took these actions to initiate the sending of text messages. Rather, Plaintiff focuses on the fact that (1) Pearson's actions were all taken before the devices dialed and (2) Pearson typed only one message to be sent to thousands of phone numbers, rather than creating separate messages for each phone number. Doc. 97 at pp. 6-7. These facts, Plaintiff contends, show the amount of human intervention required was not so extensive after all.

Plaintiff's emphasis on the fact that instances of human intervention occurred before the devices dialed is not persuasive. In *Glasser*, too, all instances of human intervention occurred before dialing. 948 F.3d at 1312. That a device, instead of a human, does the dialing itself is not determinative; the question is how much action a human must take to initiate the device's features.

Concerning his second argument, Plaintiff contends a device is not an ATDS only if a separate act of human intervention is required for each individual call. Doc. 97 at p. 7. Thus, Plaintiff argues, Pearson's actions of typing a single message and hitting "send" once to initiate

the dialing and sending of messages to thousands of numbers does not disqualify the devices from being ATDSs.

This argument is undercut by *Glasser* as well. In *Glasser*, the Eleventh Circuit acknowledged that not all forms of human intervention would negate the prospect of a device qualifying as an ATDS. *See* 948 F.3d at 1312. But, like in *Glasser*, the devices at issue here "demand[] far more from its human operators than just 'turning on the machine or initiating its functions.'" *Id.* (distinguishing *Marks*, 904 F.3d at 1052-53).

Plaintiff's argument is further diminished by at least one district court opinion which discussed a device similar to Defendants'. *Herrick v. GoDaddy.com LLC*, 312 F. Supp. 3d 792, 793 (D. Ariz. 2018). In *Herrick*, defendant contracted with a web-based software application company called 3Seventy, Inc. ("3Seventy") to send a marketing text message to nearly 100,000 of defendant's customers. *Id.* To send the messages, defendant logged on to the 3Seventy platform, provided 3Seventy with a list of customer phone numbers, selected which numbers to send a text message to, typed in the desired content, and selected a time and date for the messages to be sent. *Id.* On the specified date and time, 3Seventy sent the messages. *Id.* at 793-94.

The District of Arizona held that the 3Seventy device was not an ATDS because (1) it dialed from a prepared list and did not have the capacity to generate random or sequential numbers and (2) it did not have the capacity to dial without human intervention. *Id.* at 800.[6] With respect to the second holding, the Court found the amount of human intervention to use 3Seventy— transmitting numbers, logging in, creating a message, and scheduling a time and date to send—

---

[6] *Herrick*, decided after *ACA Int'l* but before *Marks*, is at odds with *Marks*. In its previous Order denying Defendants' motion for summary judgment as premature, this Court noted it was unclear whether *Herrick* was still good law in the Ninth Circuit in light of *Marks*. But whether *Herrick* is still good law in the Ninth Circuit is no longer of concern to this Court given the Eleventh Circuit's recent decided split from the Ninth Circuit on the issue of what constitutes an ATDS. The *Herrick* Court's reasoning is similar to some of the reasoning used in the *Glasser* decision. Because *Herrick* is consistent with the law in this Circuit, the Court finds the decision persuasive.

was "essential." *Id.* at 803. The fact that only one message was created and sent to thousands of customers seemingly made no difference. *See id.*

As in *Herrick*, here, Pearson took a variety of actions before 212CRM and Twilio were able to dial the phone numbers and send the selected message. Plaintiff quarrels with the accuracy of some of the specific, non-relevant details—for example, exactly how many messages Pearson scheduled to have sent in a certain amount of time. Doc. 97 at pp. 5-6. But the numerous actions Pearson took to initiate dialing—uploading a list of phone numbers, reviewing the content of the data, logging in, typing a message, setting an interval, and clicking "send"—is undisputed. The amount of human intervention required to send the text messages at issue in this case excludes both 212CRM and Twilio from qualifying as an ATDS.

## IV.    CONCLUSION

*Glasser* assuages the confusion about where the Eleventh Circuit stands on the question of what constitutes an ATDS following the D.C. Circuit's invalidation of the FCC's rulings on the topic. And *Glasser* dictates the result here. Neither 212CRM nor Twilio qualify as an ATDS as a matter of law because (1) neither had the capacity to randomly or sequentially generate numbers and (2) both require human intervention. Because the text messages at issue in this case were not sent with an ATDS, Defendants are entitled to summary judgment in their favor.[7]

**Accordingly, it is ORDERED**:

1. Defendants' Motion for Summary Judgment (Doc. 94) is **GRANTED.**

2. The Clerk is directed to enter judgment in favor of Defendants, Innovative Health Insurance Partners, LLC, CyberX Group, LLC, David E. Lindsey, and Independent Truckers

---

[7] Defendants also filed a third motion for summary judgment. Doc. 110. However, because this Motion for Summary Judgment, Defendants' second, resolves the case in Defendants' favor, the Court need not reach Defendants' alternative arguments in the third motion for summary judgment.

Group, Inc., and against Plaintiff, John Northrup. The Clerk is further directed to terminate any pending motions and to close this case.

**DONE AND ORDERED** in Tampa, Florida on February 25, 2020.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any